IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                No. CR 10-117 BDB

JEFF M. HENDERSON and
WILLIAM A. YELTON,

      Defendants.

**COURT'S FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
MOTION TO DISMISS INDICTMENT**

**THIS MATTER** came before the Court on the *Motion* of Defendants Henderson and Yelton *to Dismiss Indictment for Prosecutorial Misconduct* (doc. 41), and the response of the United States (the "Government") Seeking Sanctions Against Counsel for Henderson and Yelton (doc. 55). The Court held hearings and received testimony on September 22-24, and submissions of counsel in November 2010, and now enters its findings of fact and conclusions of law as follows:

*Findings of Fact*

1.     The indictment is based on the work of Defendants when they served as officers of the Tulsa Police Department ("TPD").

2. **The indictment names several state prosecutions which are alleged to have resulted from unconstitutional actions by one or both Defendants.**

3. **Defendants interacted with scores of other officers on arrests which are now alleged to be fraudulent and illegal.**

4. **Prior to August 3, 2010, Special Investigation Division ("SID") officers of the TPD were providing assistance to Defendants Henderson and Yelton by attempting to investigate Government witnesses in an effort to discredit those witnesses. For example, after it became publicly known that Rochelle Martin was cooperating in this federal investigation, TPD Deputy Chief McCrory instructed Corporal Watkins to make it a priority to retrieve TPD reports regarding Rochelle Martin's work as an informant for TPD with the goal of discrediting her as a Government witness.**

5. **On May 24, 2010, Deputy Chief McCrory and TPD Captain Hondros attended an in-person meeting with the United States Attorney for the Eastern District of Arkansas, Jane Duke (the "Prosecutor"), Special Assistant United States Attorney Pat Harris, Special Assistant United States Attorney Patricia Harris, Tulsa City Attorney Gerald Bender, and an FBI agent.**

6. **At the May 24 meeting, there were discussions about the arrest of potential Government witnesses including Teresa Sheppard and the efforts of TPD officers to discredit Rochelle Martin. Indeed, at the May 24 meeting, there was a**

2

**discussion in which the Prosecutor asked Captain Hondros if he was aware of the ramifications of interfering with a federal investigation, but no one threatened to file obstruction of justice charges.**

7. **During the May 24, 2010, meeting, no threats were made to Deputy Chief McCrory or any other TPD officer.**

8. **Deputy Chief McCrory has not spoken to the Prosecutor or either of her Special Attorneys since the May 24, 2010, meeting.**

9. **Deputy Chief McCrory testified that he does not think it is appropriate for defense attorneys to call him and suggest that TPD investigate Government witnesses.**

10. **Deputy Chief McCrory testified that he does not want his subordinate officers to have direct contact with Henderson and Yelton's defense counsel.**

11. **It has been widely rumored in the TPD that the Prosecutor was "just itching to indict more officers" but no one could testify to ever hearing such a statement from anyone representing the Prosecution.**

12. **On or about July 28, 2010, Detective Griffin and four other TPD officers went to pick up Teresa Sheppard on a misdemeanor warrant and interview her concerning her association with Government witness Rochelle Martin.**

13. **Officer Blair left a note for Henderson's defense team regarding additional TPD actions relative to Rochelle Martin and her credibility, and a redacted version of this note was introduced into evidence by the defense.**

14. **During the re-cross examination of Officer Blair, the United States introduced into evidence an unredacted copy of the note referred to above, which included officer Blair's comments to the defense team that "Major Dagleish and Deputy Chief McCrory were very adamant not to turn the information about [the informant discrediting Rochelle Martin] over to the FBI or to the U.S. Attorneys."**

15. **Officer Blair has not been directly or indirectly threatened by any member of the prosecution team, but testified that he has an unspecified "belief that a threat does exist."**

16. **On July 28, 2010, Interim Chief of the Tulsa Police Department Chuck Jordan requested a meeting with the Prosecutor and Special Attorneys to discuss which TPD officers were still under investigation and whether TPD could conduct administrative investigations of those officers.**

17. **On August 3, 2010, Chief Jordan issued a Memo ("the Memo") to all of his personnel prohibiting them from having "communications of any kind with anyone other than Federal Law Enforcement Officers or Prosecutors regarding any aspect of the current federal criminal investigation of current or former**

**Tulsa Police officers." This Memo was not issued at the directive of the Prosecutor, Special Attorneys or any agent of the federal Government.**

18. **Chief Jordan issued the August 3, 2010, Memo of his own volition in order to prevent TPD officers from doing something that "would get them in trouble."**

19. **Federal officials did not ask the TPD to cease conducting investigations of Government witnesses.**

20. **Captain Hondros recalled a telephone conference with members of the prosecution team wherein it was specifically stated that it would be "business as usual" if TPD should discover information that any Government witnesses in this case were committing crimes. He also recalled being advised by someone in Chief Jordan's office that if appropriate subpoenas were served on the City of Tulsa by the Defendants' counsel, such counsel should be provided appropriate documents.**

21. **Chief Jordan will consider any request from Henderson and Yelton's defense attorneys to have contact with TPD personnel on a case-by-case basis.**

22. **After TPD Officer David Foust's grand jury testimony in the related <u>Wells</u> case, he was told by Special Assistant United States Attorney Pat Harris that Officer Foust's grand jury testimony was untruthful and that when he remembered things differently, he could come back to the grand jury and tell the truth.**

**23.** **When he returned to the TPD, Officer Foust was told that he was under investigation by the grand jury and placed on a desk in restrictive duty and not allowed to carry a gun or badge until he was cleared six weeks later. Attorney Harris was apparently incorrect about what statements Officer Foust heard at the Pancake House, and his statements to Officer Foust as he exited the grand jury were based on this faulty understanding.**

**24.** **In filing their Motion to Dismiss, counsel for Defendants relied on rumors within TPD that the Prosecution team was threatening and intimidating TPD officers who cooperated with defense counsel. They also quoted second- and third-hand hearsay, some of which was inflammatory and factually inaccurate, in their supporting briefs.**

*Conclusions of Law*

**1.** **The standard for determining prosecutorial misconduct is "the narrow one of due process," based on a showing that a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).**

**2.** **Dismissal of an indictment on the basis of law enforcement officials' pre-indictment conduct is appropriate only when such conduct "is outrageous enough to shock the conscience of the court." *United States v. Thompson*, 518**

**F.3d 832, 861 (10th Cir. 2008) (quoting *Rochin v. California*, 342 U.S. 165, 172-72 (1954)); *see also United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000) ("Misconduct by law enforcement officials in collecting incriminating evidence may rise to the level of a due process violation when the misconduct is outrageous enough to shock the conscience of the court.").**

3. **Witnesses belong to neither prosecutor nor defense counsel and both sides have a right to interview witnesses before trial. *United States v. Carrigan*, 804 F.2d 599, 603 (10th Cir. 1986). However, a witness in a criminal case has a right to refuse to be interviewed and a defendant's rights are not violated when a witness decides not to talk to his counsel. *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985); *United States v. Fred*, 2006 WL 4079619 (D.N.M.).**

4. **No one representing the Prosecutor instructed or legally prohibited TPD officers from talking to Defendants or their counsel or providing appropriate evidence to them.**

5. **While it may have been otherwise had Government attorneys actually had any involvement, Chief Jordan was not prohibited as an employer from requesting his employees not to talk to counsel without his express permission. *Workman v. Bell*, 178 F.3d 759, 772 (6th Cir. 1998); G. Hazard, W. Hodes & P. Jarvis, LAW OF LAWYERING § 30.12 (3d Ed. 2001).**

6. **The comment of Assistant United States Attorney Pat Harris to Officer Foust outside the grand jury, while not condoned by this Court, did not constitute a violation of the legal or constitutional rights of Defendants.** *Siripongs v. Calderon*, **35 F.3d 1308, 1319 (9th Cir. 1994).**

7. **While the Court cannot condone the hyperbole and failure to thoroughly investigate some of their allegations, defense counsel's conduct does not merit legal sanctions.** *CTC Imports & Exports v. Nigerian Petroleum Corp.*, **951 F.2d 573, 578 (3d Cir. 1991).**

**An order denying Defendants' motion to dismiss the indictment for prosecutorial misconduct as well as the Government's motion for sanctions shall follow.**

_____
**BRUCE D. BLACK**
**Chief Judge**
**Sitting by Designation**