```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4  UNITED STATES OF AMERICA,  )
                               )
 5                             )
                               )
 6             Plaintiff,  )
                               )
 7  vs.                        )         CASE NO. 10-CR-117-BDB
                               )
 8                             )
    JEFF M. HENDERSON,         )
 9  WILLIAM A. YELTON,         )
                               )
10             Defendants. )

11

12

13

                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
14                          AUGUST 8, 2011
           BEFORE THE HONORABLE BRUCE BLACK, DISTRICT JUDGE
15                           VOLUME VI

16

    APPEARANCES:
17

18

    For the Plaintiff:            MR. PATRICK HARRIS
19                                MS. JANE DUKE
                                  MS. PATRICIA HARRIS
20                                U.S. Attorney's Office
                                  P.O. Box 1229
21                                Little Rock, AR  72203

22  For Defendant Henderson:     MR. STEPHEN JONES
                                  Jones Otjen Davis Nixon &
23                                Gungall
                                  114 E. Broadway, Ste 1100
24                                Enid, OK  73702

25
```

U.S. District Court
Northern District of Oklahoma

```
 1   APPEARANCES CONTINUED:

 2
                                MR. ROBERT WYATT, IV
 3                              Wyatt Law Office
                                501 N. Walker Ave., Ste 110
 4                              Oklahoma City, OK  73101

 5                              MS. NICOLE BABBITT
                                Babbitt Law Firm
 6                              13410 Preston Road
                                C-750
 7                              Dallas, TX 75240

 8
     For Defendant Yelton:      MR. ANTHONY ALLEN
 9                              MR. SCOTT GRAHAM
                                Graham Allen & Brown PC
10                              427 S. Boston Ave., Ste 355
                                Tulsa, OK  74103
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. District Court
Northern District of Oklahoma

```
 1                        INDEX

 2  WITNESSES ON BEHALF OF THE UNITED STATES        PAGE

 3  RYAN LOGSDON

 4       Direct Examination by Mr. Harris          1132
         Cross-Examination by Mr. Wyatt            1182
 5       Cross-Examination by Mr. Allen            1277
         Redirect Examination by Mr. Harris        1288
 6       Recross-Examination by Mr. Wyatt          1305

 7  KELIE BARNES

 8       Direct Examination by Ms. Harris          1308
         Cross-Examination by Mr. Wyatt            1322
 9       Cross-Examination by Mr. Allen            1327

10  ASHLEY BALOCCA

11       Direct Examination by Ms. Harris          1329
         Cross-Examination by Mr. Wyatt            1335
12
    JAMES FUE
13
         Direct Examination by Ms. Duke           1336
14       Cross-Examination by Mr. Wyatt            1349
         Redirect Examination by Ms. Duke          1362
15
    JAN REINCKE
16
         Direct Examination by Ms. Harris          1364
17       Cross-Examination by Mr. Wyatt            1396
         Cross-Examination by Mr. Allen            1410
18       Redirect Examination by Ms. Harris        1416

19

20

21

22

23

24

25
```

U.S. District Court
Northern District of Oklahoma

```
 1                        PROCEEDINGS
 2   AUGUST 8, 2011:
 3      (The following proceedings were had outside the presence of
 4   the jury.)
 5           THE COURT:  As I recall, on Friday when we left off,
 6   we'd just finished reading some trial testimony.  The
 7   defendants indicated they may wish to have additional testimony
 8   read from that transcript.
 9           MR. WYATT:  Yes, Your Honor, and because Mr. Raley
10   could not be present, we've agreed that Mr. Graham will sit in
11   in his place and do the reading on the other side.
12           MR. GRAHAM:  I drew the short straw.
13           THE COURT:  Are we ready for the jury?
14           MR. WYATT:  Yes, Your Honor.
15      (The following proceedings were had within the presence and
16   hearing of the jury.)
17           THE COURT:  When we left on Friday, I believe we were
18   reading testimony from the Haley trial, and the defense wishes
19   to add some additional testimony.
20           Welcome back, ladies and gentlemen, to week two.
21           Mr. Graham, I guess, will be Mr. Haley, since he's no
22   longer available.
23           MR. WYATT:  Your Honor, I believe this was testimony
24   from the Barnes trial.
25           THE COURT:  The Barnes trial, excuse me.  I'm sorry.
```

U.S. District Court
Northern District of Oklahoma

```
 1          MR. WYATT:  And for the jury's sake, Mr. Graham is

 2  filling in today because Mr. Raley could not be here this

 3  morning, so he'll be reading the transcript.

 4      You agree with that, she doesn't need to transcribe it?

 5          MR. HARRIS:  That's correct.

 6          MR. WYATT:  For purposes of the record, we will be

 7  reading from the transcript of jury trial proceedings United

 8  States of America v. Larry Wayne Barnes, Sr. and Larita Annette

 9  Barnes, Case No. 07-CR-135-CVE, which was taken during the week

10  of April 21, 2008.

11          There were a few pages skipped in Mr. Henderson's

12  testimony, so we're going to start very briefly at page 39,

13  line 15.  Mr. Graham, if you would read the questions, I'll be

14  glad to read the answers as Mr. Henderson.  You will be the

15  prosecutor, Mr. Raley, for purposes of this testimony.

16          (Whereupon testimony of Jeff Henderson was read to the

17  jury and the reporting was waived by all parties.)

18          MR. HARRIS:  Your Honor, we've already read this

19  through to page 79.

20          THE COURT:  All right.

21          MR. WYATT:  I won't dispute that, Your Honor, it was

22  just those two pages.

23          THE COURT:  All right.

24          (Whereupon the testimony was read to the jury.)

25          MR. HARRIS:  Your Honor.
```

U.S. District Court
Northern District of Oklahoma

```
 1              THE COURT:  Mr. Harris.
 2              MR. HARRIS:  I would prefer to put Mr. Logsdon on, and
 3  if they want to read this, we'll read that rather than do it
 4  now.
 5              THE COURT:  Makes sense.
 6              MR. WYATT:  I would prefer to read it to the jury
 7  because I'll have questions for Mr. Logsdon about this, and I
 8  don't know in what order they intend to do that.
 9              THE COURT:  Why don't you read the questions right
10  before you question Mr. Logsdon about it.  I think that would
11  make more sense.
12              MR. WYATT:  Very well, Your Honor.
13              THE COURT:  So you're done with the trial?
14              MR. WYATT:  We are, Your Honor, with the transcript.
15              THE COURT:  Thank you, Mr. Graham.
16              Mr. Harris, you may call your next witness.
17              MR. HARRIS:  I'll call Ryan Logsdon.
18              May I approach and remove the book?
19              THE COURT:  Yes, sir, you may.
20                              RYAN LOGSDON,
21  having been first duly sworn, was called as a witness and
22  testified as follows:
23                           DIRECT EXAMINATION
24  BY MR. HARRIS:
25  Q.  Would you state your name, please, sir.
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1133

```
 1   A.  Ryan Logsdon.
 2   Q.  Mr. Logsdon, would you pull that microphone closer to you
 3   so you don't have to lean up.  How old are you, Mr. Logsdon?
 4   A.  38.
 5   Q.  Do you live here in Tulsa?
 6   A.  Yes.
 7   Q.  Do you have any prior convictions?
 8   A.  Yes.
 9   Q.  What do you have prior convictions for?
10   A.  Drugs.
11   Q.  Drugs?
12   A.  Drugs, yes.
13   Q.  And when you used to sell drugs, what did you start out
14   selling?
15   A.  Marijuana and meth.
16   Q.  And you got busted and started cooperating with police; am
17   I correct?
18   A.  Yes.
19        MR. HARRIS:  Mary Anne, would you put up Exhibit 6 for
20   me.
21   Q.  (By Mr. Harris) Mr. Logsdon, it's going to be Exhibit 6 in
22   front of you, and this is the Tulsa Police Department Special
23   Investigations Division confidential informant background
24   information, and it's dated 9/18 of '97, and it has Ryan Martin
25   Logsdon.  Is that you?
```

1  A.  Yes.

2  Q.  It gives you a CI number of 95-08-06.  Do you see that in

3  the right-hand corner?  See that number in the right-hand

4  corner, 95-08-06?

5  A.  Yeah.

6  Q.  I was going to touch this, but touch screens don't work.

7  A.  All right.

8  Q.  And at the time --

9      MR. HARRIS:  If you'll go down to the bottom of the

10  page, Mary Anne.

11  Q.  (By Mr. Harris) At the time, the officer who was working

12  with you was Wilcoxen; do you remember that?

13  A.  Yes, I remember him.

14  Q.  What happened?  Did you get busted and then you started

15  cooperating?

16  A.  Yes, that's what happened.  Yes.

17  Q.  Did you end up going to prison?

18  A.  Yes, I did.

19      MR. HARRIS:  If you'll switch to page 2.

20  Q.  (By Mr. Harris) So page 2 is a cooperating individual

21  agreement.  If you'll notice at the bottom, it has a date of 18

22  September '97.  Is that your signature?

23  A.  Yes, it is.

24  Q.  And the officer was Wilcoxen?

25  A.  Right.

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1135

1   Q.  So back in '97, what did you do for Officer Wilcoxen?

2   A.  I gave him a few individuals, to lessen my sentence.

3          MR. HARRIS:  If you'll go to page 3, Mary Anne.

4   Q.  (By Mr. Harris) Now, that shows a date of 04/12/97,

5   somebody involving Jimmy Green?

6   A.  Yes.

7   Q.  These are Tulsa Police Department records.

8   A.  Yes.

9   Q.  The next page, same year, Mario Valdovinos.

10  A.  Yes.

11  Q.  Another person, Jamil something, Cerane or Cervane?

12  A.  Factor.

13  Q.  Beg your pardon?

14  A.  Jamil Factor.

15         MR. HARRIS:  Switch over two pages.

16  Q.  (By Mr. Harris) You also must have worked for an officer

17  named Claramunt.

18  A.  Yes.

19  Q.  Back in '95?

20  A.  Chris Claramunt, yeah.

21         MR. HARRIS:  If you'll go over two more pages.

22  Q.  (By Mr. Harris) And then in 19- -- I'm sorry, in 2007, do

23  you remember a search warrant at your house?

24  A.  2007?

25  Q.  Uh-huh.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                                    1136

```
 1   A.   Yes.

 2   Q.   What year -- I mean what month?

 3   A.   January, end of January.

 4   Q.   Around the 23rd?

 5   A.   Yeah.

 6   Q.   Tell me what you remember about that search warrant.

 7   A.   I remember leaving the house around noon, one o'clock, and

 8   getting pulled over by Officer Henderson.

 9   Q.   You motioned this way.  Do you know Officer Henderson?

10   A.   Yes, I know him.

11   Q.   Do you see him here today?

12   A.   Yes, I see him there.

13   Q.   What's he wearing?

14   A.   He's wearing a black suit.

15   Q.   What color shirt?

16   A.   I can't see.  That screen is in the way right there.  Blue.

17   Q.   He's sitting next to the gentleman in the white linen suit?

18   A.   Mr. Jones, yeah.

19   Q.   You know Mr. Jones?

20   A.   From the papers.

21   Q.   Okay.  And tell me what happened on January 23rd, 2007.

22   A.   I got pulled over leaving the house.  Mr. Henderson stopped

23   me in his maroon Impala, I believe, and he said, "Logsdon, I

24   got a warrant for your house."  I said, "Oh, you do?"  He goes,

25   "Yeah, let's go back to the house."
```

```
 1    Q.  Was he by himself?

 2    A.  No, he wasn't by himself.  He was with two other men.

 3    Q.  Did you know them?

 4    A.  No, I didn't know them.  Didn't know Henderson at that time

 5    either.

 6    Q.  Did you eventually find out the other two guys' names?

 7    A.  Yes, I did.

 8    Q.  Who were they?

 9    A.  Brandon McFadden and Frank Khalil.

10    Q.  Now, when they went back to your house, did they have a

11    search warrant?

12    A.  Well, he handed it to me when he pulled me over.

13    Q.  Uh-huh.

14    A.  He handed the search warrant to me, and I read it.

15    Q.  And what happened when they went back to your house?

16    A.  Went back to the house.  They handcuffed me, of course,

17    took me back to the house.  Actually, before we went to the

18    house, Henderson got my girlfriend out of the car and searched

19    her.  And then they -- we went back to the --

20    Q.  They showed you the search warrant eventually?

21    A.  Yes.

22    Q.  Did you --

23    A.  Well, they showed me the search warrant on the traffic

24    stop.

25    Q.  Yeah.
```

```
 1   A.  Uh-huh.

 2   Q.  So they went back to your house, and they had a search

 3   warrant; right?

 4   A.  Right.

 5   Q.  And did they search your house?

 6   A.  Searched my house for about three hours, three, four hours.

 7   Q.  We'll come back to this in a second, but let me put up

 8   Exhibit 11-e.  Do you recognize that?

 9   A.  Yeah, that's my house.

10   Q.  On Peoria?

11   A.  Yes.

12   Q.  So they went back to your house and they searched, and what

13   did they find?

14   A.  Nothing.

15   Q.  And who all was there during the search?

16   A.  Frank Khalil, Brandon McFadden and Jeff Henderson, just

17   them three.

18   Q.  What about your girlfriend?

19   A.  She was there and my three-year-old son.

20   Q.  And where were you all during all this?

21   A.  We sat in the living room on the couch.

22   Q.  While they did the search?

23   A.  While they did the search, yeah.

24   Q.  What happened after they didn't find anything?

25   A.  Well, they didn't find anything, so Officer Henderson and
```

```
 1   Brandon McFadden -- as you see, there's a garage that's
 2   detached from my house.
 3   Q.  Where is the garage?
 4   A.  It's behind the house.
 5   Q.  The white building?
 6   A.  White building in the back there.  That's a detached
 7   garage.  Henderson and McFadden went out to my garage, and they
 8   was out there five, ten minutes, and they came right back in
 9   the house.  Well, Henderson did.  Told Frank Khalil he needed
10   to talk to me.  So Frank Khalil stayed in the house with my
11   girlfriend and my son, and I went out back with Henderson.
12   Q.  What happened when you got out to the garage?
13   A.  He showed me two bags of marijuana that was in my toolbox.
14   Q.  Were you selling marijuana at the time?
15   A.  Not at that time, I wasn't.
16   Q.  Were you smoking it?
17   A.  No.
18   Q.  So what happened?
19   A.  We got into a big argument.
20   Q.  What kind of big argument did you get into?
21   A.  I told him, I said, "You brought that with you."
22   Q.  What did he say?
23   A.  He said, "No, I didn't."  And we argued and we argued, and
24   I kept telling him, "You brought that with you."
25   Q.  Okay.  How do you know that wasn't your dope?
```

1   A.  Wasn't selling marijuana at that time.

2   Q.  What were you selling?

3   A.  Meth.

4   Q.  Were you selling cocaine?

5   A.  No, no cocaine either.

6   Q.  The reason I asked is Exhibit 11-a is the affidavit for the

7   search warrant --

8   A.  Right.

9   Q.  -- and it talks about there was an -- Mr. Henderson said he

10  had a RCI who, in the past 72 hours, saw you selling cocaine.

11  Were you a cocaine seller then?

12  A.  No, I was not.

13  Q.  What did you sell?

14  A.  Meth.

15  Q.  How long had you been selling meth?

16  A.  I've been selling meth off and on for about the last 15

17  years.

18  Q.  In fact, did you have some meth at your house that night?

19  A.  Oh, yeah, I had meth there.  They just didn't find it.

20  Q.  So what happens after he says, I got this marijuana, and

21  all that kind of stuff?

22  A.  He asked me, "Where are you getting your marijuana from?"

23  And I said, "You."

24  Q.  You said, "You"?

25  A.  Yeah.  I said, "You're the one that brought it."

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1141

1   Q.   What did he say?

2   A.   He goes, "Now, you're saying I plant drugs?"  I said,

3   "Hell, yeah, you do."

4   Q.   So what happened?

5   A.   He said, "Well, here's the deal.  You're going to jail, and

6   we're taking your kid, DHS custody, if you don't tell us where

7   you're getting your marijuana."  I said, "Oh, really?"  And I

8   thought about it for a minute, and I said, "Well, I'll show you

9   my dope, but that dope right there, you brought."  I said, "But

10  before I show you where my dope is at, I want my child and my

11  girlfriend out of here now."  And he did that.

12  Q.   So your girlfriend and your three-year-old left?

13  A.   Yes.

14  Q.   So it's just you, Officer Henderson, Agent McFadden and

15  Officer Khalil after they --

16  A.   Uh-huh.

17  Q.   And so after they left, what happened?

18  A.   He took my handcuffs off me.  I walked down my hallway.

19  They stood and watched.  And I had a hole up in my wall in

20  between the ceiling and attic, and I had two pounds of

21  methamphetamine stashed in there.

22  Q.   You mean just in the hallway?

23  A.   In a hallway closet at the end of my hall.

24  Q.   So you reached up there, and how much dope did you have?

25  A.   Two pounds of meth.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1142

1   Q.   So you brought it down?

2   A.   Brought it down.

3   Q.   What did you do?

4   A.   Threw it on the kitchen table, and I said, "That's the dope

5   you're looking for right there.  That marijuana is not mine."

6   Q.   How much dope was that?  I mean, how much did the dope cost

7   you?

8   A.   That there?

9   Q.   Yeah.

10  A.   I paid about --

11  Q.   What's a pound cost you?

12  A.   Back then, it was 15,000.

13  Q.   Okay.  So you threw down the meth?

14  A.   Yes.

15  Q.   Then what happened?

16  A.   He reached over and picked the marijuana up and put it in

17  his coat pocket.  He goes, "Where are you getting this meth

18  at?"  I said, "I can give you my supply on the meth, but I

19  can't give you no supplier on the weed because I'm not selling

20  weed."  Then we began to talk about my supplier.

21  Q.   Was anything else found at your house?

22  A.   Yes.

23  Q.   What?

24  A.   $60,000 cash.

25  Q.   Where was the cash?

RYAN LOGSDON - DIRECT (By Mr. Harris)                        1143

1   A.  It was in the garage, in the attic, up in the insulation.

2   Q.  How did they find that?

3   A.  I showed them where it was at.

4   Q.  Why did you do that?

5   A.  Because I wanted to get everything out on the table and be

6   straight-up honest with these guys.

7   Q.  So what did you, go out to the garage?

8   A.  Yeah.  Officer Henderson climbed up on my washer.  I told

9   him where to go.  And he reached up in there and he pulled --

10  it was a Wal-Mart sack, it had 60,000 in it.

11  Q.  Where did you get that money from?

12  A.  Selling dope.

13  Q.  A lot of money?

14  A.  Yeah.

15  Q.  What had you been doing, saving your money?

16  A.  Yeah, I'd been saving it.

17  Q.  You must have been a good drug seller.

18  A.  No, just saving my money.

19  Q.  Did you ever sell drugs to a lady named Rochelle Martin?

20  A.  No.

21  Q.  It's a black female?

22  A.  Yeah.

23  Q.  You know who I'm talking about?

24  A.  Yeah.

25  Q.  How do you know who I'm talking about?

RYAN LOGSDON - DIRECT (By Mr. Harris)                1144

1    A.   I met Rochelle Martin through Jeff Henderson.

2    Q.   You mean before he searched your house?

3    A.   No.  After he searched my house, months later.

4    Q.   When he searched your house, had you ever met Rochelle

5    Martin?

6    A.   Before he searched the house?

7    Q.   Uh-huh.

8    A.   No.

9    Q.   Had you ever dealt with her?

10   A.   No.

11   Q.   How about a guy named Matt Douglas, do you know him?

12   A.   No.

13   Q.   Did you ever deal with him?

14   A.   No.

15   Q.   Now, so you gave him the money and you gave him the cocaine

16   -- I mean you gave him the meth.  And so what happened?

17   A.   He then had me place a call to my supplier, and I set my

18   supplier up that night.

19   Q.   Who was your supplier?

20   A.   Avery Brewer.

21   Q.   What happened with Avery Brewer?

22   A.   He got arrested and went to federal prison.

23   Q.   Where did he get arrested at?

24   A.   At my house.

25   Q.   How did you get him over to your house?

RYAN LOGSDON - DIRECT (By Mr. Harris)                              1145

1    A.  I made a phone call to him to bring a pound of meth over,

2    and they arrested him when he pulled in the driveway.

3    Q.  So he pulled in the driveway of your house bringing you a

4    pound of meth?

5    A.  Yes.

6    Q.  And the cops arrested him; is that right?

7    A.  Yeah.

8    Q.  And so did you get hauled off to jail that night?

9    A.  No.

10   Q.  Why not?

11   A.  Because I gave up my supplier.

12   Q.  Did you get to keep your dope?

13   A.  No.

14   Q.  Did you get to keep your cash?

15   A.  No.

16   Q.  But you got to stay home?

17   A.  Got to stay home.

18   Q.  So after this, did you have any more conversations with

19   Mr. Henderson or Mr. Khalil or Mr. McFadden about doing stuff

20   for them?

21   A.  Yeah.  We talked a few days later.  They wanted me to bring

22   them some more suppliers.

23   Q.  Okay.  In front of you here, this is still part of

24   Exhibit 6, your RCI file with the Tulsa Police Department.

25   Shows a confidential informant background information, dated

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1146

1   2/5/07.  Do you see that in the top left hand?

2   A.  Yes, I do.

3         MR. HARRIS:  Go down do the bottom, Mary Anne.

4   Q.  (By Mr. Harris) And it shows that the officers are

5   F. Khalil and J. Henderson.

6   A.  Okay.

7   Q.  Okay.  So if you go to the next page.  Next page, I think,

8   is going to be an individual agreement, cooperating individual

9   agreement.  See that?

10  A.  Yes.

11        MR. HARRIS:  Go down to the bottom, Mary Anne.

12  Q.  (By Mr. Harris) Your signature down there of February 5th,

13  I think?  Do you see that?

14  A.  Yes.

15  Q.  Okay.  And the officers are Khalil and Henderson again; am

16  I right?

17  A.  Right.

18  Q.  So you started being a cooperator again, didn't you?

19  A.  Yes, I did.

20  Q.  And did you help them do some people?

21  A.  Yes, I did.

22  Q.  Avery Brewer?

23  A.  Avery Brewer, started out with him.

24  Q.  A guy named Dennis Martin --

25  A.  Yes, I did.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1147

```
 1   Q.   -- in March?

 2   A.   Yes.

 3   Q.   David Jones in March?

 4   A.   Yes.

 5   Q.   Remember that?

 6   A.   Yep.

 7   Q.   So why were you doing this?

 8   A.   So I wouldn't have charges brought against me and I

 9   wouldn't lose my child.

10   Q.   Now, there was also a guy name Luis Gonzalez, wasn't there?

11   A.   Yes.

12   Q.   Was that a controlled buy?

13   A.   Controlled buy, yes.

14   Q.   Tell us what happened on that.  That was in February or

15   March.

16   A.   I believe that was in March of '07.  March, April area of

17   '07.

18   Q.   Let me look at this, this Exhibit 6.  February 6, '09.

19   A.   That's when the buy was done?

20   Q.   Okay.  Tell me about that.

21   A.   What I would do with Luis is -- I met him through a guy I

22   know.  And I did a few deals with him, bought some meth from

23   him.  Done one deal with him, went back and done another deal

24   with him.  And on a third deal, I snuck in a buy with money

25   that Henderson gave me to make a purchase.
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                      1148

1   Q.   When they do these controlled buys, what do they do?

2   A.   Well, usually the night before, I'll get in the car with an

3   officer and they'll take me out, I'll show them where the

4   person lives and here's where he lives, you know, I'll give him

5   his name.  And the next day, we'll meet up, and I'll make the

6   phone call.  They normally search my car, search my person,

7   and then I'll go in and make the buy, then bring the drugs back

8   out to the officer.

9   Q.   On these controlled buys, were you buying on the sly?

10  A.   Yes, I was.

11  Q.   Were Henderson and Khalil knowing about it?

12  A.   Yes, they did.

13  Q.   What did they say about that?

14  A.   They knew I was doing business with the guy.  They knew I

15  was buying dope and selling it.  That's the only way I could

16  get the guy to trust me in order to make a buy.

17  Q.   When you were buying and selling, were you using your own

18  money?

19  A.   Using my money, yes.

20  Q.   Then what would happen on the controlled buy?

21  A.   I would use the money that Jeff Henderson gave me.

22  Q.   This Luis Gonzalez, do you remember going to trial and

23  testifying in his case?

24  A.   Yes, I testified in state court.

25  Q.   Did you testify about the controlled buy?

1   A.  Yes.

2   Q.  Did you testify about the uncontrolled buys?

3   A.  No.

4   Q.  Did they know about them?

5   A.  In the courtroom?

6   Q.  Uh-huh.

7   A.  No.

8   Q.  Why not?

9   A.  Because that was something that only Jeff Henderson and I

10  knew about, and Frank Khalil.

11  Q.  Now, tell me about in May of 2007 -- now, during this time,

12  this spring of 2007, who you are in contact with?  Is it

13  Henderson, Khalil or McFadden?

14  A.  Mostly Henderson.

15  Q.  Why is that?

16  A.  Because he was the officer that I agreed to work with.

17  Q.  Do you know who Larita Barnes is?

18  A.  Childhood friend of mine.

19  Q.  And she's somebody that lives here in Tulsa?

20  A.  Yes.

21  Q.  And you know where she lives?

22  A.  Yes.

23  Q.  And tell me about what happened when you and Officer

24  Henderson talked about Larita Barnes.

25  A.  One day we was driving around and I was showing him some

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1150

1    places that had dope in it, houses, say, this house has got

2    dope in it, this house has got dope in it.

3    Q.  Who was in the car with you besides you and him?

4    A.  Me, Henderson and McFadden.  He asks me, he says -- I

5    didn't bring up the Barneses.  He did.  He said, "What about

6    the Barneses?"  I said, "I know them real well."  He goes, "Can

7    you buy from them?"  I said, "No, I can't buy from them."  He

8    goes, "Do you know where they're keeping their dope?"  I said,

9    "No, but I've known them a long time.  I've known Larita a long

10   time."  He said that they -- that Larita and Larry -- Larita,

11   she knew that I was working for the TPD, because my house got

12   busted.

13   Q.  Well, I mean, was Avery Brewer busted because of you?

14   A.  Yes.

15   Q.  Did he get charged?

16   A.  Yes.

17   Q.  Did you get -- that same time back in January, did you get

18   some cars forfeited?

19   A.  Yeah, he forfeited my car, yeah.

20   Q.  Did you have a friend named Paul Wells?

21   A.  Yes.

22   Q.  Did he know you got busted and were cooperating?

23   A.  Yes.

24   Q.  Do you know if Paul Wells knew Larita Barnes?

25   A.  Yes.

U.S. District Court
Northern District of Oklahoma

1  Q.  So what happened when you all started talking about the

2  Barneses?

3  A.  I said, "I don't know where they keep their dope.  I know

4  they don't keep it at their house, and I can't buy off of

5  them.  I just can't."  And the conversation kind of went dead.

6  Quit talking about it and started talking about other people.

7  Q.  When's the next time Larry and Larita Barnes' name came up?

8  A.  It came up in May.

9  Q.  Of '07?

10  A.  Uh-huh.

11  Q.  What happened?

12  A.  Well, Henderson called me one morning, he said, "I'm over

13  here sitting on the Barneses' house."  So in my mind, I'm

14  thinking he's got an informant on the house.  I didn't know

15  what he was talking about.  I went to the casino and messed

16  around for a while, and I came home.  And that afternoon, right

17  before dark, he called me and he asked me if I was home.  I

18  said, "Yeah, I'm home."  He pulls up in the back drive, and I

19  get in the car with him and I sat down and look at him, and he

20  tosses three ounces of dope in my lab.

21  Q.  What kind of dope?

22  A.  Meth.  And I said, "What's this for?"  And he goes, "Well,

23  we just made a buy from the Barneses today."  I said, "Oh, we

24  did?"  He goes, "Yeah."  I said, "I told you" -- I threw it

25  back at him and I said, "I can't buy from them people.  I told

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1152

1  you that."  He said, "Well, you're probably going to have to

2  testify."  I said, "No, I'm not."  And he goes, "Well, how

3  about this.  You can think about going to prison, losing your

4  kid, or you can testify.  What do you want to do?"  I got out

5  of the car and went in my house.

6  Q.  Okay.  Now, they were first charged in state court, did you

7  know that?

8  A.  State court, yeah.

9  Q.  Did you have to go testify in state court?

10 A.  No.

11 Q.  Are you aware that later on, they got indicted by --

12 A.  Feds.

13 Q.  -- the feds, and they got charged in federal court?

14 A.  Picked it up, yeah.

15 Q.  In April of 2008, there was a jury trial.  Do you remember

16 that?

17 A.  Yes.

18 Q.  Did you testify at that?

19 A.  Yes, I did testify.

20 Q.  What did you testify to?

21 A.  That I made a buy out of their house.

22 Q.  From whom?

23 A.  From Larita Barnes.

24 Q.  And was it true that you made that buy?

25 A.  No, it was not.

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1153

1   Q.  Were you under oath and testifying?

2   A.  Yes, I did.

3   Q.  Were you sitting in front of a jury just like this?

4   A.  Yes, I did.

5   Q.  Were you sitting in a witness chair just like that?

6   A.  Yes, sir.

7   Q.  Did you tell the truth or lie?

8   A.  I lied.

9   Q.  Why in the world would you do that?

10  A.  Officer Henderson told me to.

11  Q.  Did you not think coming into federal court and lying was a

12  big deal?

13  A.  Yeah, it was, but I had no choice.  I didn't want to lose

14  my child.

15  Q.  So how did you come up with a story of what happened?

16  A.  Well, there was several times, three or four different

17  times Henderson and McFadden would come pick me up late at

18  night and we'd go ride around in Tulsa, and they'd tell me what

19  to say, what not to say.

20  Q.  What did they tell you to say?

21  A.  Basically, you know, from beginning to the end of how the

22  buy went down.

23  Q.  What did they tell you how the buy went down?

24  A.  Basically that, you know, we met up, we searched you, we

25  searched your car, we gave you the money, you went to the

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1154

1    Barneses' house.  The whole scenario.

2    Q.  You went in the Barneses' house?

3    A.  Made the buy, came back out, meet us down the street, give

4    us the dope, we search you again and you go on.

5    Q.  How much dope were you supposed to have bought?

6    A.  Supposed to been three ounces for $3,000.

7    Q.  Where did the $3,000 supposed to have come from; did you

8    know?

9    A.  Supposedly McFadden checked it out.

10   Q.  So that was the story you were going to tell?

11   A.  Yeah.

12   Q.  So it is pretty easy to walk in here with just kind of a

13   synopsis of what you're supposed to tell and tell about it?

14   A.  It's not easy.

15   Q.  How did you make it up?

16   A.  They coached me.  I didn't -- I did what they told me to

17   do.

18   Q.  So when the Assistant U.S. Attorney got up here and asked

19   you questions, what did you do?

20   A.  Lied.

21   Q.  Did you know whether McFadden was lying?

22   A.  Yes, he was lying.

23   Q.  Did you know whether Henderson was lying?

24   A.  Yes, he was lying.

25   Q.  How do you know that?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1155

```
 1   A.  Because it didn't happen.  The buy did not happen.
 2   Q.  Before you testified, did you meet with the Assistant U.S.
 3   Attorney?
 4   A.  Before the buy?
 5   Q.  No, before the trial.
 6   A.  Yes, Rob Raley.
 7   Q.  Uh-huh.
 8   A.  Yeah, I met with him twice.
 9   Q.  Did you tell him this was all made up?
10   A.  No.  Scared to.
11   Q.  Why?
12   A.  Afraid I'd go to prison if I did.
13   Q.  What happened to the Barneses; do you know?
14   A.  Went to prison.
15   Q.  They got convicted?
16   A.  Yes.
17   Q.  Have you seen them since?
18   A.  I've seen Larry.
19   Q.  What did you say to him?
20   A.  Just kind of looked at each other.  He looked at me, and he
21   said, "I appreciate that."  I said, "No problem."  He
22   appreciated me coming forward and telling the truth so he got
23   released from federal prison.
24   Q.  Let's go back to the Barneses.  Back in '07 after the
25   Barnes thing of May, do you remember start working with Brandon
```

1    McFadden?

2    A.  Yeah, I worked for Henderson for about seven months.  Then

3    I went to McFadden.

4    Q.  How did you get hooked up with McFadden?

5    A.  I got McFadden's phone number the day of the warrant at my

6    house.  I got all three of their phone numbers, Khalil,

7    Henderson and McFadden.  And I done probably eight to ten

8    suppliers for Henderson, gave up eight to ten suppliers.  And I

9    got a phone call from Henderson the summer of '07 area, and he

10   said, hey, he goes, "Do you still got McFadden's phone

11   number?"  I said, "Yeah, I've got it in my phone."  He goes,

12   "Well, the feds are wanting to indict you, so you need to do

13   some things for them now."  And that's when I called Brandon

14   and said, "What do I got to do?"

15   Q.  So what was McFadden telling you about the feds wanted to

16   indict you?

17   A.  They wanted to indict me.

18   Q.  Who was the AUSA who wanted to indict you; did you know?

19   A.  Jan Reincke.

20   Q.  Did you ever meet with her?

21   A.  No, I never met her.

22   Q.  So all this was coming through whom?

23   A.  McFadden.

24   Q.  So you met with McFadden.  And so what did you start doing

25   with him?

1   A.  Same thing I did with Henderson.

2   Q.  Which is what?

3   A.  Giving up suppliers.

4   Q.  Do you remember a meeting one time at the Tulsa Community

5   College?

6   A.  Yes.

7   Q.  And what was that all about?

8   A.  That was -- let's see, around May -- April, May of '07, I

9   got a phone call from Henderson, and he asked me how was my

10  cash.  I said, "My cash is -- I got some cash.  What's up?  I

11  just won some money at the casino.  What you needing?"  He

12  said, "Well, I got this girl you need to go hook up with.

13  She's got some dope."  I said, "What's she got?"  He said,

14  "She's got 10 ounces of meth."  I said, "Okay.  So how much she

15  want for it?"  He said, "Well, I think it's 5,000."  This

16  conversation is with Henderson.  I said --

17  Q.  The conversation you're talking about right now?

18  A.  Right.  I said, "Well, what's this girl look like?  Who is

19  she?"  He goes, "It's going to be a black girl.  She's going to

20  be in a dark-blue Chrysler.  You're going to meet her at Tulsa

21  Community College on North Harvard."  I said, "Okay."

22  Q.  Was it going to happen that day or the next day, or what?

23  A.  Within an hour or two.

24  Q.  So what did you do?

25  A.  About an hour later, I go -- I pull in Tulsa Community

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1158

```
 1   College and I see a dark-blue Chrysler, but about five or six
 2   parking spaces down, I see McFadden sitting in his black
 3   Chrysler with the window down halfway.  I saw his face.  I
 4   looked at him.  I got out of my car.  I got in the car with
 5   this black girl, and there was a Doritos bag rolled up on the
 6   floorboard.  And she looked at it, and I looked at her, and I
 7   put the money on the console right here, and I grabbed the
 8   Dorito bag.  I didn't say nothing to her.  I got in my car and
 9   I went home.
10   Q.  Had you ever met that black lady before?
11   A.  No.
12   Q.  Did you know who she was at the time?
13   A.  No, not at that time.
14   Q.  So you picked up the Dorito bag.  What was in the Dorito
15   bag?
16   A.  Dope.  Meth.
17   Q.  And you left the money with her?
18   A.  Yes.
19   Q.  And you got in your car.
20   A.  Got in my car.
21   Q.  What happened?
22   A.  Went home.
23   Q.  What did you think was happening?
24   A.  Well, Henderson told me that this girl sold meth and they
25   got her dirty, they ran a warrant on her house, and I needed to
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1159

1   help her get rid of this dope so they could pay her supplier so

2   they could get her supplier, was what he told me.  So that's...

3   Q.  So what were you supposed to do with the dope once you got

4   it?

5   A.  Sell it, get rid of it.

6   Q.  Were you doing controlled buys for -- or controlled sales,

7   I guess?

8   A.  At that time?

9   Q.  Yeah, for them?

10  A.  No.

11  Q.  This is just -- you get to make some money?

12  A.  Yeah, make some money.  Help them out, which will help me

13  out.

14  Q.  So this meth that you paid 5,000 for, how much could you

15  turn around and sell it for?

16  A.  13, 14,000.

17  Q.  What do you do?  How do you do that?

18  A.  Package it up.

19  Q.  What does "package it up" mean?

20  A.  Weigh it up, put it in packages, sell it.

21  Q.  Do you cut it?

22  A.  No, never cut my dope.

23  Q.  So did you do that?

24  A.  Yes.

25  Q.  Did you later find out from Henderson or McFadden who that

U.S. District Court
Northern District of Oklahoma

```
 1   lady was?

 2   A.   Yes, I did.

 3   Q.   How did you find that out?

 4   A.   I found out through McFadden who she was.

 5   Q.   Who did he tell you she was?

 6   A.   Her name was Rochelle Martin.

 7   Q.   And who was Rochelle Martin, did he tell you?

 8   A.   I guess it was one of Henderson's informants.

 9   Q.   Okay.  Had Henderson ever brought you any before?

10   A.   Had Henderson ever brought me dope before?

11   Q.   Uh-huh.

12   A.   Yes.  On two different occasions.

13   Q.   What was that for?

14   A.   The same scenario.

15   Q.   Same lady?

16   A.   No.  He brought it, him and McFadden brought it to my house

17   in February of '07.

18   Q.   Right after you got busted?

19   A.   Right after I got busted.

20   Q.   What were you supposed to do with that dope?

21   A.   Sell it, get rid of it for them.

22   Q.   And did you?

23   A.   Yes, I did.

24   Q.   What did you do with the money?

25   A.   Kept it.
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1161

1   Q.  Oh, you bought it from them?

2   A.  I paid cash for it when they came to the house.

3   Q.  I gotcha.  Did he tell you where he got that dope from?

4   A.  Same scenario.  That they got a guy dirty, busted his

5   house, and I needed to help them get rid of this dope so they

6   could, in exchange, get his supplier.

7   Q.  So had you ever done this with the police before?

8   A.  No, I had not.

9   Q.  Kind of weird?

10  A.  Real weird.

11  Q.  Now, do you remember in June of that year of '07 getting

12  some marijuana?

13  A.  Some marijuana?  Yes.

14  Q.  Who did you get that from?

15  A.  McFadden.

16  Q.  What did that marijuana look like?

17  A.  It was a big bale, looked like a bale of hay, but it was --

18  Q.  Okay, you're doing your arms out like three feet or four

19  feet.

20  A.  Yeah, 50 pounds.

21  Q.  How did you know it was 50 pounds?

22  A.  I broke it down and weighed it up.

23  Q.  How did you get it?

24  A.  I got it from McFadden.

25  Q.  What were you supposed to do with it?

```
 1   A.  Sell it.

 2   Q.  How is it -- would he just call you up and say, "I got 50

 3   pounds"?

 4   A.  No.  He called up, asked me if I was at home.  I said,

 5   "Yeah," and he came by.  He said, "Is your garage door open?"

 6   I said, "No."  And he goes, "Well, open it."  So I opened my

 7   garage door, and he pulled his car in my garage and shut the

 8   garage door and he popped his trunk, and there it was.

 9   Q.  I thought you were a meth dealer.

10   A.  Right.  I couldn't have got rid of it.

11   Q.  Well, what did he do?

12   A.  Well, I weighed it up.

13   Q.  No.  What did he do when it was in his trunk?

14   A.  He got it out and gave it to me.  He goes, "Hey, I need you

15   to get rid of this."

16   Q.  How much were you supposed to pay him for it?

17   A.  10,000.

18   Q.  Why were you buying marijuana if you you're a meth dealer?

19   A.  I was doing everything they told me.  Didn't want to go to

20   prison or lose my kid.

21   Q.  So what did you do with that marijuana?

22   A.  I packaged it up, put it in a big trash bag.  And after I

23   got through weighing it up, this was about midnight, I looked

24   across the street from my house, and there was a sheriff's

25   deputy sitting in the ditch, which his name is Lance Ramsey,
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                1163

1   and he's been after me because he knew I was a dope dealer.  He

2   was always looking at my house, driving by my house, driving

3   by, watching.

4   Q.  Because you were a dope dealer, weren't you?

5   A.  I was a dope dealer.  And he sat there for three or fours

6   hours.  And after he left, it was about three o'clock in the

7   morning, I take the marijuana and I put it in my car, and I

8   drive about a mile up the road and there's this big ditch, a

9   ravine, I place it down there just to get it away from my house

10  because I didn't know what was going on.  And I went back a

11  couple of days later, and it was gone.

12  Q.  Somebody stole it?

13  A.  I guess so.  I guess somebody seen it or found it or

14  whatever.

15  Q.  Now, Lance Ramsey, who is Lance Ramsey?

16  A.  He works for the Sheriff's department.

17  Q.  Tulsa County?

18  A.  Yes.

19  Q.  Do you remember a time when he had a search warrant for

20  your house?

21  A.  Yeah.  I found out through one of his informants, yeah.

22  Q.  Did you talk to McFadden about that?

23  A.  Yes, I did.

24  Q.  What did McFadden tell you?

25  A.  McFadden said -- I told McFadden that I heard that Lance

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1164

```
 1    Ramsey had a search warrant for my house.  He said, "Oh,
 2    really?"  He called me back a few hours later and said, "Yeah,
 3    he does."
 4    Q.  What did you do with that information?
 5    A.  I called Lance Ramsey and asked him why he had a search
 6    warrant for my house.
 7    Q.  This period when you're talking about Lance Ramsey has
 8    a search warrant for your house, was this before or after this
 9    marijuana -- where you take it in the ditch?
10    A.  It was after.
11    Q.  Sometime later?
12    A.  Yeah, uh-huh.
13    Q.  So what happened when you called up Lance Ramsey?
14    A.  It pissed him off.  Made him mad.  We argued a little bit,
15    and we hung up on each other.  But I told him, "I found out you
16    got a warrant for my house."
17    Q.  Did he ask you how you knew?
18    A.  I told him his informant Jeff Mears told me.  That's
19    exactly who told me.
20    Q.  Did he end up running that search warrant?
21    A.  No.
22    Q.  Did you ever see or talk to Ramsey again?
23    A.  I didn't talk to him for about year and a half later.
24    Q.  What happened a year and a half later?
25    A.  He ran a search warrant on my house.
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1165

1   Q.  Was that in June?

2   A.  June of '09, yeah.

3   Q.  Let's go back.  Do you know a guy named Adrian Torres?

4   A.  Adrian Torres.  Yeah, I met him in the late summer of '07.

5   Q.  Who did you meet him through?

6   A.  Through McFadden.

7   Q.  What was the purpose of you meeting Mr. Torres?

8   A.  From what McFadden told me, they busted him with some coke

9   or something and he was working off charges, like I was, so he

10  wanted us to work together.

11  Q.  Okay.  So what did you do to work together?

12  A.  We bought drugs.

13  Q.  Who is "we"?

14  A.  Adrian and I.  We found suppliers, and we turned them over

15  to McFadden.

16  Q.  Were you doing controlled buys at the time or were you

17  getting the dope and selling, or what?

18  A.  I did no controlled buys for McFadden.

19  Q.  Beg your pardon?

20  A.  At that time, I didn't do any controlled buys for McFadden.

21  Q.  So when you say you bought dope --

22  A.  With my money.

23  Q.  What would you do with it?

24  A.  Resell it.

25  Q.  What kind of dope were you buying?

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1166

```
 1   A.  Meth.
 2   Q.  And how many times do you think you bought -- did you buy
 3   from Adrian Torres or with him?
 4   A.  I bought dope from Adrian Torres probably for our five
 5   times.
 6   Q.  Did he ever buy it from you?
 7   A.  He bought it from me, yeah.
 8   Q.  And so what would you do when he would buy it from you?
 9   A.  When he would buy from me?
10   Q.  Yeah.
11   A.  I'd sell it to him.
12   Q.  Was McFadden there surveilling or watching over you?
13   A.  He knew what I was doing.
14   Q.  How do you know that?
15   A.  I told him.
16   Q.  It was okay with him?
17   A.  Yeah, it was okay with him.
18   Q.  Were you giving him any of the money or any of the dope?
19   A.  Who?  McFadden?
20   Q.  Yeah.
21   A.  No.
22   Q.  Do you know if Mr. Torres got busted?
23   A.  I don't even know if he got busted.  I was told he was an
24   informant that was working, just like I was.  That's what I was
25   told by McFadden.
```

1   Q.   What about a guy named Amador, do you know him?

2   A.   Rodolfo Amador?

3   Q.   Yeah.

4   A.   Yeah.

5   Q.   How do you know him?

6   A.   I met him at the flea market.

7   Q.   Did you buy dope through him?

8   A.   Yeah, I bought dope through -- from him.

9   Q.   Or did you sell dope to him?

10  A.   No, I never sold dope to him.

11  Q.   Did you ever buy dope or sell dope with him?

12  A.   I bought dope from Rodolfo Amador, yes.

13  Q.   Did you ever talk to Henderson about Amador?

14  A.   Yes.

15  Q.   And what did you say to him?

16  A.   Henderson asked me, you know, what kind of dope is he

17  selling.  And I said, he's got crack, he's got weed, he's got

18  meth, but I wasn't interested in anything else but the meth.

19  Q.   Do you know if Henderson arrested him?

20  A.   Yes, he did.

21  Q.   How do you know that?

22  A.   Because I -- I made a -- I showed Henderson where he

23  lived.  And I told Henderson there's dope, guns in that

24  house -- that apartment.  And one day, I ordered up two pounds

25  of meth, cost me $30,000, and Henderson and Frank Khalil

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1168

1   watched the deal go down at Bell Elementary over there in

2   Tulsa.  And I purchased two pounds of meth from him.  He left

3   the parking lot.  Henderson pulled him over, and then went from

4   there.

5   Q.  I'm going to put an exhibit in front of you, Mr. Logsdon,

6   Exhibit 3.  Look at the very bottom.  There's -- it's been

7   admitted into evidence, a search warrant and affidavit

8   Mr. Henderson got on July 19, '07 --

9   A.  Okay.

10  Q.  -- on a residence at 3403 North Lansing, Elton Shaw.  Were

11  you the RCI for that search warrant?

12  A.  No, I was not.

13  Q.  Do you know Elton Shaw?

14  A.  No.

15  Q.  Look at the top three there.

16  A.  Okay.

17  Q.  Admitted into evidence is a search warrant affidavit

18  Mr. Henderson got on 9317 South 94th East Avenue for Dustin

19  Shelley.  Shows you to be the RCI.  Were you the RCI for that

20  search warrant on Dustin Shelley's place?

21  A.  No, sir.

22  Q.  Do you know Dustin Shelley?

23  A.  No.

24  Q.  Do you know where South 94th East Avenue is?

25  A.  I didn't know, but I was showed by a federal agent where it

RYAN LOGSDON - DIRECT (By Mr. Harris)                              1169

```
 1   was at.
 2   Q.  On August 14, '07, Mr. Henderson got a search warrant for
 3   7976 South Sheridan, No. 301, for Corey Wayne Smith.  Shows you
 4   as the RCI.  Were you the RCI on that?
 5   A.  No.
 6   Q.  Did you deal with Mr. Smith?
 7   A.  No.
 8   Q.  Did you ever go to that 7976 South Sheridan, Apartment 301?
 9   A.  No.
10   Q.  On September 26 of '07, Mr. Henderson got a search warrant
11   for 2132 South 76th East Place, house of Jose Angel Gonzalez.
12   Did you know Mr. Gonzalez?
13   A.  I heard of him, but -- let's see, when was this?  '07?
14   Q.  Yes.  September 26, '07.
15   A.  I didn't hear of him until the summer of '08 through
16   McFadden.  So at that time, I did not know him.  No, I did
17   not.  No.
18   Q.  Did you deal with him in '07, Jose Angel Gonzalez?
19   A.  No.
20   Q.  Were you the RCI on that search warrant?
21   A.  No.
22   Q.  Do you know why Mr. Henderson would list you as the RCI on
23   these four search warrants?
24   A.  I have no idea.
25   Q.  But you were -- did provide him information on other
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1170

1   places?

2   A.  Oh, yeah.

3   Q.  But just not those?

4   A.  Not them, no.

5   Q.  Now, you said that you found out in the summer of '08 about

6   Jose Angel Gonzalez from Mr. McFadden.  What did you find out

7   about that?

8   A.  I found out that he was a dope dealer that McFadden and

9   Henderson had busted, I guess.  And that he was working off

10  some federal charges for McFadden.

11  Q.  Do you remember in the summer of '08 Mr. Henderson bringing

12  by four ounces?

13  A.  Of meth?

14  Q.  Uh-huh.

15  A.  To me?

16  Q.  Yeah.  What was that about?

17  A.  I don't know.  He called my cell phone in late summer of

18  '08, and he asked me if I was home.  I said, "Yeah."  He goes,

19  "Well, I'll be there in a minute."  He pulled up about five

20  minutes later in my back driveway, and I hopped in the car with

21  him.  He was driving his black Charger at this time.  He ran

22  down the same scenario.  He got this guy dirty, and he was

23  trying to get rid of the dope so they could get their

24  supplier.  I said, "What do you got?"  He goes, "I got four

25  ounces here."  I said, "What do you want for it?"  He said

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1171

1    $600.  I went ahead and helped him out.  I bought it and got

2    rid of it.

3    Q.  Four ounces of what?

4    A.  Meth.

5    Q.  For 600 bucks?

6    A.  Pretty cheap.

7    Q.  Real cheap, isn't it?

8    A.  Yeah.

9    Q.  Didn't you testify in the Barnes trial, you bought three

10   ounces for 3,000?

11   A.  Yes.

12   Q.  Why was he selling it for 600 bucks?

13   A.  I don't know.

14   Q.  Did you ask him?

15   A.  No.

16   Q.  Didn't you think it was kind of hinky?

17   A.  Yeah, a little cheap.

18   Q.  So what did you do with that dope?

19   A.  Resold it.

20   Q.  Why would he sell it so cheap?

21   A.  I don't know.

22   Q.  So what's happening during '07 -- now we're in the summer

23   of '08 -- and all through '08?  Are you seeing McFadden or

24   Henderson any or regularly or every now and then, or what?

25   A.  Every now and then.

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1172

1  Q.  Are you calling them up saying, hey, what more can I do for

2  you?

3  A.  Yeah.

4  Q.  Are they calling you?

5  A.  "Just bring me more suppliers.  We need more suppliers.  We

6  need more.  We need more.  They're wanting to file charges on

7  you.  Come on."

8  Q.  Is McFadden talking to you any more about federal charges,

9  or has that kind of gone away, or what?

10 A.  McFadden called me September -- August, September of '08

11 and said, "Oh, by the way, we're not filing charges on you.

12 You're done."

13 Q.  When he said that, did you continue to deal with him?

14 A.  McFadden?

15 Q.  Uh-huh.

16 A.  I think I dealt one more time with him, and that was it.

17 Q.  What was the one more time?

18 A.  I bought some dope off him, McFadden.

19 Q.  What kind of dope did you buy?

20 A.  Meth.

21 Q.  What about Henderson, did you keep dealing with him?

22 A.  No.

23 Q.  Why not?

24 A.  Stopped calling.  I stopped calling him.

25 Q.  So did you think you all were even?

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1173

1   A.  I didn't know.  Well, McFadden told me I was done, so...

2   Q.  What did Henderson tell you?

3   A.  He never did.  He just told me I needed to call McFadden

4   because the feds wanted to indict me.

5   Q.  Did you ever used to use meth?

6   A.  No.

7   Q.  Why not?

8   A.  My addiction is money.

9   Q.  You like it, huh?

10  A.  Oh, yeah.

11  Q.  Now, in June of '09, Lance Ramsey ran a search warrant on

12  your house, didn't he?

13  A.  June of '09?

14  Q.  Yes.

15  A.  Yes, sir.

16  Q.  Who else was with him?

17  A.  The whole drug task force.  There was one guy in particular

18  that stuck out, tall man.  I never seen him before.  And I

19  asked Lance Ramsey, I said -- they had searched my house.  They

20  didn't find anything.  Found some scales.  Four or five hours

21  went by.  I asked Lance Ramsey, I said, "Who is that tall guy

22  right there?"  He said, "Well, his name is Gary, and he's from

23  the FBI."  I said, "Oh, really?"  I said, "I need to talk to

24  him."  And that's when the conversation started.

25  Q.  Why did you -- do you know who Gary Graff is?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1174

1   A.  I know who he is now.

2   Q.  He's a special agent with the FBI?

3   A.  Yes.

4   Q.  Why did you talk to him?

5   A.  I said, "I think I know why you're here."  He goes, "Why is

6   that?"  I said, "Well, it's not for drugs, because there's none

7   here."  He goes, "Well, what do you think I'm here for?"  I

8   said, "You're here to talk to me about some dirty cops, aren't

9   you?"  He goes, "Yeah, I am."  I said, "Well, let's go talk,

10  because we're not going to talk here.  We need to go talk

11  somewhere else."

12  Q.  So did you go talk with the FBI?

13  A.  Yeah.  Yes, I did.

14  Q.  What did you tell them?

15  A.  I told them everything that happened from '07 all the way

16  up until now.

17  Q.  Did you tell them about you selling dope?

18  A.  Selling drugs for the police.

19  Q.  Did you tell them about you selling drugs?

20  A.  Yeah.  Oh, yeah, yeah, yeah.

21  Q.  I mean, you were a drug dealer, weren't you?

22  A.  Yeah, I was -- yeah.  Oh, yeah, yeah.

23  Q.  Did you tell them about Henderson?

24  A.  Yes.

25  Q.  McFadden?

U.S. District Court
Northern District of Oklahoma

```
 1   A.   McFadden.

 2   Q.   How about Deb Clayton?

 3   A.   Deb Clayton, yeah.

 4   Q.   Do you know who J.J. Gray is?

 5   A.   J.J. Gray.  I know J.J. Gray.

 6   Q.   Why did you do this, Mr. McFadden -- Mr. Logsdon?  Why did

 7   you tell them?

 8   A.   Just to get everything out on the table.  And, look, man,

 9   these guys -- you need to know some things, man.  These guys

10   are dirty.  They did me wrong.

11   Q.   Did they promise you immunity?

12   A.   Who, the FBI?

13   Q.   Uh-huh.

14   A.   No.

15   Q.   How about the U.S. Attorney's Office?

16   A.   No.

17   Q.   Do you have immunity today?

18   A.   No.

19   Q.   Do you have an agreement with the United States?

20   A.   No.

21   Q.   Can you be charged for everything you're telling?

22   A.   Yeah.

23   Q.   Why are you doing this?

24   A.   These cops, they need what's coming to them.  They've done

25   a lot of people wrong, and I'm one of them.
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1176

1   Q.  Well, you did a lot of people wrong, too, didn't you?

2   A.  Well, I did a lot of people wrong, too, but --

3   Q.  I mean, you're not innocent in all this, are you?

4   A.  Oh, no.  Oh, no.  I used to sell dope.

5   Q.  Let me ask you something back up here.  11-c.  This is the

6   TRACIS report of the search on January 23, 2007.

7   A.  Of my house?

8   Q.  Yeah.

9   A.  Okay.

10  Q.  There's going to be a document in front of you.  See this

11  in front of you, Mr. Logsdon?

12  A.  Yes.

13  Q.  Look at the bottom.  Is that your signature?

14  A.  Down at the bottom?

15  Q.  Yes, sir.

16  A.  Yes, that's mine.

17  Q.  Below that, it says J. Henderson, and a date is 1/23/07.

18  Do you see that?

19  A.  Yes.

20  Q.  At 1900, which is 7 p.m.

21  A.  Okay.

22  Q.  See all that writing above your signature?  Is that your

23  writing?

24  A.  No.

25  Q.  Whose writing is that?

RYAN LOGSDON - DIRECT (By Mr. Harris)                     1177

```
 1   A.  I don't know who that is.
 2   Q.  Well, why did you sign it?
 3   A.  He told me that this was -- he had me sign this paperwork.
 4   Q.  Who is "he"?
 5   A.  Jeff Henderson.
 6   Q.  Why did he have you sign this paperwork?
 7   A.  He said, "Sign the bottom of this.  I got to come back
 8   tonight and do my report.  Just sign this right here for me."
 9   It wasn't filled out when I signed it.
10   Q.  It talks about -- this report talks about your vehicles,
11   and you've been read your Miranda rights --
12   A.  Right.
13   Q.  -- and there was a search warrant on your house and you
14   gave permission to search.  And why would you sign something
15   blank?
16   A.  He told me to, so I did.
17   Q.  When is the last time you saw Mr. Henderson?
18   A.  I saw Mr. Henderson about a year ago.
19   Q.  Where did you see him at?
20   A.  Out south, in south Tulsa.  He pulled me over on a traffic
21   stop.
22   Q.  Did you all talk?
23   A.  No.
24   Q.  What happened?
25   A.  I got pulled over on a traffic stop with him and Officer
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1178

```
 1   Yelton.  They pulled me over, said I didn't have a seat belt

 2   on, which I did.  I ended up standing there about a hour and a

 3   half.  They searched my car, pulled my car all apart, didn't

 4   find anything.  Then I went home.

 5   Q.  Did he know at the time that you'd been cooperating with

 6   him with the FBI?

 7   A.  I believe so.

 8   Q.  Why do you think that?

 9   A.  My name was all in the newspapers.

10   Q.  When is the last time you saw McFadden?

11   A.  Last time I saw McFadden?  '08.

12   Q.  Okay.  Where was that at?

13   A.  I'd been out in Owasso the last time I dealt with him.

14          MR. HARRIS:  May I have a moment, Your Honor?

15          THE COURT:  You may.

16   Q.  (By Mr. Harris) When they searched your house in January

17   23, 2007, do you know whether or not any of your meth was

18   stolen?

19   A.  I received some meth from Officer Henderson and Brandon

20   McFadden about a month after the search warrant.  It looked

21   like mine.

22   Q.  Did you see it -- after you gave them the meth, do you know

23   what they did with it at your house?

24   A.  In January?  No, I don't know what they did with it.

25   Supposed to have turned it in.
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                          1179

1   Q.  In all the times you dealt with Officer Henderson, when you

2   were getting drugs from him or whatever you were doing, was he

3   wearing a firearm?

4   A.  Yes.

5   Q.  Was he carrying a firearm?

6   A.  Yes.

7   Q.  Was he a policeman?

8   A.  Yes.

9   Q.  When you got busted by the FBI -- not busted, but when you

10  started talking to Gary Graff from the FBI in June of '09, did

11  you tell them about the Barnes trial?

12  A.  Yes.

13  Q.  Did you tell them about the fake Barnes buy?

14  A.  Yes.  First thing I told them.

15  Q.  Did they know anything about it; do you know?

16  A.  They knew that I testified, but they --

17        MR. WYATT:  Objection.  Calls for speculation as to

18  what Gary Graff --

19        THE COURT:  Sustained.

20  Q.  (By Mr. Harris) Did you tell them about what you did with

21  the Barneses?

22  A.  They knew that I testified, but they didn't know that it

23  was a fake buy.

24  Q.  Did you tell them it was a fake buy?

25  A.  Yes.

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1180

```
 1   Q.  Did you tell them you lied?
 2   A.  Yes.
 3           MR. HARRIS:  That's all I have, Your Honor.
 4           THE COURT:  Let's take our morning break at this
 5   time.  We'll be in recess until 10:50.
 6           Spectators remain.
 7      (The following proceedings were had outside the presence of
 8   the jury.)
 9           THE COURT:  The person who has been identified as the
10   one who was trying to communicate with one of the jurors in the
11   courtroom, I'd like to talk to you, sir.  Can you identify
12   yourself, please?
13           MR. MILLS:  Tony Mills.
14           THE COURT:  What is your interest in this trial?
15           MR. MILLS:  Just watching it.
16           THE COURT:  Are you a friend of one of the parties or
17   know something about the case?
18           MR. MILLS:  I don't know anybody in it.
19           THE COURT:  You're just a citizen from Tulsa?
20           MR. MILLS:  Yes, my whole life.
21           THE COURT:  Well, it's been reported to me you were
22   talking to one of the jurors in the elevator, and I need to
23   find out what you said.  That was last week.
24           MR. MILLS:  I didn't know it was a juror that I was
25   talking to.  The only thing I mentioned was that Attorney Jones
```

RYAN LOGSDON - DIRECT (By Mr. Harris)                    1181

```
 1  seemed a little off on his comment.  It was right after he

 2  testified about the north and south.

 3          THE COURT:  All right.  You understand that you cannot

 4  talk to jurors about anything about this case?

 5          MR. MILLS:  Yes, I do.

 6          THE COURT:  Are you TPD or former law enforcement?

 7          MR. MILLS:  No, sir, I have nothing to do with this

 8  case.

 9          THE COURT:  Any questions from the government?

10          MS. DUKE:  No, Your Honor.

11          THE COURT:  Defense counsel?

12          MR. GRAHAM:  No, Your Honor.

13          MR. JONES:  No, Your Honor.

14          THE COURT:  All right.  Thank you very much,

15  Mr. Mills.  In the future, try to refrain from commenting to

16  anyone who may be a juror, now that you've seen them.

17          MR. MILLS:  I will.

18          THE COURT:  Thank you very much.  Court will be in

19  recess.

20     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

21  WERE HAD IN OPEN COURT, WITHIN THE PRESENCE AND HEARING OF THE

22  JURY:)

23          THE COURT:  Court is back in session.  Cross-

24  examination?

25          MR. WYATT:  Yes, please.
```

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1182

```
 1        May it please the court.
 2            THE COURT:  Counsel.
 3                      CROSS-EXAMINATION
 4  BY MR. WYATT:
 5  Q.  Are you employed today, Mr. Logsdon?
 6  A.  Am I employed?
 7  Q.  Pardon me?
 8  A.  Employed?
 9  Q.  Yes, sir.  Are you employed today?
10  A.  No.  I'm in between jobs.  I'm looking.
11  Q.  When's the last time you had a job?
12  A.  Oh, about five, six months ago.
13  Q.  What was that job, sir?
14  A.  At Magnesium Products.
15  Q.  And were you working there just part-time?
16  A.  Yeah, part-time off and on for about the last three years.
17  Q.  Okay.  What has been the primary source of your income
18  during that time?
19  A.  That and a little bit of casino.
20  Q.  Okay.  When you say "a little bit," how much money are you
21  talking about you've made in the last three years at a casino?
22  A.  Three years at the casino?  Close to 140,000.
23  Q.  Have you reported all that on your tax returns?
24  A.  Yes, uh-huh.
25  Q.  Okay.  Now, you've been a drug dealer for the last 15
```

U.S. District Court
Northern District of Oklahoma

1   years, haven't you?

2   A.  Right.

3   Q.  And that's been your principal occupation?

4   A.  Off and on, yeah.

5   Q.  You've made most of your income during the last 15 years

6   off of that?

7   A.  Yeah.

8   Q.  You might buy a pound of methamphetamine for $17,000, sell

9   it for $34,000; right?

10  A.  Yeah.

11  Q.  You break it down, you sell it; is that correct?

12  A.  Yes, sir.

13  Q.  And you double your money in most cases?

14  A.  Right.

15  Q.  In some cases, if you may buy four ounces for $600, then

16  you're going to make about 10 times the amount; right?

17  A.  Yeah, yeah.

18  Q.  And when you're talking --  About how many pounds of

19  methamphetamine have you moved in the last 15 years?

20  A.  I wouldn't know.  A lot.

21  Q.  More than 100?

22  A.  Probably around there, yeah, somewhere around there.

23  Q.  Okay.  And at $10,000 a pound, that's, what, a million

24  dollars?

25  A.  Yeah.

1  Q.  And that would be a fair price; right?

2  A.  Yeah.

3  Q.  In fact, that would be probably low, wouldn't it?  That

4  would be the actual cost?

5  A.  Right.

6  Q.  So you may have profited a million dollars in the last 10

7  years?

8  A.  I don't know if I would say that much.

9  Q.  Now, you buy in both bulk quantities and small quantities;

10  right?

11  A.  Right.

12  Q.  You sell in bulk quantities and small quantities; right?

13  A.  Right.

14  Q.  So that means that you're either selling to the street

15  user, who might buy a $100 worth; right?

16  A.  Right.

17  Q.  Or you might sell to other dealers where they might want

18  $10,000, $20,000 worth at a time?

19  A.  Right, right.

20  Q.  And that's something that you can make happen; right?

21  A.  I used to be able to but I can't no more.

22  Q.  Okay.  During the time that you've talked about that's

23  alleged in this indictment, you were a person who could make

24  that happen?

25  A.  Right.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1185

1    Q.  You were the go-to guy in Tulsa to get methamphetamine?

2    A.  Well, one of them.

3    Q.  One of them.  Larry Barnes was another one, wasn't he?

4    A.  Yeah.

5    Q.  And Larita Barnes was another one, wasn't she?

6    A.  Yeah.

7    Q.  And they were well-known drug dealers in this area, weren't

8    they?

9    A.  Yeah.

10   Q.  You were a well-known drug dealer in this area?

11   A.  Yes, sir.

12   Q.  The police were aware of your activities and illegal

13   activities; correct?

14   A.  Yes.

15   Q.  The police were aware of Larry Barnes and Larita Barnes'

16   illegal activities, weren't they?

17   A.  Yeah.

18   Q.  And they were always looking to get you.  Some officer,

19   whether it was feds, whether it was county, whether it was

20   local, city, TPD, somebody was looking over your shoulder at

21   all times, weren't they?

22   A.  Yeah.

23   Q.  And you had to be careful, didn't you?

24   A.  Yes.

25   Q.  Now, to be someone who is dealing in mass quantities of

1   methamphetamine, you have to be on the look all the time;

2   right?

3   A.  Right.

4   Q.  You're always looking over your shoulder, you want to know

5   who's paying attention to you; right?

6   A.  Right.

7   Q.  You're looking around your house, looking to see if there

8   are any sheriff's officers, any strange cars, any police

9   officers watching me; right?

10  A.  Right.

11  Q.  When you're driving down the road, whether you're in your

12  PT Cruiser or your brand new red Chrysler 300M, you're looking

13  to see is somebody following me; isn't that right?

14  A.  That's right.

15  Q.  And something you pay very close attention to?

16  A.  That's right.

17  Q.  Now, to be a supplier who can make a phone call and get one

18  pound delivered to you in a matter of 30 minutes, that means

19  you're an important fellow, doesn't it?

20  A.  At one time, yeah.

21  Q.  Okay.  I mean, not just anybody can make a phone call and

22  have somebody deliver a pound of meth in a matter of 30 minutes

23  or even an hour.

24  A.  Right.

25  Q.  In fact, most suppliers would need a couple of days to come

1   up with a pound, maybe a week or more; right?

2   A.  Yeah, some people.

3   Q.  So that means that you know people and are dealing with

4   people who have substantial quantities available to them?

5   A.  At one time I was, yeah.

6   Q.  Okay.  Now, this meth that you're dealing with, is it the

7   old style crank or is it the new ice?

8   A.  What I used to deal in, the new ice.

9   Q.  Tell the jury the difference.  What is crank?

10  A.  Crank is a form of meth that's been out for a long time,

11  which it's hard to find any more.  And the new style meth is

12  ice which has mostly been brought in from Mexico.

13  Q.  And during this period of time there was a shutdown on

14  pseudoephedrine in Oklahoma, wasn't there?

15  A.  I heard something about it, yeah.

16  Q.  Well, I mean, it was all over the news, all over the

17  papers.

18  A.  Right.

19  Q.  The governor of Oklahoma had an agenda on this, didn't he?

20  A.  Yeah, something like that, yeah.

21  Q.  And during that time it became even harder to get ice or to

22  get meth in any form during that period of time; isn't that

23  true?

24  A.  Yes.

25  Q.  And, in fact, almost all of the ice, all of the meth, was

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                    1188

1  coming out of Mexico at that time because you couldn't get the

2  product to make it here; isn't that correct?

3  A.  Right.

4  Q.  Now you're a person who knows how to make it though, aren't

5  you?

6  A.  No.

7  Q.  You don't?

8  A.  No.

9  Q.  You don't know the Nazi method, you don't know --

10 A.  No.

11 Q.  -- the single-pot method?

12 A.  No.

13 Q.  You don't know any of those things?

14 A.  No.

15 Q.  Don't know how it's made?

16 A.  No.

17 Q.  Don't know what the ingredients are?

18 A.  No.

19 Q.  Okay.  Now, on January 23rd, the day the search warrant was

20 served on you in 2007, --

21 A.  Yes, sir.

22 Q.  -- you were able to make a single phone call to Avery

23 Brewer and within 30 minutes have him there with a pound of

24 meth; isn't that correct?

25 A.  Yes, sir.

1    Q.  And you did that?

2    A.  Yes, sir.

3    Q.  And he did that because you're a trustworthy client,

4    someone that he believes in?

5    A.  Right.

6    Q.  And somebody that he knows can move this kind of quantity?

7    A.  Right.

8    Q.  And somebody that you dealt with him buying and/or selling

9    for a long time; isn't that correct?

10   A.  Right.

11   Q.  He was a regular customer of yours, whether it was to

12   deliver you meth or whether you were selling to him; correct?

13   A.  I never sold any meth to him.  I always got meth from

14   him.

15   Q.  Okay.  So he's just your supplier; you never sold to him?

16   A.  At one time he was, yeah.

17   Q.  Okay.  Now, there was a mention just toward the end of your

18   testimony about in February of 2008 that you found out that the

19   Tulsa County Sheriff's Office might have a search warrant out

20   for your property; right?

21   A.  Right.

22   Q.  And you said that you made a phone call to Lance Ramsey

23   about that and asked him about that; isn't that what you told

24   this jury?

25   A.  Yes, I did.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1190

1   Q.  Now, the reality is, sir, you went to Brandon McFadden and

2   asked him, "Is there a search warrant," and he told you, "Yes";

3   isn't that right?

4   A.  Well, in reality, sir, I had sold some --

5   Q.  Is that right?

6          THE COURT:  Let the witness finish his response.

7          MR. WYATT:  Yes, Your Honor.

8   A.  What had happened was I sold some meth to one of my

9   customers.  My customer got busted with that meth, didn't give

10  me up, but Lance Ramsey questioned him all night long in the

11  county jail about me.  That man made bond and come and told me

12  that Lance Ramsey was going to run a warrant on my house.

13  Q.  And you confirmed that with Brandon McFadden; isn't that

14  true?

15  A.  I confirmed that with McFadden, yes.

16  Q.  And then you immediately made a phone call to Lance Ramsey

17  bragging that you had people in high places and that you knew

18  there was a warrant and they better not serve it because there

19  wasn't any dope there, that you moved it.  Isn't that what

20  happened, sir?

21  A.  I didn't brag to nobody.

22  Q.  Okay.  You didn't call him telling him, "I have friends in

23  high places"?

24  A.  I didn't tell him that.  I just asked him, "Do you have a

25  warrant for my house," and he said, "Yes."

1  Q.  You just asked him did he have a warrant?

2  A.  I asked, "Do you have a warrant for my house," and he said,

3  "Yes."

4  Q.  Okay.  Very well.  Now, did you tell him you have friends

5  in high places?

6  A.  No.

7  Q.  Have you told other officers that since you have been

8  working with the feds in this particular investigation?

9  A.  No.

10  Q.  Were you stopped by a traffic officer in Tulsa, Oklahoma,

11  on a traffic stop and did you tell that officer that you had

12  friends in high places and you would take him to federal court

13  if he messed with you?

14  A.  No.

15  Q.  Now, after this search warrant in January 23rd, 2007, you

16  began doing a lot of illegal business deals with Brandon

17  McFadden, didn't you?

18  A.  Yes, I did.

19  Q.  And, in fact, you had so many deals with him that you told

20  the Office of Inspector General for the Department of Justice

21  that you paid him between 250- and $300,000 during the period

22  of your association with Brandon McFadden?

23  A.  Between Officer Henderson and McFadden, that's how much

24  money I gave them two.

25  Q.  You told the Office of Inspector General that it was 250-

1  to 300,000 to McFadden; isn't that correct, sir?

2  A.   I believe so.

3  Q.   And you had an opportunity to read the report that the

4  Office of Inspector General prepared; isn't that correct?

5  A.   Right.

6  Q.   And you didn't tell them to change that; you left it that

7  Agent McFadden received 250- to 300,000?

8  A.   Right.

9  Q.   You also swore under oath at page 36 of the grand jury that

10  during your association with Brandon McFadden that you paid him

11  between 250- and $300,000; is that correct?

12  A.   That's correct.

13  Q.   Now, today you're saying, though, it was split between

14  McFadden and Henderson?

15  A.   Right.

16  Q.   Okay.  That's different --

17  A.   Not the full amount.  Not the full amount.

18  Q.   So that would be different from your testimony under oath

19  in the grand jury?

20  A.   Right.

21  Q.   Now, at the grand jury you took the same oath that you took

22  in this courtroom; is that correct?

23  A.   Yes, sir.

24  Q.   Okay.  Now, if Brandon McFadden testified that he only got

25  between 50- and $100,000, you would disagree with that,

```
 1   wouldn't you?

 2   A.  I would disagree with that, yes.

 3   Q.  Now, that 250- to $300,000, you told the grand jury, was

 4   from the sale of 25 pounds of methamphetamine; is that right?

 5   A.  Yes, sir.

 6   Q.  And that Brandon McFadden dealt with you, and whoever is

 7   buying, selling doesn't matter, there was a total of 25 pounds

 8   of meth moved between the two of you; is that correct?

 9   A.  That's correct.

10   Q.  Okay.  And is 25 pounds, that would be right at 10 kilos;

11   correct?

12   A.  Yeah, somewhere around there, yeah.

13   Q.  Now, you would have made around 250- to $300,000 off of

14   that 25 pounds yourself too, wouldn't you?

15   A.  Yeah, but I didn't.

16   Q.  Okay.  Now, when Mr. McFadden left Tulsa and moved back to

17   Lubbock, everything just stopped, didn't it?

18   A.  Yes.

19   Q.  Mr. McFadden was your contact?

20   A.  Contact for what?

21   Q.  Your partner in crime.

22   A.  I don't call it that.

23   Q.  Okay.  He was not a partner in crime with you?

24   A.  I don't call it that.

25   Q.  Okay.  Now, you've never been prosecuted for any of the
```

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1194

1  illegal transactions related to this time period in the

2  indictment, have you?

3  A.  No.

4  Q.  So from January of 2007, January 23rd, to be specific,

5  2007, until today, have you been prosecuted or charged with any

6  crime?

7  A.  No.

8  Q.  You haven't been charged with drug distribution?

9  A.  No.

10 Q.  You told the grand jury you were heavily involved in it

11 though, didn't you?

12 A.  Right.

13 Q.  Under oath?

14 A.  Right.

15 Q.  You've told this jury that you're heavily involved in drug

16 dealing during that time?

17 A.  Right.

18 Q.  You've not been charged with perjury in the Barnes case,

19 have you?

20 A.  No.

21 Q.  Nobody has even talked to you about that, have they?

22 A.  About what?

23 Q.  Charging you with perjury.

24 A.  It has been brought to my attention by the FBI but I

25 haven't been charged though, no.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1195

1   Q.  Okay.  You haven't been charged with violating anyone's

2   civil rights?

3   A.  No.

4   Q.  For your false testimony?

5   A.  No.

6   Q.  You haven't been arrested during that period of time, have

7   you?

8   A.  I went to jail about two months ago.

9   Q.  Okay.  What was that for?

10  A.  Interfering with an officer.

11  Q.  Something you did here in Tulsa County?

12  A.  I guess so.

13  Q.  Did you do it or not?

14  A.  I don't even know what it means.

15  Q.  So you didn't do it?

16  A.  I guess not.

17  Q.  Okay.  You haven't had to post bail for any of these

18  offenses other than maybe this one a couple months ago?

19  A.  No, no.

20  Q.  Okay.  Haven't been punished in any way for your criminal

21  activity?

22  A.  No.

23  Q.  Okay.  Your son hasn't been taken away from you?

24  A.  No.

25  Q.  Even though you were dealing drugs out of the house with

```
 1  him present?
 2  A.  Right.
 3  Q.  Even though you were dealing drugs in the car with him
 4  present?
 5  A.  Right.
 6  Q.  And that was a major concern to you, wasn't it?
 7  A.  Yes, it was.
 8  Q.  Now, you told this jury today that Officer Henderson
 9  threatened you with taking your son away?
10  A.  Yes, sir.
11  Q.  Now, you told the Office of Inspector General, specifically
12  I believe it was Rachel Hart, you told her that it was McFadden
13  who made those comments; isn't that correct?
14  A.  They both did, sir.
15  Q.  Sir, did you read the OIG report that was prepared?
16  A.  Right.  Well, I must have left it out.
17  Q.  Well, in that OIG report it says that McFadden made that
18  statement; isn't that correct?
19  A.  Right.
20  Q.  Now, you also gave testimony in a number of depositions
21  related to the Barnes civil case, haven't you?
22  A.  In a deposition?
23  Q.  Yes, sir.
24  A.  Yes.
25  Q.  In fact, you've given testimony on at least three occasions
```

```
 1   within the last 90 days?

 2   A.  Yes.

 3   Q.  And, in fact, that gentleman right back there in the yellow

 4   tie, he asked you some questions, didn't you?

 5   A.  Oh, yeah.

 6   Q.  Mr. Tony Allen?

 7   A.  Yeah.

 8   Q.  Probably, what, a stack of questions about that thick?

 9   (INDICATING)

10   A.  Oh, yeah.

11   Q.  And you've seen the transcripts of those; correct?

12   A.  Yes.

13   Q.  You have them?

14   A.  I've got half of them.

15   Q.  Okay.  And your attorney has the others; right?

16   A.  I believe so.

17   Q.  Okay.  And in that testimony you admitted that it was

18   McFadden.  Again, that testimony was under oath; correct?

19   A.  Right.

20   Q.  Same oath you took in this courtroom?

21   A.  Right.

22   Q.  But in that testimony, in that deposition, that civil

23   deposition, you said it was Brandon McFadden who threatened

24   you -- your son, not Jeff Henderson; isn't that correct?

25   A.  I believe so.
```

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1198

1   Q.   Okay.  So your testimony today is different from what you

2   told the Office of Inspector General and it's different from

3   the deposition?

4   A.   I just left it out but, yeah, it's different.

5   Q.   Okay.  Have there been any DHS investigations of you and

6   your family?

7   A.   Oh, no.

8   Q.   Do you have more kids than one now?

9   A.   I have two.

10  Q.   At the time of the search warrant, you had one son,

11  Rashawn, age three; correct?

12  A.   Three-and-a-half years old, yes.

13  Q.   And your girlfriend, Deanna Blassengill, was pregnant at

14  that time; is that correct?

15  A.   One month pregnant, yes.

16  Q.   Okay.  And that went to full-term and delivered a child?

17  A.   Yes, sir.

18  Q.   So you have two children today?

19  A.   Yes.

20  Q.   Okay.  And DHS has never come to investigate or inspect

21  your house or to question whether those children are at risk?

22  A.   No.

23  Q.   Okay.  Now, you're an informant for the FBI today, aren't

24  you?

25  A.   Not today I'm not.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1199

```
 1    Q.  You're not cooperating with them?
 2    A.  I was told, I don't know, God, six, seven, eight months ago
 3    that they no longer needed me.  They got enough information
 4    from me, I guess.  I don't know.
 5    Q.  Okay.  So they're through with you?
 6    A.  Basically.
 7    Q.  All but your testimony?
 8    A.  Right.
 9    Q.  Okay.  From October of 2009 until seven or eight months
10    ago, you were an informant for the FBI; is that correct?
11    A.  I believe, yeah.
12    Q.  Okay.  And when they came to serve a search warrant on you,
13    what was it, June of 2009?
14    A.  Yeah, June 10th, I believe.
15    Q.  In June the FBI showed up along with Lance Ramsey, you said
16    it was?
17    A.  Right.
18    Q.  And a number of people, and they're pulling up the carpet
19    in your house?
20    A.  Yeah, tearing out sheetrock.
21    Q.  You had new carpet, didn't you?
22    A.  Not new.  I put it in about, I don't know, four or five
23    years before that.
24    Q.  They were tearing up -- digging holes in your yard?
25    A.  Yeah, with shovels.
```

U.S. District Court
Northern District of Oklahoma

1   Q.   They were breaking out your sheetrock?

2   A.   Yeah.

3   Q.   Looking behind things?

4   A.   Yeah.

5   Q.   And they were tearing up your house; right?

6   A.   Yeah.

7   Q.   Looking through everything, your refrigerator, every drawer

8   in your house, pulled out everything and went through

9   everything?

10  A.   Everything, sir.   Everything.

11  Q.   And that was the Tulsa County Sheriff's Office?

12  A.   And a couple of agents from the FBI.

13  Q.   A couple of agents from the FBI?

14  A.   Uh-huh.

15  Q.   Now, after that particular day, you've had at least 15 to

16  20 meetings with Agent Gary Graff; isn't that correct?

17  A.   Oh, yeah, quite a few.

18  Q.   Has he shown you a single memorandum of interview to look

19  at?

20  A.   What do you mean?

21  Q.   Well, has he shown you a report and asked you to read it

22  and say is this information accurate?

23  A.   The information that I gave them?

24  Q.   Yes.

25  A.   Yeah.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                        1201

1    Q.  Has Gary Graff done that?

2    A.  Yes.

3              MR. WYATT:  Your Honor, may we approach?

4              THE COURT:  Yes, sir.

5         (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF

6    THE HEARING OF THE JURY:)

7              MR. WYATT:  Your Honor, to my knowledge, we've never

8    been given copies of any FBI 302s from Gary Graff regarding his

9    interviews with this witness.

10             MR. HARRIS:  I think this witness is talking about the

11   OIG report that he signed that came from Rachel Hart.

12             THE COURT:  You don't have any 302s, is what you're

13   saying?

14             MR. HARRIS:  I'm saying he's never been shown a 302,

15   yeah.

16             MR. WYATT:  I have never seen one either.  I haven't

17   had one produced.

18             MR. HARRIS:  I mean, you've got all the 302s.

19             MR. WYATT:  What I'm saying is I do not have any from

20   Gary Graff regarding this witness.

21             MR. HARRIS:  Because I don't think there are any.  I

22   think he's talking about an OIG report.  Just follow up and ask

23   him.

24             THE COURT:  (NODS HEAD UP AND DOWN)

25             MR. WYATT:  Thank you, Your Honor.

U.S. District Court
Northern District of Oklahoma

1      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

2   THE PRESENCE AND HEARING OF THE JURY:)

3   Q.  (BY MR. WYATT)  Respectfully, sir, the U.S. Attorney,

4   Mr. Patrick Harris, tells me that there are no reports prepared

5   by Gary Graff.  Have you seen reports?

6   A.  Well, I've seen a lot of paperwork from him.  I'd have to

7   see it so I can say "yes" or "no".  I've seen reports.  I'm

8   thinking maybe the one that I gave them is what I'm thinking

9   you're talking about.  All the information I gave them, is that

10  what you're talking about?

11  Q.  I don't know, sir.

12  A.  Well, tell me what you're talking about.

13  Q.  I'm asking you:  What did you see?

14  A.  I've seen paperwork, all the information I gave them.

15  Q.  Other than the OIG report prepared by Rachel Hart, have you

16  seen any other investigative reports prepared that outline what

17  you told them?

18  A.  No.  Just the ones that I gave them.  I'm sorry.  I

19  misunderstood your question, sir.  No, I haven't.

20  Q.  Now, you would do anything to avoid going to prison; isn't

21  that correct?

22  A.  I try.

23  Q.  Meaning you've said that on a number of occasions, haven't

24  you?

25  A.  Yeah.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1203

1   Q.   You've told Larita Barnes that?

2   A.   Yeah.

3   Q.   You have told Gary Knox that?

4   A.   Gary Knox that?

5   Q.   Yes, sir.  You know a man named Gary, don't you?

6   A.   Yeah, yeah.

7   Q.   And you've told him that you would do anything to avoid

8   prison, wouldn't you?

9   A.   Yeah.

10  Q.   Okay.  You've told these officers, whether it's the FBI,

11  whether it's Officer Henderson, whether it is Brandon McFadden

12  or Sean Larkin, you've told a lot of people, "I'll do anything

13  to avoid going to prison.  I just don't want to go to prison."

14  Right?

15  A.   Right.  But I don't know Sean Larkin like that.

16  Q.   Okay.  How about Frank Khalil, did you tell him that?

17  A.   I never had that conversation with Frank Khalil.

18  Q.   Okay.  You didn't have that conversation on January 23rd,

19  2007?

20  A.   I had that conversation with Henderson.

21  Q.   No one else was there other than Jeff Henderson?

22  A.   Well, McFadden and Khalil was there.  They might have heard

23  it but I wasn't talking to them.  I was talking to Henderson

24  himself.

25  Q.   Now, you today have a lawyer; is that correct?

U.S. District Court
Northern District of Oklahoma

1    A.  Yes.

2    Q.  Is your lawyer in the courtroom?  He's holding his hand up;

3    right?

4    A.  Yeah.

5    Q.  His name is Stan Monroe, isn't it?

6    A.  Yes.

7    Q.  And, in fact, Stan Monroe and you intend to file a civil

8    lawsuit against Jeff Henderson and Brandon McFadden and the

9    City of Tulsa, don't you?

10   A.  We haven't decided what we're going to do, sir.

11   Q.  Okay.  Did you tell Gary Knox, a friend of yours, that you

12   were going to sue all of these people?

13   A.  I can't remember saying that.

14   Q.  You don't remember saying that, "Once Henderson gets found

15   guilty, then I can file my lawsuit against him and McFadden for

16   here and my mom's house, all that shit, search warrants fake,

17   they planted dope, making me get on the stand for all the dope

18   I sold for them, there's one great big lawsuit," Stan says

19   here.  He goes, "Ryan I'm not going to do nothing for you until

20   Henderson is found guilty because there's no point.  If

21   Henderson does beat this case" --

22        MR. HARRIS:  Judge, I'm going to object.  This seems

23   to be a really long question.

24        THE COURT:  And it seems to be quoting from something.

25        MR. HARRIS:  It does.

1              MR. WYATT:  Your Honor, I'd be glad to play a tape if

2    so and ask him if it's his voice.  I'm asking him if he made

3    this statement.

4              THE COURT:  All right.

5    A.  I've heard the recording, sir.

6    Q.  (BY MR. WYATT)  You've heard the recording, haven't you?

7    A.  I've heard it sounds like me but I don't remember saying

8    those things.

9    Q.  You don't remember those things?

10   A.  No.

11   Q.  Okay.  You don't deny it sounds like you on those

12   recordings?

13   A.  It sounds like me but I don't remember saying it.

14   Q.  And you know Gary Knox, don't you?

15   A.  Yeah; a childhood friend of mine.

16   Q.  Okay.  In fact, you were angry with him for making those

17   recordings, weren't you?

18   A.  I didn't know he made those recordings just until recently

19   but, no, I'm not angry.

20   Q.  Okay.  So it was you on the recordings then?

21   A.  I don't know if it was.  It sounds like it but I don't

22   remember saying them things.

23   Q.  Okay.  Now, since the investigation began, and I'm going to

24   use June of 2009 since that was the day that the FBI ran a

25   search warrant on you with Lance Ramsey.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1206

```
 1   A.  Sure.
 2   Q.  So from June of 2009 until today, how many times have you
 3   met with anyone sitting at this table?
 4   A.  At that table?
 5   Q.  Yes, sir.
 6   A.  Three to five times.
 7   Q.  When was the last one?
 8   A.  The last time I met with these at this table?
 9   Q.  Yes.
10   A.  Oh, probably three weeks ago.
11   Q.  How long was that meeting?
12   A.  Oh, an hour or two.
13   Q.  Where did that meeting happen?
14   A.  I believe it was at the federal building there on 61st and
15   Memorial.
16   Q.  Okay.  Would that be the FBI office?
17   A.  I believe it is, yeah.
18   Q.  And would that have been Agent Legleiter's office?
19   A.  I believe so.
20   Q.  Okay.  Was Agent Graff there?
21   A.  No.
22   Q.  Who all was at that meeting?
23   A.  Pat Harris, Patricia Harris, Ms. Duke, Kevin.
24   Q.  Okay.  No one else?
25   A.  Oh, there was other officers.  I seen some other people
```

1  there, employees, but I don't know who they are.

2  Q.  Was your lawyer there?

3  A.  No.

4  Q.  Okay.  Now, during the period of time, from June of 2009

5  until today, and I'll use that time frame, at any time during

6  that period, were you carrying an FBI phone?

7  A.  From June of '09 up until now?

8  Q.  Any period of time during that.

9  A.  I carried one for about three months, yeah.

10  Q.  Actually, maybe more like from May until October, maybe six

11  or seven months?

12  A.  An FBI phone?

13  Q.  Yes, sir.

14  A.  I carried an FBI phone for about three months, sir.

15  Q.  Okay.  And that phone was a monitored telephone; correct?

16  A.  That I got from the FBI, yes.

17  Q.  In other words, every time that phone rang or every time

18  you dialed it, the FBI could listen?

19  A.  Right.

20  Q.  And, in fact, it was either recorded or they were listening

21  live; correct?

22  A.  Right.

23  Q.  Okay.  And that was your understanding when you accepted

24  that phone; is that correct?

25  A.  Right.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                1208

1   Q.  And in those monitored phone calls, you made at least three

2   phone calls to Jeff Henderson; isn't that correct?

3   A.  Yes.

4   Q.  And in those phone calls you tried to set Jeff Henderson up

5   and ask him questions, didn't you?

6   A.  Yes.

7   Q.  And you asked him about the Barnes case, didn't you?

8   A.  Right.

9   Q.  And, in fact, Jeff Henderson said, "I hear you've been

10  talking to people"; isn't that right?

11  A.  Something around there.

12  Q.  Yeah.  And he said, "The only thing that I'm upset about is

13  you lying to the feds about the Barnes case"; is that right?

14  A.  I didn't lie to the feds, sir.

15  Q.  Isn't that what he asked you?  That's all I asked.

16  A.  Something about he heard I talked to the feds, but I don't

17  remember him saying I lied to the feds.

18  Q.  He asked you specifically, "Did you tell anybody with the

19  federal government that you lied or that we lied at the Barnes

20  trial"?

21  A.  I don't --

22  Q.  All I'm asking is:  Did he ask you that?

23  A.  I don't remember.

24  Q.  All I'm asking is --

25          THE COURT:  Let him finish the answer, please.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1209

```
 1              MR. WYATT:  Yes, Your Honor.
 2         (MR. WYATT BEGAN APPROACHING THE BENCH)
 3              THE COURT:  I said, "Let him finish his answer."
 4              MR. WYATT:  Oh, I'm sorry.  I thought you said to
 5    approach the bench, Your Honor.
 6              THE COURT:  I guess I'll have to speak more
 7    distinctly.
 8              MR. WYATT:  Excuse me.  I apologize, Your Honor.  I'll
 9    slow down.
10    Q.  (BY MR. WYATT)  I ran over you a little bit and I
11    apologize.
12    A.  All right.
13    Q.  I asked you and I believe you answered but I want to make
14    sure I heard it right.  I asked you:  During that conversation,
15    Jeff Henderson specifically asked you did you give them
16    information saying that you lied about Larry Barnes at that
17    trial?
18    A.  It was brought up, somewhere around -- I can't remember the
19    exact conversation but it was brought up about the Barnes.
20    Q.  And in that conversation you never said, "Hey, I didn't
21    tell them that," did you?
22    A.  I might have said something like that, yeah.
23    Q.  Okay.  And you never said when he said, "Hey, if you did
24    that, then I'm mad at you because you lied about it."  He said
25    that to you, didn't he?
```

```
 1   A.  Honestly, I can't remember.
 2   Q.  Do you think it would refresh your recollection if we
 3   needed to play those tapes?
 4   A.  I guess.
 5   Q.  Okay.  Well, we may come back and do that in just a few
 6   minutes.
 7   A.  Okay.
 8   Q.  Didn't Jeff Henderson tell you that he was angry with you
 9   for lying about that particular incident?
10   A.  He never told me he was angry.  I could hear it in his
11   voice, you know.
12   Q.  He told you if you lied about that, if you said that, that
13   that was a lie, and you never denied it, did you?
14   A.  Honestly, I can't remember, sir.
15   Q.  Very well.
16       Did you tell Gary Knox, your childhood friend, about the
17   search at your house?
18   A.  There's a lot of people that knows about the search at my
19   house.  Which one, which search?
20   Q.  January 23rd, 2007.
21   A.  I told a lot of people about that search.
22   Q.  Well, I'm asking about Gary Knox, your childhood friend.
23   A.  I told him a little bit about it, yeah.
24   Q.  And during that particular conversation, it was tape
25   recorded; isn't that correct?
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                        1211

1   A.   I've been told it was.

2   Q.   Tapes have been provided to you in the civil case, haven't

3   they?

4   A.   Yeah, I've got some recordings at home, yeah.

5   Q.   And, in fact, you've listened to those, haven't you?

6   A.   Yeah.

7   Q.   Okay.  So, in fact, there was a conversation recorded,

8   wasn't there?

9   A.   I guess there was.

10  Q.   Yes, sir.

11       And in that conversation, isn't it true that you said that

12  the feds are wicked?

13  A.   Wicked?

14  Q.   Yes, sir.

15  A.   Well, you've got to understand, when Gary Knox was coming

16  out to my house recording me, he would bring a case of beer

17  with him too.  So if I was drunk, I don't remember saying these

18  things.

19  Q.   Okay.  So, do you lie when you're drunk?

20  A.   I can do whatever I want at my house.

21  Q.   Well, I'm not saying --

22  A.   I can lie to anybody; I can sit there and drink beer all

23  day; I can do what I want at my house.  If it was my childhood

24  friend or not, I can say what I want to say.  That's my house.

25  Q.   I agree with you, you can.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1212

```
 1   A.  Okay.
 2   Q.  So when you're talking to your childhood friend, are you
 3   just lying to him?
 4   A.  Just shooting the bull.
 5   Q.  Shooting the bull.  And when you're shooting the bull, you
 6   were talking about this particular case; right?
 7   A.  I could have been.  I can't remember.
 8   Q.  And, in fact, you were bragging about how they didn't find
 9   that weed; isn't that right?
10   A.  Find what weed?
11   Q.  At your house.  Excuse me.  That meth.
12   A.  What search?
13   Q.  January 23rd, 2007.
14   A.  They didn't find meth at my house.
15   Q.  I'm asking:  Were you bragging to Gary about that?
16   A.  I don't know.  I can't remember.
17   Q.  You don't remember telling them how big their eyes were
18   when they found all that?
19   A.  Well, they eyes were big.
20   Q.  Well, you came out and you slammed your chairs {sic} down
21   on the table and said, "Let's fucking talk about this."
22   A.  Yeah.
23   Q.  That's what you told them; right?
24   A.  That's what I told them that day on the 23rd, yeah.
25   Q.  And you told them that, "I know why you're here.  Let me
```

1   just put it all out there."  Is that right?  Is that right?

2   A.  I can't remember saying that.

3   Q.  Okay.  And every other word was the F word; is that right?

4   A.  I can't remember saying that either.

5   Q.  Okay.  Would that be typical of your language?

6   A.  Sometimes, yeah.

7   Q.  Okay.  And let me ask you, sir:  You have been a

8   confidential informant at least three times where you were

9   signed up by TPD; correct?

10  A.  Right.

11  Q.  Once in 1995?

12  A.  Right.

13  Q.  As a result of what, drug activity?

14  A.  Yeah.

15  Q.  Once again in 1997 with TPD?

16  A.  Right.

17  Q.  Now, on either one of those cases, Jeff Henderson was not

18  involved; right?

19  A.  No, not none of those, no.

20  Q.  He wasn't your handler?

21  A.  No.

22  Q.  Okay.  Now, he was on the force in 1995.  Did you know him?

23  A.  No.

24  Q.  Okay.  Didn't have anything to do with that?

25  A.  Henderson?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1214

1   Q.  Uh-huh.

2   A.  No.

3   Q.  In 2007 you signed up again, and we saw that just a moment

4   ago in government's exhibit number 6; right?

5   A.  Yes, sir.

6   Q.  Okay.  And as a result of that, you gave up 17 to 18 of

7   your own suppliers; correct?

8   A.  Yes, sir, I did.

9   Q.  And all of that was legitimate police work giving those

10  people up; correct?  You were working off your charges?

11  A.  I guess it was.

12  Q.  Okay.  That's what you told the grand jury, isn't it?

13  A.  Yeah.

14  Q.  And you told the Office of Inspector General that you set

15  up Dave -- David at Custom Wheels & Tires?

16  A.  Right.

17  Q.  And that was for meth; right?

18  A.  Right.  He kept it at his shop, yeah.

19  Q.  Yeah.  And Dennis Grant?

20  A.  Yeah.

21  Q.  That was for meth?

22  A.  Uh-huh.

23  Q.  And Kyle Isaacs?

24  A.  Kyle Isaacs.

25  Q.  That was for meth too, wasn't it?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                    1215

```
 1   A.  Yeah.

 2   Q.  Byron, do you remember Byron?

 3   A.  Yeah.

 4   Q.  Now, Byron was for cocaine; right?

 5   A.  Yeah.

 6   Q.  But you don't deal in cocaine?

 7   A.  No.  actually, I was in the house and I saw it and I

 8   relayed the information to Henderson.

 9   Q.  You know cocaine when you see it?

10   A.  Well, yeah.  It appeared to be.  That's what I thought it

11   was.

12   Q.  Do you know crack cocaine when you see it?

13   A.  Yeah.

14   Q.  Do you know weed when you see it?

15   A.  Yeah.

16   Q.  Do you know weed when you smell it?

17   A.  Yeah.

18   Q.  Okay.  Any other drugs you're familiar with?

19   A.  Meth.

20   Q.  Heroin?

21   A.  Heroin.  A little bit of heroin, yeah.

22   Q.  In fact, you were busted for heroin once; right?

23   A.  Yeah.

24   Q.  Okay.  You didn't mention that to the jury when you told

25   them earlier about your convictions?
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1216

1   A.  I forgot to.

2   Q.  Now, in addition to Byron, also Jonathan Cherry?

3   A.  I guess -- I don't know Jonathan Cherry.  I guess Byron,

4   from what I was told, rolled over on him, so maybe I got credit

5   for it.  I don't know.

6   Q.  Okay.  Now, I'm going to again ask you:  You read the OIG

7   report?

8   A.  Yeah, I remember reading it, yeah.

9   Q.  And in that report it says that you told them that Jonathan

10  Cherry was one of the people you gave up; is that correct?

11  A.  I don't remember actually telling them that.  I remember

12  that it rolled over to him.

13  Q.  Okay.  That was with Byron and the cocaine; right?

14  A.  Right.

15  Q.  Okay.  Rodolfo Cruise Amador?  Actually, "Cruise" was his

16  nickname, I guess, his street name?

17  A.  His name was Cruise, yeah.

18  Q.  Okay.  And that was cocaine; right?

19  A.  No, I saw the cocaine -- I saw crack and weed in his

20  apartment but I went there to buy meth, like I told the jury

21  earlier.

22  Q.  Okay.  So he was involved in all three then?

23  A.  Yeah.

24  Q.  He was busted for crack and weed; correct?

25  A.  Right.

```
 1   Q.  And weed's marijuana; right?

 2   A.  Yeah.

 3   Q.  Jerry Hill?

 4   A.  I saw weed in his house.  I was just there for five minutes

 5   one night and I saw it there.

 6   Q.  And he was arrested for meth though; right?

 7   A.  I thought it was just weed.

 8   Q.  Okay.  Dustin Eaton?

 9   A.  Dustin Eastom?

10   Q.  Eaton.  E-A-T-O-N, I believe it was.

11   A.  No, I didn't give information on him.

12   Q.  Okay.  Well, would you like to see the --

13   A.  I saw that on there.  I've already pointed that out to the

14   FBI that I didn't do that guy.

15   Q.  Okay.  So you told them that you weren't involved in that

16   one at all?

17   A.  Right.

18   Q.  Did you ever see a supplemental report that corrected that?

19   A.  No.

20   Q.  Okay.  You also told them three or more Mexicans or people

21   of Mexican descent; is that correct?

22   A.  Right.

23   Q.  And you didn't know their names but it was for all

24   different kinds of drugs; right?

25   A.  They might have gave me their name but I don't know if that
```

U.S. District Court
Northern District of Oklahoma

1   was their real name or not.

2   Q.  And also Chris, whose last name you didn't know, who was

3   involved in cocaine distribution; right?

4   A.  Well, yeah, he told me he could give me some meth, and when

5   I went to his house to get the meth he had coke there and some

6   assault rifles, yeah.

7   Q.  And you agree that you legitimately informed on all of

8   those people?

9   A.  Except for the --

10  Q.  Except Eaton or Eastom?

11  A.  Dustin Eastom.  And Cherry, Jonathan Cherry, that rolled

12  over.  Like I said, that was something Byron did.  I didn't do

13  that one.  I might have got credit for it.  I don't know.

14  Q.  Because Byron rolled on somebody --

15  A.  His supplier.

16  Q.  -- after he rolled on him --

17  A.  Right.

18  Q.  -- and you got credit?

19  A.  I guess so.

20          THE DEPUTY COURT CLERK:  Can you wait for like two

21  seconds before you answer?

22          THE WITNESS:  Sure.

23          MR. WYATT:  I'm sorry.

24  Q.  (BY MR. WYATT)  If Brandon McFadden sent an e-mail or a

25  statement or some kind of writing which has come into this

1   court, exhibit number 185, to Jan Reincke stating that you

2   worked on the Avery Brewer case, that would be true; right?

3   A.  Yes.

4   Q.  The Larry Barnes case; right?

5   A.  I didn't -- well, I lied.

6   Q.  Many Mexicans?

7   A.  Yes.

8   Q.  Jerry Hill and Stephanie Crawford?

9   A.  Yes.

10  Q.  You know Stephanie Crawford too, don't you?

11  A.  I don't know her.

12  Q.  But you know who she is?

13  A.  I know of her.

14  Q.  Jerry Hill's girlfriend?

15  A.  I guess she was at that time.  I don't know.

16  Q.  Brian Cole Williams?

17  A.  Brian Cole Williams?

18  Q.  Don't recognize that name?

19  A.  No.

20  Q.  Okay.  Isias Gonzalez?

21  A.  Isias Gonzalez?  (WITNESS SHAKES HEAD FROM SIDE TO SIDE)

22  Q.  Juan Mata, M-A-T-A?

23  A.  No, I wasn't with Juan Mata.

24  Q.  Arias Nelson?

25  A.  I would have to see their faces.

1   Q.   Kyle Isaacs?

2   A.   I know Kyle Isaacs, yeah.

3   Q.   Okay.  You informed on him?

4   A.   Yeah.

5   Q.   You already talked about Rodolfo Amador?

6   A.   Yeah.

7   Q.   Alphie McKinney?

8   A.   No.

9   Q.   No?  Okay.  Jeremy Battle?

10  A.   No.

11  Q.   And if he said you were involved in 30 to 40 other cases,

12  would that be true or false?

13  A.   30 to 40 other ones?

14  Q.   Yes.

15  A.   No, that wouldn't be true, sir.

16  Q.   Okay.  Now, earlier in your testimony today, dealing with

17  the January 23rd, 2007, search warrant, the first time you met

18  Henderson and McFadden; correct?

19  A.   Yes, sir.

20  Q.   You testified that they pulled you over on a traffic stop?

21  A.   Leaving the house.

22  Q.   You, your wife and your son?

23  A.   Right.

24  Q.   Correct?

25       And that during the traffic stop --  How long was that

1    stop?  Let's start with that?

2    A.  How long was the stop?

3    Q.  Yes, sir.

4    A.  Long enough for them to turn lights on, pull me over, get

5    me out of the car, patted me down, Henderson patted my girl

6    down, hopped back in the car.  10 minutes.

7    Q.  Okay.  And where did this take place in relation to your

8    house?

9    A.  I live on 76th.  I pulled over at about 74th, the 73rd

10   area.  Probably three or four blocks, five blocks from the

11   house.

12   Q.  Were you driving?

13   A.  Yes.

14   Q.  PT Cruiser?

15   A.  Yes.

16   Q.  Okay.  Silver?

17   A.  Silver.

18   Q.  Did you exit the car to be patted down and searched?

19   A.  He opened the car door and had me step out; yes.

20   Q.  And your girlfriend, Deanna, stepped out?

21   A.  She stayed in the car.

22   Q.  Okay.  So Mr. Henderson patted her down while she's seated

23   in the car?

24   A.  I'm getting to that.  He patted me down, placed me in

25   handcuffs, and then he went over there and opened the door and

1    got her out.

2    Q.  Okay.

3    A.  Left my son in the car.

4    Q.  Okay.  Now, when you were placed in handcuffs, then what

5    happened to you?

6    A.  I was placed in the front seat of Henderson's car.

7    Q.  Okay.  And at what point in this scenario did Mr. Henderson

8    tell you he had a search warrant for your house?

9    A.  Well, right when he got me out of the car he handed me a

10   warrant, right before he patted me down.  I was reading it.  I

11   looked at it and I put my hands on the car, he patted me down,

12   and then he handcuffed me in the front because I've got a bad

13   shoulder and he handcuffed me in the front.  And as I'm sitting

14   in the car, I'm reading the search warrant that said cocaine on

15   it.

16   Q.  And you told him you had a bad shoulder?

17   A.  Yeah, that's why I asked him not to handcuff me in the

18   back.

19   Q.  And he did that?

20   A.  Yes.

21   Q.  He was professional and courteous about that?

22   A.  At first, yeah.

23   Q.  Okay.  Now, at your deposition that was given in the last

24   90 days, you said you didn't learn about the search warrant

25   until you got back to your house; isn't that correct?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1223

```
 1   A.  I guess.  Is that what I said?

 2   Q.  I believe it is; yes, sir.  You don't deny that, do you?

 3   A.  No, I don't deny that, no.

 4   Q.  That would be different from your testimony today, isn't

 5   it?

 6   A.  Yeah.

 7   Q.  Now, we saw government's exhibit 11-c.

 8           MR. WYATT:  May we have that, the handwritten

 9   statement?  11-c.

10   Q.  (BY MR. WYATT)  Can you see that on the screen, sir?

11   A.  Yes.

12   Q.  Now, today is the first time you've given a statement that

13   this was a blank page that you just signed at the bottom; isn't

14   that correct?

15   A.  Yeah, I believe this is the first time I've gave a

16   statement, yeah.

17   Q.  In all previous statements regarding this particular

18   document, you've said that you just didn't read it but you

19   signed it.

20   A.  This paper I signed.

21   Q.  I understand that, sir.

22   A.  I signed that before it was filled out, the night Henderson

23   ran the warrant on my house.

24   Q.  That's your testimony today?

25   A.  Yeah.
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1224

1   Q.  In previous testimony with the grand jury, you never told

2   them that; isn't that correct?

3   A.  I can't remember.

4   Q.  Well, I'll direct you to page 24 and 39 of the transcript,

5   if we need to.

6   A.  That's fine.

7   Q.  You never told them that, did you?

8   A.  I can't remember.

9        MR. WYATT:  May we see the transcript, please?  Oh,

10  I've got it.

11     May I approach, Your Honor?

12        THE COURT:  Yes.

13  Q.  (BY MR. WYATT)  Would you take a moment and just read from

14  about, let's say, line 10 down through that page and part of

15  the next page.  Read it to yourself.

16  A.  Yeah, I signed this when it was blank.

17  Q.  Okay.  I want you to go ahead and read the next page on

18  page 25, just the top of the page.

19     I want to take you over to page 39 of the transcript,

20  starting at about line 10 -- excuse me -- it's around line 19.

21  A.  All right.

22  Q.  Just read the top of the next page, page 40.

23        THE DEPUTY COURT CLERK:  Would you pull the mic over

24  just a little bit so we can hear you?

25        THE COURT:  And speak loudly.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                    1225

```
 1              THE DEPUTY COURT CLERK:  For Mr. Wyatt.
 2              MR. WYATT:  Yes, I asked that he turn the page to page
 3   40, the top of the page.
 4   Q.  (BY MR. WYATT)  Have you read that, sir?
 5   A.  Yes.
 6   Q.  Having read those pages of the grand jury transcript, you
 7   would agree with me that there was nothing said to the grand
 8   jury about that being a blank statement, was there?
 9   A.  Right.
10   Q.  And in the OIG report, the 22-page report prepared by
11   Rachel Hart with the Office of Inspector General, you talked
12   about this particular statement too, didn't you?
13   A.  Right.
14   Q.  And there's nothing in that report that says that it was
15   blank when you signed it?
16   A.  Right.
17   Q.  Now, in addition to that, you testified at a trial for
18   Larry and Larita Barnes, didn't you?
19   A.  Yes.
20   Q.  And at page 207 of that transcript there was discussion
21   about that particular handwritten statement, wasn't there?
22   A.  Yeah, it come up again, yeah.
23   Q.  It did.  And this was a couple of years ago, wasn't it?
24   A.  A couple of years?  Yes.
25   Q.  Actually, I believe it was April 21st of 2008, maybe April
```

1    22nd of 2008.

2    A.   Somewhere around there.

3    Q.   Okay.  And in that transcript you were shown the statement,

4    and you didn't tell the jury, "I signed that in blank," did

5    you?

6    A.   I can't remember.  I might have.  I don't know.  I know I

7    signed that when it was blank.

8    Q.   Okay.

9         MR. WYATT:  Could we see government's exhibit number

10   30 at page 207, please.  Actually, I stand corrected.  It's

11   page 205.

12   Q.   (BY MR. WYATT)  Can you see that on the screen, sir?

13   A.   Yeah.

14   Q.   Let's go down to the bottom of that page.  That would be

15   line 17.  And there was discussion about the $10,000 concealed

16   in your garage attic, wasn't there?

17   A.   There was 60,000 there.  There wasn't 10-.

18   Q.   Well, I understand that.  That's not my question.  My

19   question is:  At the trial of Larry and Larita Barnes at page

20   205 of the transcript, beginning at line 18, there's a

21   discussion about money concealed in your attic; isn't that

22   correct?

23   A.   Right.

24   Q.   And you said that there was $10,000 when asked the

25   question:  "And how much money was it?"

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1227

1   A.   Right.

2   Q.   And you said:  "10,000 even."

3   A.   Okay.

4   Q.   Is that right?

5   A.   That's right.

6   Q.   And it says -- the next question was, line 24:  "And was

7   that $10,000 of profit from drug dealing?"

8        And the answer:  "Yes it was."

9        Is that correct?

10  A.   That's correct.

11  Q.   And then we go to the next page, page 206, beginning at the

12  top line, the question was asked of you:  "And did you advise

13  Officer Henderson of that?"

14       The answer:  "Yes, I did."

15       Is that right?

16  A.   That's right.

17  Q.   Okay.  Now, during that conversation did you tell the jury

18  anything about that statement being signed in blank?

19  A.   You've got to understand the Barnes trial was all a

20  lie.  The only thing I didn't lie about was my name.

21  Q.   That's my question, sir, is:  Did you tell the jury

22  anything about that document being signed in blank?

23  A.   I must have but everything was made up in that trial.  Some

24  of this stuff I wasn't coached on, and some of the things I was

25  coached on, you know.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                               1228

1   Q.   And both the prosecutor and the defense attorney asked you

2   questions about exhibit 11-c?

3   A.   Yeah.

4   Q.   Right?

5   A.   Right.

6   Q.   Okay.  And you were under oath on April 22nd, 2008, at the

7   Barnes trial when you testified; is that correct?

8   A.   Yes, sir.

9   Q.   And was that the same oath given to you today before your

10  testimony?

11  A.   Yes.

12  Q.   The same oath that you took during the three depositions

13  with Anthony Allen?

14  A.   Yes.

15  Q.   And at the time you took that oath in each of those

16  occasions, including today, you understood that it was your

17  lawful obligation to tell the truth?

18  A.   Right.

19  Q.   You understood that telling a lie while under oath in a

20  court proceeding is a crime?

21  A.   Right.

22  Q.   You understood that that's called perjury?

23  A.   Yes, sir.

24  Q.   And it is punishable as either a state or federal offense

25  depending where it occurred?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                    1229

1    A.  Right.

2    Q.  And you did that knowingly and voluntarily?

3    A.  Yes.

4    Q.  Of your own free will?

5    A.  Yes.

6    Q.  Now, I want to turn again to 207 of government's exhibit

7    30.  At the top of that page, beginning at line 3, again, you

8    were specifically asked about that handwritten statement that

9    is government's exhibit 11-c.  Isn't that correct?

10   A.  Yes.

11   Q.  And you told the story -- and this is you talking; right?

12   A.  Yes.

13   Q.  This is you giving answers?

14   A.  Right.

15   Q.  You said:  "The statement here I gave them at my house, I

16   remember him and I was sitting at my kitchen table."

17       Did you say that, sir?

18   A.  This is in front of the grand jury; right?

19   Q.  No, this is in front of the Barnes trial, in front of the

20   jury.

21   A.  I told you the Barnes trial was a lie.

22   Q.  Did you say those words?

23   A.  I must have.

24   Q.  And then it says in line 7:  "And did you write that, did

25   you?"  Or it says:  "And you didn't write that, did you?"

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1230

1    And you said:  "No, he did," referring to Mr. Henderson;
2    correct?
3    A.  Yes, sir.
4    Q.  And then they asked you the question on line 9:  "Did you
5    tell him what to write?"
6        And your answer was:  "Well, he was -- yeah, basically I
7    told him."  Is that right?
8    A.  That's right.
9    Q.  Line 15 says:  "Have you had an opportunity to read this
10   statement?"  Is that right?
11   A.  That's right.
12   Q.  And you said, "Yes."
13       Line 17:  And did you sign this statement?"
14       The answer at line 18:  "Yes, I did."
15       The question at line 19:  "And is that your signature?"
16       The answer:  "Yes, sir."
17       The question at line 21:  "And is everything in that
18   statement true?"
19       Answer:  "Yes."
20       The question:  "Accurate?"
21       Answer, 24:  "Accurate."
22       Is that right?
23   A.  Yes.
24   Q.  Give me just a moment.  I'll set this aside for a moment.
25       Now, how did you come up with the $10,000 figure at the

1   Barnes trial?

2   A.  It was off the top of my head.

3   Q.  Just something you made up, wasn't it?

4   A.  The whole trial was made up, sir.

5   Q.  Okay.  So the $10,000 wasn't based upon anything you had

6   read; you just pulled it out of thin air.  Isn't that right?

7   A.  Like I said, there was some questions I was coached on and

8   there was some questions I wasn't coached on.

9   Q.  Okay.  And, in fact, in the deposition with Mr. Allen,

10  just, what, in the last 30 or 40 days, you said, "I just made

11  it up, just came up with that figure."

12  A.  I gave you the same answer I gave him.

13  Q.  Okay.  Now, at the grand jury, you told the grand jurors

14  that you've seen that statement before but you just didn't read

15  it; isn't that right?

16  A.  It seems like --  I've got a lot of paperwork over the

17  years and I might have got it confused with something else.  I

18  don't know.

19  Q.  Well, I showed you the transcript just a minute ago --

20  A.  Right.

21  Q.  -- and read page 24.  And at page 24 you said you had seen

22  it but that you just didn't read it.

23  A.  In front of the grand jury?

24  Q.  Correct.

25  A.  Right.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                1232

1   Q.  And then at page 39 you told the grand jurors, when one of

2   the ladies asked you or one of the gentlemen, I'm not sure

3   which it was, one of the grand jurors asked you the question:

4   "Mr. Logsdon, are you in the routine of signing documents you

5   haven't read?"  And you said:  "No, but I didn't read that

6   one."  Right?

7   A.  Right.

8   Q.  But you didn't tell them it was blank?

9   A.  Right.  I forgot to tell them it was blank when I signed

10  it.  That's all I did.

11  Q.  Kind of a big fact you left out, isn't it?

12  A.  I guess so.

13  Q.  Now, you told the grand jury that the amount of meth taken

14  from your house was two pounds; correct?

15  A.  Right.

16  Q.  Okay.  And two pounds is just under a kilo; is that right?

17  A.  Around there.

18  Q.  A kilo is 2.2 pounds; right?

19  A.  Right.

20  Q.  And you know that from your business; correct?

21  A.  Right.

22  Q.  You can calculate metric figures; right?

23  A.  Right.

24  Q.  And a thousand grams is in a kilo?

25  A.  I guess.  I never weighed it like that.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1233

1   Q.  Okay.  So you don't know that a thousand grams makes up a

2   kilogram?

3   A.  I never looked at it like that.  I always seen on the scale

4   2.2, a little over two pounds, you know.

5   Q.  And you told this grand jury that the amount of

6   methamphetamine turned in on January 27th -- excuse me -- after

7   this search on January 23rd, 2007, was around, what, 1,147

8   grams, something like that?

9   A.  Somewhere around there, yeah.

10  Q.  Okay.  So that would be just over 2.2 -- or just over two

11  pounds, wouldn't it?

12  A.  What was checked in?

13  Q.  Yes, sir.

14  A.  Yeah.

15  Q.  So the amount that you said was seized from your house was,

16  in fact, turned in on the sheet; is that correct?

17  A.  That's what it looked like, yeah.

18      MR. WYATT:  Can you show 11-c, please, on the property

19  receipt.  Government's exhibit 11-c.

20  Q.  (BY MR. WYATT)  If you look there, about four lines down,

21  it's being highlighted right now, it says, "1,147.56 grams of

22  crystal substance."

23  A.  Right.

24  Q.  Is that correct?

25  A.  Yes, sir.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1234

1   Q.  And you would agree that that would be the description of

2   the items at your house that were seized on that day?

3   A.  Does it say there that it was in three bags?

4   Q.  There were more than three bags.  There were three bags

5   collected; yes, sir.

6   A.  Okay.

7   Q.  It says -- she just highlighted the number "3."  Do you see

8   that, under "Quantity"?

9   A.  Yeah.

10  Q.  Okay.  So you agree with that; correct?

11  A.  Yeah.

12  Q.  So that's an accurate description of what was seized from

13  your house; right?

14  A.  Right.

15  Q.  But a few minutes ago you told this jury that a month

16  later, sometime in February of 2007, they brought to you, they

17  being McFadden and Henderson, my client, Jeff Henderson, this

18  gentleman right here --

19  A.  Right.

20  Q.  -- in the gray suit and blue shirt.

21  A.  Yeah.

22  Q.  You said that, "They brought me what was some of my own

23  dope."

24  A.  Looked like it.

25  Q.  If they turned in 2. -- excuse me -- if they turned in

```
 1    1,147 grams, which is more than two pounds, how is it they

 2    brought you the same dope back?

 3    A.  I don't know.

 4    Q.  Now, there's two or three different versions of your story

 5    with respect to the finding of the marijuana too, isn't there?

 6    A.  If there is, I don't know.  What Officer Henderson says and

 7    what I say is probably two different stories, yeah.

 8    Q.  Well, today you told the grand jury that Officer Henderson

 9    found the marijuana; correct?  Excuse me.  You told this jury,

10    not the grand jury.

11    A.  Yeah.

12    Q.  Okay.  I mean, I want to be sure I didn't mistake that.  Am

13    I accurate?

14    A.  You're right, sir.

15    Q.  Okay.  Now, in previous testimony, either testimony with

16    the grand jury, or in statements to the Office of Inspector

17    General, you said that it was McFadden who found the marijuana,

18    and not Henderson; isn't that correct?

19    A.  I might have.  I might have said that.

20    Q.  Okay.  So that's different from what you said today;

21    correct?

22    A.  Yeah.

23    Q.  And in the Barnes trial, you actually said they found the

24    meth first and you took them to the marijuana; isn't that

25    correct?
```

1   A.   The Barnes trial was a lie, sir.

2   Q.   All I'm asking is:  Did you say that?

3   A.   I probably did.

4   Q.   Okay.  And you'll accept that as a fact?  I can show you

5   the page if we need to.

6   A.   No; you're fine.

7   Q.   Okay.  You don't dispute it?

8   A.   No.

9   Q.   Now, let's talk for a minute about the amount of money that

10  was at your house on October -- excuse me -- January 23rd,

11  2007.

12  A.   Sure.

13  Q.   You said that was $60,000?

14  A.   Right.

15  Q.   But you've seen the receipt and we've talked about that and

16  all the different stories about that 10,000.  That's different

17  from what you told the grand jury, that that was $60,000, is

18  different from what you told Rob Raley and what's on that

19  report, correct, the handwritten statement?

20  A.   Rob Raley?

21  Q.   Rob Raley, the Assistant United States Attorney.

22  A.   Right.  everything I told Rob Raley was a lie.

23  Q.   Okay.

24  A.   That had to do with the Barneses; right?

25  Q.   Yes, sir.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1237

```
 1   A.  Okay.
 2   Q.  And the first time that you decided that maybe some of your
 3   dope was missing from that particular search was when J.J. Gray
 4   told you that; is that right?
 5   A.  Yeah, J.J. Gray mentioned it to me, yeah.
 6   Q.  But prior to that, you didn't believe that to be true, did
 7   you?
 8   A.  What's that?
 9   Q.  That any of the dope was missing, because it was all turned
10   in.
11   A.  I was too worried about getting myself out of trouble and
12   not losing my child.
13   Q.  Okay.  Now, let's go, for a moment, to TCC.
14   A.  Sure.
15   Q.  Do you remember talking about Tulsa County -- is it
16   community college?
17   A.  Yeah.
18   Q.  Okay.  You said that you met a person there.  Who was that
19   person?
20   A.  A black female.
21   Q.  Okay.  Do you know her today?
22   A.  I know of her.
23   Q.  Okay.  Don't know her name?
24   A.  Rochelle Martin is her name.
25   Q.  Did you speak to her?
```

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1238

1  A.  I never have spoken to her ever.  Never said one word to

2  her.

3  Q.  Now, you told this grand jury today that you paid, what was

4  it, $5,000?

5  A.  Yeah, somewhere around there.

6  Q.  And that was for 10 ounces?

7  A.  10 ounces of meth, yeah.

8  Q.  Okay.  And would it be fair to say that you told the Office

9  of Inspector General that it was six to 12 ounces and the cost

10 was 2- to $3,000?

11 A.  It was somewhere around there.  I did a lot of business and

12 I might have got my numbers mixed up.  I did a lot of business

13 in that time period with a lot of people.

14 Q.  Okay.

15 A.  Yeah.

16 Q.  But this is business we're talking about with Officer

17 Henderson?

18 A.  Right, right, the one he directed me to go get.

19 Q.  Okay.

20 A.  Yeah.

21 Q.  And this is important because you're testifying to this

22 under oath today; right?

23 A.  That's right.  It's real important.

24 Q.  And when you met with the Office of Inspector General, you

25 were giving them information to prosecute Mr. Henderson; right?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1239

 1   A.   Right, right.

 2   Q.   Because of all the wrongs he did to you?

 3   A.   Right.

 4   Q.   So you wanted to be right when you did that; right?

 5   A.   Right.

 6   Q.   You wanted that information to be accurate?

 7   A.   Right.

 8   Q.   And, in fact, after the 22-page report was prepared, it was

 9   presented to you for you to examine and determine if there was

10   anything wrong; is that correct?

11   A.   That's right.  But like I said, there was a lot of things

12   that went on in that time period.  I was as close as I could

13   get, the best I could do on that, okay?

14   Q.   Well, let me ask you:  When you read that report and you

15   saw that it said six to 12 ounces of meth -- and that's on page

16   17 of the OIG report -- and you said it cost 2,000 to $3,000 --

17   and that's on page 17 --

18   A.   Right.

19   Q.   -- did you tell them, "That's wrong, it was really 10

20   ounces and it was 4- to $5,000"?

21   A.   I knew it was close, sir.  Like I said, I did the best I

22   could on it.

23   Q.   For purposes of your testimony, is close good enough?

24   A.   That's the best I can do.

25   Q.   Okay.  Now, I believe I heard you tell this jury that you

1  got in Rochelle Martin's car; is that right?

2  A.  Yes.

3  Q.  Did you sit down?

4  A.  Sat down in the car seat.

5  Q.  Close the door?

6  A.  Not all the way.

7  Q.  What time of year was it?

8  A.  Oh, I'm going to say it was, what, spring.

9  Q.  Was it hot, was it cold?

10 A.  It wasn't hot, it wasn't cold.  It was nice outside.

11 Around the April, May area of '07.

12 Q.  Tell me, when you pulled into the TCC parking lot,

13 describe, as you approach, what's going on on this particular

14 deal.  Give me as much detail as you can.

15 A.  Like I said, Officer Henderson told me to call this -- or

16 he called me and told me to go meet with this girl, and so I

17 got my cash together, I went to TCC on Harvard, north Harvard,

18 I pulled in the parking lot, there was a few cars, and I'm

19 looking for the blue Chrysler.

20 Q.  What time of day is this?

21 A.  Oh, 5, 6 o'clock area, right before dark.

22 Q.  Is it a busy time at the college?

23 A.  There was a few cars there.  There wasn't a whole lot.  I

24 remember.

25 Q.  Was school going on?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1241

 1  A.  I don't know.  I didn't go inside.

 2  Q.  I understand.  I apologize.

 3  A.  I mean, it could have been.  Could have been.

 4  Q.  Let me rephrase that.  Was it at a time when college is in

 5  regular session?

 6  A.  It could have been.  Night classes, maybe?  I don't know.

 7  Q.  Okay.  There was just a few cars in the parking lot?

 8  A.  Right.  And I find the car, I find the blue Chrysler.

 9  Q.  Was it just out in the open?

10  A.  Yeah, it was out on the west side of the college, closest

11  to Harvard.

12  Q.  So is it fair to say, from what you're describing, that

13  Rochelle Martin was already parked and present?

14  A.  Right, right.

15  Q.  All right.  And what did you see when you saw her?

16  Describe what you saw.

17  A.  When I pulled up next to her car, I look over and I see

18  McFadden sitting about five, six, seven car parking spots down

19  with his window halfway down and I saw his face.  I just looked

20  at him and I looked away.  I got out of my car; got in the

21  passenger seat of her car and just almost shut the door, but

22  not all the way; I looked at her and she looked down at the

23  floor; and I stuck the money right there in the console; then I

24  looked at her again and I grabbed the Doritos bag, and I left

25  and went home.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1242

1   Q.  Can you tell me, how was your money packaged?

2   A.  In thousand dollar stacks.

3   Q.  Okay.  Was it just rubber-banded?

4   A.  It had like five stacks of 1,000, five stacks, and then I

5   had a rubber band around it.

6   Q.  Was it flat or was it rolled into a ball?

7   A.  It was flat and the money was folded over.

8   Q.  So you just take a dollar bill, got a rubber band around

9   the middle of it, --

10  A.  Fold it once.  There you go.

11  Q.  Fold it once?

12  A.  Yeah.  Right there.  Yeah.

13  Q.  Anything unique about the way that's folded?

14  A.  No.

15  Q.  Is that the way you always fold your money?

16  A.  Yeah.

17  Q.  Pardon me?

18  A.  Yeah.

19  Q.  Was the money contained in a sack?

20  A.  No.

21  Q.  Or did you just lay $5,000 down in the car?

22  A.  I sat it right there on the console of the car.  Didn't say

23  a word.

24  Q.  And picked up your --

25  A.  Picked up the package --

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                     1243

1   Q.  -- bag of meth and left?

2   A.  -- and left.

3   Q.  Okay.  Did you even look in the bag while you were sitting

4   there?

5   A.  No.

6   Q.  Did you see what she did with the money?

7   A.  No.

8   Q.  And that was five $1,000 stacks of bills?

9   A.  Seemed like it was five, yeah.

10  Q.  Now, if Rochelle Martin said that the money was in a brown

11  paper sack, that would be inconsistent with your testimony,

12  wouldn't it?

13  A.  That would be inconsistent, sir.  I don't remember putting

14  that money in a brown paper sack that day.  But I did meet up

15  with her and get meth from her under the direction from Officer

16  Henderson.

17  Q.  If Rochelle Martin says that the meth was in a brown paper

18  sack, would that be inconsistent with your testimony today?

19  A.  I guess it would be.

20  Q.  Because you said it was in a Doritos bag.

21  A.  Are you talking about the dope?

22  Q.  Yes, sir.

23  A.  The dope was in a Doritos bag.  I thought you was talking

24  about the money.

25  Q.  Well, I'm asking you:  If Rochelle Martin said that the

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1244

```
 1   dope, the meth, was in a brown paper sack, you would disagree
 2   with that?
 3           MR. HARRIS:  I object.  I don't think she said it was
 4   in a brown paper sack.
 5           THE COURT:  She did say it was in a Doritos bag, I
 6   believe.  I don't remember the sack.
 7           MR. WYATT:  Very well.  We'll let the jury remember,
 8   sir.
 9           THE COURT:  Yes, sir.  That's why we have 12 of them.
10           MR. WYATT:  Pardon me.
11   Q.  (BY MR. WYATT)  Now, we want to take you, sir, to 50 pounds
12   of marijuana delivered to your house.
13   A.  Right.
14   Q.  Okay.  You said that Agent McFadden brought to you 50
15   pounds of marijuana in a bale wrapped in electrical tape;
16   correct?
17   A.  Yeah, electrical tape, yeah.
18   Q.  And that's one bale; correct?
19   A.  Right.
20   Q.  And you paid $10,000 for that marijuana?
21   A.  Right.
22   Q.  What's that marijuana valued at?
23   A.  I don't know.  I haven't sold marijuana in so long, so I
24   don't know.
25   Q.  More or less than 10,000?
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                     1245

1   A.   Oh, I imagine more.

2   Q.   Double, 20,000?

3   A.   Yeah, yeah.

4   Q.   Okay.  And you took time to even break that down and look

5   at it -- excuse me -- break it down from the bale to littler

6   bags for distribution?

7   A.   Right, right.

8   Q.   You said you spent about three hours that night breaking it

9   down and then you put all the little bags in a big trash bag?

10  A.   Right.  I weighed it up in one-pound packages.

11  Q.   One-pound packages?

12  A.   Put it in a big trash bag, yeah.

13  Q.   And when that comes to you in that brick like that, it's

14  heavily compacted; correct?

15  A.   It was, yes.

16  Q.   Okay.  I mean, you have to get something out to break it.

17  You're not even just breaking it with your hands, are you?

18  A.   I had to use a long screwdriver to break it apart.

19  Q.   And then do you loosen it up or keep it in littler bricks?

20  A.   Keep it in littler bricks, yeah.

21  Q.   Okay.  So, as much as you can, you try to keep it in a

22  little brick?

23  A.   Right.

24  Q.   Okay.  But you weighed it out into one-pound baggies?

25  A.   Right.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1246

1  Q.  Now, if Agent McFadden told this jury that he delivered to

2  you two bales at about 24 pounds each, that would be

3  inconsistent with your testimony, wouldn't it?

4  A.  Yeah.

5  Q.  Now, you said also, you told this jury that you had -- you

6  had this weed in your house, you've just broken it down, --

7  A.  Right.

8  Q.  -- and Lance Ramsey, this Tulsa County sheriff's deputy, --

9  A.  Right.

10 Q.  -- was outside your front yard, parked outside, watching

11 you?

12 A.  Right.

13 Q.  You got nervous; correct?

14 A.  Yes, sir.

15 Q.  About 3 o'clock in the morning you went and threw the baggy

16 in a ditch?

17 A.  Yes.

18 Q.  When I say "baggy," we're talking about a trash bag?

19 A.  That would be a trash bag, yeah.

20 Q.  Black trash bag?

21 A.  Yeah, it was black, yeah.

22 Q.  Threw it in the ditch.  You were going to go back and get

23 it; right?

24 A.  I was going to, yeah, but --

25 Q.  It was gone when you got back there?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1247

1    A.  Yeah.

2    Q.  Now, if Agent McFadden, Brandon McFadden, told this jury

3    that you had had the marijuana stored in an air conditioner at

4    Steve's and it was stolen, that would be false, wouldn't it?

5    A.  Well, see, I made that up because I didn't want McFadden

6    knowing that I lost it.

7    Q.  I see.

8    A.  I just went ahead and paid him.

9    Q.  Now, at this deposition that you gave not too long ago to

10   Anthony Allen, --

11   A.  Yes.

12   Q.  -- you said that Jeff Henderson was not involved in that

13   marijuana transaction; isn't that correct?

14   A.  Not that I know of.

15   Q.  Okay.  And you said that you didn't -- that Jeff Henderson

16   didn't deliver you any marijuana; correct?

17   A.  No.

18   Q.  He didn't --  He didn't --  You didn't hand Jeff Henderson

19   any of that $10,000; correct?

20   A.  No.

21   Q.  I want to talk to you very briefly about Rodolfo Amador.

22   A.  Sure.

23   Q.  His name was Cruise, that's his street name; right?

24   A.  Cruise, yeah.

25   Q.  What's your street name?

1   A.   Never had one.

2   Q.   You told McFadden about Amador; correct?

3   A.   Yeah, I mentioned it him to, yeah.

4   Q.   Because that was after you started working for Brandon

5   because you had already worked off everything for Jeff and he

6   told you why don't you start working with Brandon at this

7   point?

8   A.   No; I gave Amador to Henderson.

9   Q.   Okay.

10  A.   I showed Henderson and Frank Khalil one day where he lived.

11  Q.   So you took him to their house? {sic}

12  A.   Took them to his apartment.

13  Q.   Apartment?

14  A.   Uh-huh.

15  Q.   And you got in the car and rode with them?

16  A.   Yeah; it was a brown Tahoe that Frank was driving.

17  Q.   And when you would take them to places like this whenever

18  you would snitch someone, you would get in the car with them,

19  drive over and look at it; correct?

20  A.   Point out the house or apartment, yeah.

21  Q.   Okay.  They might stop and look at it?

22  A.   Yeah.

23  Q.   Didn't get out?

24  A.   No.

25  Q.   They might slow down?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1249

```
 1   A.  Right.
 2   Q.  Or they might just drive on buy if they thought somebody
 3   might be matching?
 4   A.  Right.
 5   Q.  And that was routine with the 17 or 18 times that you did
 6   this; correct?
 7   A.  Yeah, pretty close, yeah.
 8   Q.  And that was fairly normal with how you did those things?
 9   A.  Right.
10   Q.  And you'd call them up and say, "Hey, guys, I've got this
11   information, and let me tell you about it"?
12   A.  "Hey, guys, I've been doing business with this guy."
13   Q.  And then the next day or that day, depending on what time
14   it was, y'all would hook up and get together; correct?
15   A.  Uh-huh.
16   Q.  And then usually one of the police vehicles, not your
17   vehicle, whether it's undercover or not, they would be in the
18   police vehicle; right?
19   A.  Right.
20   Q.  And those were usually an undercover vehicle, not a marked
21   unit; correct?
22   A.  Right.
23   Q.  And you would make sure that they had the accurate
24   information and give them as much knowledge and intelligence as
25   you could; correct?
```

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                1250

 1  A.  Right, on the ones that I did give them.

 2  Q.  Okay.  Yes, sir.  That's what I'm talking about.

 3  A.  Yeah.

 4  Q.  Now, in particular, on Rodolfo Amador, isn't it fair to say

 5  that you told the Office of Inspector General that Henderson

 6  already knew about Rodolfo Amador when you gave him

 7  information?

 8  A.  Now, that's what Henderson had told me, but I don't know.

 9  I don't know.  He said he had an informant that knew where he

10  lived already, knew all that.  Well, if that's the case, then

11  why did I have to take him out there?

12  Q.  Okay.  But you understood that at the time that you were

13  giving him that information; isn't that correct?

14  A.  He told me --  He didn't tell me on that exact day.  He

15  told me a few days later.

16  Q.  Okay.  Now, in the memorandum prepared by the OIG, on page

17  7, you told the OIG officer that, "Logsdon" -- that's you --

18  "believed Henderson had a different confidential informant who

19  was also providing information on Amador because Henderson

20  already knew where Amador's apartment was."  That's what you

21  told them; isn't that correct?

22  A.  That's what Henderson told me, yeah.

23  Q.  That's what you told the inspector general?

24  A.  Right, that's what I told them, but I didn't know for sure

25  if he had one or not.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1251

1  Q.  All I'm asking you is that what you told the inspector

2  general?

3  A.  Yeah, I remember telling them something like that, yeah.

4  Q.  So there were occasions where information that you provided

5  was either confirming what Henderson already knew or Henderson

6  had other confidential informants; isn't that correct?

7  A.  From what he told me, yeah, but I didn't know for sure.

8  Q.  Okay.  But in this particular case, regarding Rodolfo

9  Amador, you told the inspector general that you believed that

10 Henderson had a different confidential informant?

11 A.  I told them, yes, I did.

12 Q.  And you read this report and did not correct that or make

13 any changes to it?

14 A.  Right.

15 Q.  I apologize for backtracking.  I try not to.

16     You know Lance Ramsey and you've talked about him?

17 A.  Yeah.

18 Q.  Did you try to set up a deal with Lance Ramsey to help Deb

19 Clayton?

20 A.  Yeah, I did.

21 Q.  And you were trying to get her to set up a guy with half a

22 kilo of cocaine; correct?

23 A.  Right.  She asked for some help and --

24 Q.  And why was it that you thought you could help her with

25 Lance Ramsey?

1    A.   She asked for some help, she needed some help at that time,

2    and I told her I would help her out.

3    Q.   So did you make the call to Lance?

4    A.   I made the call to Lance.  I said, "I've got some

5    people that" -- asked her {sic} if he knew Debra Clayton and he

6    said, "Yeah," and I said, "She was wanting to know if you could

7    help her with some charges if she done some things for you,"

8    and he said, "Sure, give her my number."

9    Q.   Did you have Lance Ramsey's phone number?

10   A.   Yes.

11   Q.   Cell phone?

12   A.   Yes.

13   Q.   How did you get that?

14   A.   Lance Ramsey -- I got if from Lance Ramsey.

15   Q.   When did he give it to you?

16   A.   The summer, end of summer of '07 area, somewhere around

17   there.

18   Q.   Before or after you called him about knowledge of the

19   search warrant?

20   A.   Well, I called him in '08.  I had it in '07.

21   Q.   That's what I'm asking.

22   A.   '07 sometime.

23   Q.   Okay.  Now, Larita Barnes was a longtime friend of yours?

24   A.   Childhood friend.

25   Q.   Known her since you were five or six years old; right?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1253

1    A.   Yeah.

2    Q.   Lived in the neighborhood?

3    A.   Yes.  Grew up together.

4    Q.   And you knew her father, Larry?

5    A.   Yes.

6    Q.   Her brother, Larry?

7    A.   Of them.  Didn't know them personally, but I knew of them.

8    Q.   Brother, Mike?

9    A.   I never met -- I don't guess I ever met him.

10   Q.   Sister, Kelie?

11   A.   I know Kelie.

12   Q.   Their mother, what was her name?

13   A.   Linda.

14   Q.   Linda?

15   A.   Uh-huh.

16   Q.   And you were familiar with all of them, generally?

17   A.   Yeah.

18   Q.   Knew where they lived?

19   A.   Yeah.

20   Q.   Been to their house?

21   A.   Right.

22   Q.   Been inside of their house?

23   A.   Yeah.

24   Q.   On more than one occasion?

25   A.   They've had several houses too, though.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1254

```
 1   Q.  Yes, sir.  Fair enough.
 2       But you've been in a number of those houses over the years?
 3   A.  Yeah.
 4   Q.  Okay.  And as a drug dealer, during your term as a drug
 5   dealer, you've been in their house; correct?
 6   A.  Right.
 7   Q.  And at those times that you went to Larry Barnes' house,
 8   Larita was living there; correct?
 9   A.  Some of those times, yeah, yeah.
10   Q.  Okay.  And during those times that you went there, there
11   were times when you went there to buy dope or to sell dope;
12   correct?
13   A.  Right.
14   Q.  Okay.  Both?
15   A.  Both, yeah.
16   Q.  Okay.  So sometimes they bought from you, sometimes you
17   bought from them?
18   A.  Well, I would buy from Larita and sometimes she would buy
19   from me, yeah.
20   Q.  Okay.  And you described your relationship to the grand
21   jury, your relationship with Larita Barnes, as being friendly
22   competition; right?
23   A.  Somewhat, yeah.
24   Q.  You were competitors but if you needed --
25   A.  Friends.
```

1    Q.  -- a little bit of stuff here or there, you could get it?

2    A.  Mutually, yeah.

3    Q.  You could get product any time you needed it?

4    A.  From her, yeah.

5    Q.  Before the Barnes trial, when was the last time you saw

6    Larita Barnes before the trial?

7    A.  When was the last time I seen her?

8    Q.  Yes, sir.

9    A.  Probably at the end of '06.

10   Q.  Okay.  Anything unique about her at that time?

11   A.  Pregnant, I believe.  Yeah, she was.

12   Q.  Pardon me?

13   A.  Yeah, she was pregnant.

14   Q.  And when in late '06 did you see her?

15   A.  November, December area, somewhere around there.  Late '06.

16   Q.  Would you agree with me that you have made statements that

17   Larry Barnes didn't keep his meth at his house?

18   A.  That's what I was told.

19   Q.  You understood that to be true?

20   A.  Well, yeah.

21   Q.  You relied on that?

22   A.  Well, yeah.

23   Q.  He had a stash house?

24   A.  He must have.  I didn't ask him.

25   Q.  And that's what we call it; right?

1   A.  Well, yeah, that's what they're called, yeah.

2   Q.  They have a stash house and sometimes you have your money

3   in a different location?

4   A.  Right.

5   Q.  And that's so that on occasions when somebody comes and

6   serves a search warrant, you don't lose two pounds of meth and

7   $60,000; right?

8   A.  Yeah; it depends on if they plant dope on you or not, yeah,

9   yeah.

10  Q.  Okay.  Fair enough.

11      Did you have a stash house and a money house?

12  A.  No.

13  Q.  Okay.  You just kept it all together?

14  A.  Yeah.

15  Q.  But it was your understanding that Larry kept it separate?

16  A.  From my understanding.

17  Q.  So if you made a deal with Larita, you would have to

18  contact her in advance so that they could get the dope back to

19  the house; correct?

20  A.  Right.

21  Q.  And Larry would get the dope and bring it back to Larita;

22  is that right?

23  A.  Yeah.

24  Q.  That's your understanding of how it works?

25  A.  That's my understanding, yeah.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1257

1   Q.  And then Larita would be the one who dealt it to you?

2   A.  Right.

3   Q.  Now, when you talked with Assistant United States Attorney

4   Rob Raley about your testimony that was anticipated in the

5   Barnes case, you met with him, I think you said, three, maybe

6   four times?

7   A.  Two, three, four.  Two or three times, something like that.

8   Q.  How long do you think those meetings were?

9   A.  Oh, an hour or two each time.

10  Q.  How many meetings did you have with Brandon McFadden

11  regarding that particular transaction or lack of transaction?

12  A.  With Brandon McFadden?

13  Q.  Yes, sir.

14  A.  Alone?

15  Q.  Yes, sir.

16  A.  About the Barneses?

17  Q.  Yes, sir.

18  A.  There never was one time alone with the Barneses with

19  McFadden.  It was McFadden and Henderson and myself.  We all

20  met and talked about it, but not just me and Henderson alone,

21  or me and McFadden alone.  It was us three.

22  Q.  Okay.  Fair enough.

23      With there any times when you met privately regarding the

24  Larry Barnes transaction just with Jeff Henderson?

25  A.  Just the night that he said, "You just made the buy today,"

1  and I told him, "No, I didn't."

2  Q.  So during these times you were being coached as to what to

3  say, --

4  A.  Yeah.

5  Q.  -- you were in the presence of both Brandon McFadden and

6  Jeff Henderson?

7  A.  Right.

8  Q.  Or Brandon McFadden, Jeff Henderson and Rob Raley?

9  A.  With Rob Raley?

10  Q.  Uh-huh.

11  A.  He was asking me how it went down, and I would have to tell

12  Rob Raley what these two officers told me to say.

13  Q.  Okay.  And during those two meetings, were the two officers

14  present?

15  A.  Yes.

16  Q.  Okay.  And were they correcting you and saying, "No, Ryan,

17  that didn't happen; it was this way"?

18  A.  Well, they done coached me enough, so I almost had it down,

19  you know.  Like I say, I almost had it down except for some of

20  the questions that they didn't prepare me for that was asked

21  during the trial that I had to come off the top of my head to

22  answer.

23  Q.  Like the $10,000?

24  A.  Right.

25  Q.  Okay.  Now, during those meetings that you had with both

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1259

1   Brandon McFadden and Jeff Henderson where they coached you on

2   this, how many meetings were there?

3   A.   Oh, three, four.

4   Q.   How long were they?

5   A.   A couple of hours each time.

6   Q.   And where were you during these meetings?

7   A.   We were riding around in a car in Tulsa.

8   Q.   Were you in the front seat, back seat?  Describe how it

9   happened.

10  A.   Sometimes I would be in front, sometimes I would be in the

11  back.

12  Q.   Okay.  But always they were together?

13  A.   Oh, yeah.

14  Q.   Whose car were you riding around in?

15  A.   Mostly McFadden's.

16  Q.   Okay.  So if there were three or four meetings two hours

17  each, we're talking about six to eight hours --

18  A.   Yeah.

19  Q.   -- to get your story down; is that right?

20  A.   Yeah, somewhere around there, yeah.

21  Q.   Now, isn't it fair that you've said that this transaction

22  that didn't happen, the fake transaction, --

23  A.   Did not happen.

24  Q.   -- isn't it fair to say that you told Henderson and

25  McFadden that, "I can just make it up based on a previous

```
 1   transaction from 2006"?
 2   A.  Well, they had told me, "Whenever you're explaining the buy
 3   in the trial, just put yourself in that position as before as
 4   if you was buying dope from them, when you did buy dope from
 5   them in the past," so I just put myself in that position in the
 6   courtroom that day when I testified.
 7   Q.  So the story that you described at the Barnes trial on
 8   April 22nd, 2008, that was a real drug deal that happened, just
 9   not on May 7th or 8th, 2007?
10   A.  Right, right.
11   Q.  It was a real drug deal that occurred in November or
12   December of 2006?
13   A.  Right, right.
14   Q.  Okay.  For purposes of the Larry Barnes transaction, it was
15   your understanding that former ATF Agent Brandon McFadden
16   actually got $3,000 in ATF buy money; isn't that correct?
17   A.  That's what I was told, yeah.
18   Q.  And you saw forms and things like that that showed that,
19   didn't you?
20   A.  You know, I can't remember seeing them forms.  Maybe I
21   did.  I just don't remember.
22   Q.  All right.  Now, did I hear you correctly today --
23   actually, I guess I'll just ask you because I don't recall what
24   you said.
25       You said that on this day -- I guess it was May 8th of
```

1   2007?

2   A.   Yeah.

3   Q.   Is that right?

4   A.   The buy supposedly that happened?

5   Q.   Yes, sir.

6   A.   Yeah.

7   Q.   That you were somewhere and Jeff called you.  Tell us about

8   the first call.

9   A.   That day, I went to the casino that day, but the first call

10  I got, I think I was at home, and he told me he was sitting on

11  the Barnes house.

12  Q.   What time was that call?

13  A.   It was early in the morning, 9, 10 o'clock, somewhere

14  around there.  8, 9, 10, somewhere around there.

15  Q.   What number were you using at the time?

16  A.   378 was the first -- it's whatever number I had back then.

17  I don't remember the number.

18          MR. WYATT:  May I have a moment, Your Honor?

19          THE COURT:  Yes.

20  Q.   (BY MR. WYATT)  Was it something like 378-0876?

21  A.   It's somewhere around there.  I couldn't remember.  I've

22  had several phones since then.

23  Q.   But you know it started with 378?

24  A.   Yeah, uh-huh.

25  Q.   Fair enough.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1262

 1      Now, you said that would have been in the early morning, 9

 2  or 10 o'clock, is that what you said, or am I making that up?

 3  A.  Yeah, around in that area.

 4  Q.  Okay.  And you said there was a later call in that day

 5  regarding this particular incident; is that right?

 6  A.  Right.

 7  Q.  And tell us what time that call was.

 8  A.  Oh, 5, 6, 7 o'clock area, somewhere around there.  He asked

 9  me if I was home.

10  Q.  All right.  And was that call made to the same phone

11  number?

12  A.  I believe so.

13  Q.  Did you have more than one phone at that time?

14  A.  Yeah, I did.  I had a couple of phones.

15  Q.  Were they all burner phones?

16  A.  Pretty much, yeah.

17  Q.  Okay.  And a burner phone, for the jury, is one that

18  basically there's no records for it; right?

19  A.  Right.

20  Q.  Like a Cricket phone or something like that?

21  A.  Right.

22  Q.  So there's no call detail.  It's just a phone and if

23  anybody picks it up, if the feds or the police arrest you,

24  seize you, --

25  A.  Right.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1263

1   Q.   -- they won't be able to track who all you've called or

2   when or where; right?

3   A.   Right, right.

4   Q.   You routinely carried burner phones; right?

5   A.   Yeah.

6   Q.   You didn't have any other phones like AT&T or Sprint or

7   something like that?

8   A.   No, no.

9   Q.   And you did that to protect yourself and your activities;

10  right?

11  A.   Yeah.

12  Q.   Did you ever tell your childhood buddy, Gary Knox, that

13  these events happened at midnight with the Barneses?

14  A.   That what happened at midnight?

15  Q.   These phone calls with Jeff Henderson.

16  A.   I don't remember telling him anything like that.

17  Q.   Okay.  When you gave your testimony in the Barnes case, how

18  did you get to the courthouse from your house?

19  A.   I think it might have been McFadden or Frank Khalil.  I

20  can't remember.

21  Q.   Some law enforcement officer?

22  A.   Yeah, it was law enforcement, yeah.

23  Q.   Correct?

24  A.   Yeah.

25  Q.   It wasn't Jeff Henderson, though, was it?

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                    1264

```
 1   A.  I don't think so.
 2   Q.  In fact, would it be fair to state that it was federal
 3   agents, it was U.S. marshals, or someone other than Brandon
 4   McFadden?
 5   A.  I can't remember how I got there.
 6   Q.  But do you know it was --
 7   A.  Somebody from law enforcement.
 8   Q.  -- somebody with law enforcement?
 9   A.  Yeah.
10   Q.  And did you have a particular time, like 9 in the morning,
11   you had to be there?
12   A.  Something like that, yeah.
13   Q.  Okay.  Were they there early to pick you up?
14   A.  Yeah.
15   Q.  Plenty of time to get you from Turley back down to the
16   courthouse?
17   A.  Yeah.
18   Q.  You live in Turley still?
19   A.  Yes.
20   Q.  Same house?
21   A.  Same house.
22   Q.  How far is Turley from this courthouse?
23   A.  Oh, 12, 13, 14 miles, something like that.
24   Q.  So even in heavy traffic, we're talking about 20 minutes?
25   A.  Yeah.
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                  1265

 1   Q.  Okay.  And you were here at the courthouse for your
 2   testimony?
 3   A.  Right.
 4   Q.  Did you sit with federal agents during that time -- I mean
 5   before you got on the witness stand?
 6   A.  Before I got on the witness stand?
 7   Q.  Yes, sir.
 8   A.  I sat in the witness room with Frank Khalil and Harold
 9   Wells.
10   Q.  Okay.  But you didn't have any conversations --
11   A.  No.
12   Q.  -- with Brandon McFadden or with Jeff Henderson during that
13   trial?
14   A.  No.  Henderson came in the witness room once or twice, and
15   McFadden, I believe, stayed in the courtroom the whole time.
16   Q.  He was the case agent like --
17   A.  I believe so, yeah, like Kevin.
18   Q.  -- like Kevin is?
19   A.  Yeah.
20   Q.  Okay.  When Jeff Henderson came into the witness room
21   though, there was no discussion at all about your testimony
22   that day; correct?
23   A.  No, not that day.
24   Q.  No discussion of his testimony of what he had already
25   given; is that correct?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                          1266

1   A.  Not that day.

2   Q.  Because it is fair that he testified before you did; right?

3   A.  Right.

4   Q.  Okay.  So nobody was getting together and putting it

5   together between the testimonies; right?

6   A.  No, sir.

7   Q.  Nobody provided you with a list of questions that Julie

8   O'Connell would ask you?

9   A.  No.

10  Q.  The defense attorney.

11  A.  Right.  I remember her.

12  Q.  Nobody gave you a list of questions of what Mr. Hopkins,

13  the other defense attorney, would say, did they?

14  A.  Right.  Before trial, when I was in the witness room?  No,

15  nobody gave me nothing in there.

16  Q.  At any time before the trial, did Julie O'Connell or

17  Mr. Hopkins, either one, give you a list of questions that they

18  intended to ask you?

19  A.  Not that I can remember.

20  Q.  Okay.  So it would be fair to say that you didn't know what

21  those questions would be?

22  A.  Right.

23          MR. WYATT:  Your Honor, may I have just a moment,

24  please, sir?

25          THE COURT:  Yes, sir.

U.S. District Court
Northern District of Oklahoma

1   Q.   (BY MR. WYATT)  You weren't in the courtroom at the time

2   that Jeff Henderson testified in the Larry and Larita Barnes

3   case, were you?

4   A.   No.

5   Q.   So you don't know what his testimony was even to this day,

6   do you?

7   A.   No.

8   Q.   You've not read the transcripts and they've not been

9   provided to you?

10  A.   No.

11  Q.   Do you know whether there were differences between what

12  Jeff Henderson said and what you said?

13  A.   No, I don't.  I didn't read them.  I don't know.  I've

14  never seen them.

15  Q.   You told the jury that the events that you made up, --

16  A.   Yeah.

17  Q.   -- that they occurred in the bedroom at Larita Barnes'

18  house; right?

19  A.   That whole trial was a lie from my point out of my mouth

20  was a lie.

21  Q.   Right.  I'm just asking you:  Did you tell them that the

22  event -- this fake event, this buy, occurred in the bedroom?

23  A.   That's what I told them, yeah.

24  Q.   Okay.  And if Jeff Henderson testified, and it's in exhibit

25  number 30, government's exhibit number 30, that the deal

1  happened in the living room, that would be different from your

2  testimony; right?

3  A.  Right.

4  Q.  Now, how many rooms are in that house, the Barnes' house?

5  A.  I believe there's a living room, kitchen, looked like two

6  back bedrooms.  I never did go down to the garage or whatever.

7  Q.  And I believe from reading your transcript of your

8  testimony, that you told Julie O'Connell or the prosecutor, I'm

9  not sure which, it was an 800 to 900 square foot home.

10 A.  Are you going back to the Barnes trial again?

11 Q.  Yes, sir.

12 A.  As I told you, it was a lie.

13 Q.  I understand that.  I understand that's your

14 testimony.  You testified that their house was about 8- or 900

15 square feet?

16 A.  Right around there.  About the same size as mine.  Pretty

17 close.

18 Q.  So it was just a few rooms?

19 A.  Just a few rooms.

20 Q.  A living, kitchen, bedroom -- couple of bedrooms and a

21 bathroom?

22 A.  Done deal.

23 Q.  Do you expect that between all this six hours, eight hours

24 of coaching, and your three or four meetings with Rob Raley,

25 that you and Jeff Henderson could get together on whether it

1   was the living room or the bedroom?

2   A.  I guess so.  I guess we could have, yeah.

3   Q.  You are both reasonably intelligent people; right?

4   A.  Yeah.  I guess when you tell so many lies, though, it's

5   hard to keep up with them.

6   Q.  Okay.  At the Barnes trial you specifically testified on

7   page 250 that on the day before the buy, on May 7, 2007, that

8   you got in the car and went by the house with Henderson and

9   McFadden.  Wasn't that your testimony?

10  A.  At the Barnes trial?

11  Q.  Yes, sir.

12  A.  Then, again, I told you that was a lie.

13  Q.  All I'm asking is:  Did you tell the jury that on the day

14  before this fake buy, that you got in the car with these

15  officers, drove them to the location, and showed them where it

16  occurred; is that correct?

17  A.  Yeah, that's what I told them.

18  Q.  You were cross-examined about that by both Mr. Hopkins and

19  Ms. O'Connell; correct?

20  A.  I believe I was.

21  Q.  So you told --  In response to questions from Mr. Raley and

22  Ms. O'Connell and Mr. Hopkins, you told all three of them the

23  same thing; right?

24  A.  Right.

25          MR. WYATT:  Your Honor, again, I'm about to finish.

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1270

1   May I have another moment, please, sir?

2          THE COURT:  Yes, sir.

3   Q.  (BY MR. WYATT)  Now, again, I hate to backtrack but I'm

4   just trying to fill in before you leave.  This is my last

5   chance to talk to you.

6       When you met with the OIG and, again, I believe that was

7   Officer Rachel M. Hart with the Office of Inspector General for

8   the Department of Justice; correct?

9   A.  Yes.

10  Q.  And you told her about your dealings with Rochelle Martin;

11  correct?

12  A.  One time.

13  Q.  Right.

14      And on page 17 of her memorandum, she outlined what you

15  supposedly told her; correct?

16  A.  I guess.

17  Q.  Okay.  And in that outline, in that report, she wrote in

18  regard to the early 2007 deal with Rochelle Martin -- and you

19  only dealt with her one time; right?

20  A.  One time.

21  Q.  Ever?

22  A.  One time ever.

23  Q.  Said, "McFadden instructed Logsdon to meet with Martin."

24  A.  Henderson did.

25  Q.  Okay.  Her report, at page 17, specifically says, "McFadden

RYAN LOGSDON - CROSS (By Mr. Wyatt)                              1271

1   instructed Logsdon to meet with Martin."
2   A.  McFadden never once told me to.  Maybe I forgot to tell her
3   to change that in the report, but Henderson called me and
4   directed me to go over there and buy that 10 ounces of meth.
5   Q.  So that's an important distinction; correct?
6   A.  It's important, yeah, but that's not -- McFadden didn't
7   tell me to do that.
8   Q.  And, again, you read this memorandum, this 22-page
9   memorandum --
10  A.  There's a lot of stuff in there, sir.  There's a whole lot
11  of stuff on there.
12  Q.  Yes, sir.  And on the back page it says specifically, "On
13  July 7, 2009, the completed version of this report was reviewed
14  by Logsdon and he concurred with the information contained
15  therein."  Is that right?
16  A.  Right, right.
17  Q.  So they specifically asked you, "Is there anything you want
18  to change, is there anything that's wrong"?
19  A.  Right.
20  Q.  And you didn't do that?
21  A.  Right.
22  Q.  In December of 2006, or January of 2007, did the police
23  investigate an allegation of a disturbance at your house?
24  A.  I don't know.  Probably was a -- what do they call it -- a
25  restraining order?  Is that what you're talking about?  Hell, I

RYAN LOGSDON - CROSS (By Mr. Wyatt)                    1272

```
 1   don't know.  Tell me more.  Talk to me.
 2   Q.  I'm just asking:  Did they come and investigate a
 3   disturbance?
 4           MR. HARRIS:  Objection, Your Honor.
 5           THE WITNESS:  I'm not understanding.
 6           MR. HARRIS:  Can we approach?
 7           THE COURT:  Yes, sir.
 8      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF
 9   THE HEARING OF THE JURY:)
10           MR. HARRIS:  Is this the domestic abuse?
11           MR. WYATT:  Uh-huh.  I'm not going to go into what it
12   was.  I don't care about that.  I just care about the date.
13           MR. HARRIS:  Okay.
14           THE COURT:  Well, what does it have to do with the
15   date?
16           MR. WYATT:  It impeaches something that --
17           MR. HARRIS:  McFadden says?
18           MR. WYATT:  -- that McFadden says.
19           THE COURT:  About when the police came to this
20   witness's house?
21           MR. WYATT:  Yes, sir.
22           THE COURT:  All right.  Keep it very short.
23           MR. WYATT:  I will.  Yes, sir.  I'm not trying to get
24   into the fact that it was a domestic.
25           THE COURT:  All right.
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                           1273

```
1        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

2   THE PRESENCE AND HEARING OF THE JURY:)

3   Q.  (BY MR. WYATT)  If you know, fine; if you don't, that's

4   fine.  Do you know if the police investigated a disturbance of

5   any kind at your house in December of 2006 or January of 2007?

6   A.  I don't -- I can't remember one, no.

7   Q.  Okay.  Fair enough.

8        If Brandon McFadden said that the deal at TCC was $7,000,

9   not 4,000 or 5,000, is that different from your testimony?

10  A.  Well, it sounds like it is.

11  Q.  When you first met Adrian Torres --  You recall there was

12  some conversation about Adrian Torres; correct?

13  A.  Adrian Torres?  Yes, uh-huh.

14  Q.  Yes, sir.

15       Adrian Torres, you met him at a flea market; is that right?

16  A.  No; I met him through McFadden.

17  Q.  Okay.

18  A.  I met up with him at a flea market a few times.

19  Q.  Did Mr. McFadden at any time represent you as a law

20  enforcement officer?

21  A.  He might have.  Adrian Torres, on one or two occasions,

22  asked to see my badge.

23  Q.  Okay.

24  A.  And I just kind of looked at him funny and said, "I don't

25  have no badge."
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Wyatt)                                  1274

1    Q.  Okay.

2    A.  And he said, "What about your gun?"  And I said, "I don't

3    have no gun either."

4    Q.  Okay.

5    A.  He might have.  I don't know.

6    Q.  But it was your understanding that he had done that;

7    correct?

8    A.  I didn't ask McFadden.

9    Q.  You told the OIG that he had introduced you as an officer,

10   didn't you?

11   A.  Well, that's what I was getting from Adrian.  That's from

12   my understanding.

13   Q.  Okay.

14          MR. WYATT:  Pass the witness, Your Honor.

15          THE COURT:  All right.  Let's take our noon recess at

16   this point, ladies and gentlemen.  We'll be in recess until

17   1:30.

18      (THE LUNCHEON RECESS WAS HAD)

19

20

21

22

23

24

25

```
 1                    AFTERNOON SESSION

 2                    AUGUST 8, 2011

 3   -------------------------------------------------------------

 4      (The following proceedings were had within the presence and

 5   hearing of the jury.)

 6           THE COURT:  Court is back in session.  Cross-

 7   examination.

 8           MR. ALLEN:  Your Honor, may we approach?

 9           THE COURT:  Yes, sir.

10           (Whereupon the following proceedings were heard

11   outside the presence and hearing of the jury.)

12           MR. WYATT:  Your Honor, over the noon hour, I looked

13   up on the transcript, and at page 592, lines 17 through 21,

14   Nicole Babbitt asked the question to Rochelle Martin:  "What

15   kind of bag did you hand off?

16           "ANSWER:  It was -- I know Jeff had his in a brown

17   bag.  I don't remember what kind of bag Ryan gave me.

18            ANSWER:  A clear bag -- excuse me.

19           "QUESTION:  A clear bag?

20           "ANSWER:  If it was clear, I would have seen what was

21   in it.

22           "QUESTION:  A Doritos bag?

23           "ANSWER:  I don't remember."

24           And I believe that the court instructed the jury that

25   you heard her say it was in a Doritos bag.  And we would ask
```

1  that the record be corrected.

2          MR. ALLEN:  For the jury's benefit.

3          MR. WYATT:  For the jury's benefit.

4          THE COURT:  What did you say about the dope -- I'm

5  very confused about the part you just read, frankly.

6          MR. WYATT:  Yes, sir, I specifically asked him the

7  question if Rochelle Martin said it was in a brown bag, the

8  dope, and not in a Doritos bag -- and Mr. Harris objected.  And

9  then Your Honor said, well, I believe I heard it was a Doritos

10  bag.

11          THE COURT:  Yes, that's the drugs.  You talking

12  about --

13          MR. WYATT:  Right.  And she says it was in a brown bag

14  that she handed off.

15          THE COURT:  I'll just tell the jury to rely on their

16  memory.  I thought you said the Doritos bag is what you're

17  wanting it to read, wasn't it?

18          MR. WYATT:  No.  She says, "What kind of bag did you

19  hand off," and said brown bag.  Thank you, Your Honor.

20     (The following proceedings were had within the presence and

21  hearing of the jury.)

22          THE COURT:  As I'll instruct you at the end of the

23  trial, ladies and gentlemen, it will be your memory of the

24  facts that controls this case.  So anything that I say or the

25  lawyers say should be disregarded if it is contrary to what you

RYAN LOGSDON - CROSS (By Mr. Allen)                                  1277

 1   remember being the testimony at trial.

 2            You may proceed.  Mr. Allen.

 3                        CROSS-EXAMINATION

 4   BY MR. ALLEN:

 5   Q.  Mr. Logsdon?

 6   A.  Yeah.

 7   Q.  We've met --

 8   A.  Yes, sir.

 9   Q.  -- as has been discussed?

10   A.  Uh-huh.

11   Q.  An issue that you told me about was that you had never told

12   Jeff Henderson about a meeting with Larita Barnes at the

13   QuikTrip.  Do you remember that?

14   A.  Telling Jeff about it?

15   Q.  Yes.

16   A.  That never happened.  I don't believe it ever happened.

17   Q.  The fact is that the testimony at trial about how you met

18   Larita Barnes at a QuikTrip, that never happened?

19   A.  No, no, it never did.  I've known Larita.  I've always

20   known how to get a hold of her.  Sometimes we would be distant

21   for a year or two, but we'd keep in touch.  I never did meet

22   her at no QuikTrip, no, no.

23   Q.  The only time you've bought drugs from her in any recent

24   past was that time at the end of 2006?

25   A.  Right, right.

RYAN LOGSDON - CROSS (By Mr. Allen)                    1278

1   Q.  You, in fact, hadn't bought drugs from her since early in

2   2000; right?

3   A.  Yes, somewhere around there.  I couldn't remember the exact

4   time, but yeah.

5   Q.  You haven't seen her since?

6   A.  No.

7   Q.  Except for at trial, obviously?

8   A.  At trial, yeah.

9   Q.  So if agent -- or former Agent McFadden says that you said

10  you had bought drugs from Larita Barnes a couple of times right

11  before May 8th, where would he have gotten that?

12  A.  From what I told him right before May 8th of '07?

13  Q.  Yes.

14  A.  What I told him about in '06.

15  Q.  Did you tell him about '06?

16  A.  Yeah.  I told him that's the last time I bought anything

17  from her, yeah, yeah.

18  Q.  Did you tell Jeff Henderson about that?

19  A.  Yeah.

20  Q.  When did you tell him about that?

21  A.  Whenever we was riding around one day, he wanted me to

22  point out some houses for him.  He wanted me to show him in

23  Tulsa some houses that had dope in it that he could go run a

24  search warrant on it and find dope in there.  Dope, guns,

25  whatever.  First part of '07 sometime.

RYAN LOGSDON - CROSS (By Mr. Allen)                    1279

1   Q.  Say again?

2   A.  First part of '07 sometime.

3   Q.  So when this conversation happens at your house in 2008 --

4   or in 2007, May 8, 2007, I believe you testified Jeff Henderson

5   shows up at your house and says, "You just bought drugs from

6   Larry Barnes;" right?

7   A.  Correct.

8   Q.  What else happened during the course of that conversation?

9   A.  Not a whole lot besides me giving him back the dope and

10  saying, "No, I didn't, I told you I can't buy from them

11  people.  I told you that."

12  Q.  When was the next time he talked to you about this alleged

13  buy?

14  A.  Seemed like he told me that -- him and McFadden might have

15  told me that they went and picked up -- or somebody went and

16  picked up Larry and Larita on a warrant maybe.  So it might

17  have been a few months later maybe.

18  Q.  Do you remember telling Gary Knox that it was three or for

19  months later?

20  A.  I don't remember a whole lot about that.

21  Q.  Do you remember how many times you met with Agent McFadden

22  and Officer Henderson regarding the testimony you were going to

23  give?

24  A.  Like I said, we met three or four times.  Three, four, five

25  times.  Rode around Tulsa.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - CROSS (By Mr. Allen)                    1280

1   Q.  Do you remember about when those times were?

2   A.  It was after the state arrested them, state dropped the

3   charges, and the feds picked it up, so it was after Rob Raley

4   got handed the case, which I don't know when that is, when that

5   was, but --

6   Q.  Is this when one of these officers told you to testify the

7   way that you would if you were talking about a time when you

8   actually had bought drugs from Larita?

9   A.  Right.  Just put myself in that position like the buy

10  actually happened, but it didn't.

11  Q.  So was it just a miracle that Jeff Henderson had told a

12  story and the police report exactly the way that you had bought

13  the drugs from Larita Barnes in 2006?

14  A.  He had asked me, "How do you guys normally do the deal?"

15  And I said, "Well, I call them up, go in, do the deal and

16  leave."  Gave him the basis of it.

17  Q.  You realize that there is a police report about it; right?

18  A.  Yeah.

19  Q.  It's on the TRACIS system?

20  A.  Right.

21  Q.  And that TRACIS system is out of Jeff Henderson's control.

22  You realize that; right?

23  A.  Yeah, I guess.

24  Q.  Realize that in order -- I'm sorry?

25  A.  I don't know how to get one.

U.S. District Court
Northern District of Oklahoma

1   Q.  Realize that in order to create a TRACIS report that has

2   the date of May 8, he would have had to have done it on May 8;

3   correct?

4           MR. HARRIS:  I object.  I don't know that he knows

5   that.  I'm not even sure I do.  I object to the speculation.

6           THE COURT:  Lay the foundation if you wish to pursue

7   it.

8           MR. ALLEN:  I'm just asking him if he knows.

9           THE COURT:  Well, if there's no basis to ask him that,

10  there's no sense in pursuing it.  Let's move on to something

11  else.

12  Q.  (By Mr. Allen) Was it a similar miracle that Jeff Henderson

13  happened to have written in that handwritten statement by

14  you --

15          MR. HARRIS:  Judge, I object.  I don't know what the

16  first miracle is Mr. Allen is talking about.

17          THE COURT:  He just asked a prior question about a

18  miracle -- the facts being similar to what's in the TRACIS

19  report.  Or identical, I guess.  Lay the foundation if you want

20  to pursue how he got this information.

21          MR. ALLEN:  I'm sorry, what information?

22          THE COURT:  Lay the found- -- where Henderson got it

23  or what this witness told him.

24          MR. ALLEN:  Okay.

25  Q.  (By Mr. Allen) Now, it's been your testimony that the way

1   you testified at the Barnes trial was from remembering the time

2   you bought from Larita Barnes in 2006; right?

3   A.  Right.

4   Q.  And Jeff Henderson's report happens to be exactly that;

5   right?

6   A.  Right.

7   Q.  And the Barneses didn't get arrested for several months

8   after the May 8th buy; right?

9   A.  Right.

10  Q.  How did this report happen to be exactly what your memory

11  was of 2006?

12  A.  I don't know.

13  Q.  You guys didn't start meeting and riding around until after

14  they'd gotten arrested; right?

15  A.  Yeah.

16  Q.  Similar with the $10,000.  How is it that Jeff Henderson

17  just happened to miracle $10,121 in there, and you just pulled

18  out of thin air $10,000 at trial?

19  A.  I remembered -- like I told you at deposition, I remember

20  getting some paperwork in the mail talking about how much money

21  they seized along with my car, so that just kind of stayed in

22  my mind, so I just threw that out there.  That's not nothing --

23  anything about the $10,000, Henderson didn't coach me on that.

24  That's just something I you threw out there because that was

25  one question he didn't coach me on, that he might have forgot

```
 1   to coach me on.
 2   Q.  So you're saying the forfeiture paperwork; is that right?
 3   A.  The forfeiture paperwork on my car and the funds seized at
 4   my house, yes.
 5   Q.  So when you're talking about this, you're talking about the
 6   Chrysler 300?
 7   A.  Yes.
 8   Q.  It got forfeited that night; right?
 9   A.  Yeah, he took it.
10   Q.  January 23rd, 2007?
11   A.  Took that.
12   Q.  And the money, it got forfeited that night; right?
13   A.  Yes.
14   Q.  In that handwritten statement, it shows where you write
15   that you have obtained those funds and that vehicle by using
16   illegal -- or by selling illegal substances; right?
17   A.  Right.  Right.
18   Q.  The forfeiture paperwork you're talking about in the mail,
19   can you explain to us what that is?
20   A.  I got some paperwork in the mail that showed that there was
21   a search warrant ran on my residence and they forfeited illegal
22   money, illegal contraband.
23   Q.  And you took some effort to try to get your car back;
24   right?
25   A.  Well, yeah, I responded to it, yeah, but I knew I wasn't
```

RYAN LOGSDON - CROSS (By Mr. Allen)                    1284

```
 1   going to get it back.  I just responded to the letter.
 2   Q.  Were you trying to get back the money?
 3   A.  No.
 4   Q.  So why is it that you would try to get back a car that's
 5   worth $20,000, and not try to get back $60,000 in cash?
 6   A.  I don't know.  I didn't -- they didn't give none of it
 7   back.
 8   Q.  But you made no effort to try to get $60,000 in cash back?
 9   A.  No.  60,000 was gone.  50 of it was gone.  The other ten
10   got turned in.
11   Q.  If you were going to cooperate with the police, wouldn't --
12   you say that you felt like someone planted drugs in your house;
13   is that right?  You think someone planted drugs; right?
14   A.  I know they did.
15   Q.  And you told the OIG that --
16   A.  I know they did.
17   Q.  You told the OIG very specifically that Brandon McFadden,
18   you believed, had planted marijuana; right?
19   A.  Right.
20   Q.  And that you believe that Brandon McFadden must have had it
21   in his pocket and put it in the -- or pulled it out; right?
22   You told the OIG you were actually standing in your backyard,
23   and Jeff Henderson and Brandon McFadden walked up to you?
24   A.  Yeah -- well, go ahead.
25   Q.  They showed you the marijuana; right?
```

1    A.  McFadden pointed to it.  Henderson followed up and says,

2    "Where did you get this at?  This is yours, isn't it?"  I said,

3    "No, it is not."

4    Q.  This all happened in your backyard?

5    A.  In my garage, yeah.

6    Q.  And you didn't tell the OIG that anybody had thrown a

7    bottle at your chest or anything like that?

8    A.  No.

9    Q.  And you didn't -- you told the OIG that you had $1,200 in

10   your pocket also; right?

11   A.  I did have $1,200 in my pocket.  Henderson took it.  He

12   gave my girlfriend $100 of it and told her to go get a hotel

13   room.

14   Q.  Where do you figure Jeff Henderson got $10,121 to put in

15   this report?

16   A.  I don't know.

17   Q.  So if you're going to cooperate at this point, once you

18   feel like Agent McFadden has shown you marijuana, you feel like

19   it's not yours, you're going to be set up; right?

20   A.  I know it wasn't mine.

21   Q.  You know it wasn't yours.  You were going to be set up.

22   Somehow they were going to take your kids; right?

23   A.  That's what they told me.  That's what they attack first.

24   Q.  You're willing to give up Avery Brewer, your supplier?

25   A.  That's right.

RYAN LOGSDON - CROSS (By Mr. Allen)                    1286

1  Q.  Why in the world do you give them the $60,000?

2  A.  I had to put everything out on the table.  I had to be

3  honest.  I had to be straight up with them.  I was scared.

4  Q.  Why in the world did you give them the two and a half

5  pounds of methamphetamine?

6  A.  To show them that marijuana wasn't mine.  That you missed

7  this two pounds of dope when you searched my house.

8  Q.  You were sitting there and watched Frank Khalil try to find

9  it in the closet; right?

10  A.  Henderson asked me, he said, "I want your marijuana

11  supplier."  I said, "I don't have one.  I don't sell

12  marijuana."

13  Q.  Did you not think giving up Avery Brewer would have gotten

14  you out of this?

15  A.  No.

16  Q.  Not without giving them $60,000 and two and a half pounds

17  of meth?

18  A.  And 20 suppliers later.

19  Q.  You told the grand jury at some point that you never sold

20  out of the house; right?

21  A.  Right.

22  Q.  But you did?

23  A.  Yeah, I did.

24  Q.  You have since that time; right?

25  A.  I did before I met with the federal agents on '09.  That's

RYAN LOGSDON - CROSS (By Mr. Allen)                              1287

 1  the last time I sold dope.

 2  Q.  And the federal agents, before you started cooperating with

 3  this, had done controlled buys on your house; right?

 4  A.  They told me they had controlled buys from my house, yes.

 5  Q.  Like about nine ounces of it?

 6  A.  I was told a pound.

 7  Q.  So federal agents had already bought a pound?

 8  A.  That's what they said.

 9  Q.  That didn't have anything to do with Jeff Henderson?

10  A.  No, I was selling dope on my own.

11  Q.  Or Brandon McFadden, nothing like that?

12   A. No.

13  Q.  You're not charged with that today?

14  A.  No.

15  Q.  You haven't been charged since sometime in '09, whenever

16  that happened; right?

17  A.  No.

18  Q.  Is that why you're here testifying today?

19  A.  Yes, hoping I can get some type of leniency.  Something.

20          MR. ALLEN:  One second, Your Honor.

21  Q.  (By Mr. Allen) The one meeting you had that you testified

22  about with Bill Yelton during a traffic stop, do you remember

23  that?

24  A.  When him and Henderson pulled me over?

25  Q.  Yes.

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1288

```
 1   A.  Yes.
 2   Q.  Did Bill Yelton do anything to you that you felt like was
 3   inappropriate?
 4   A.  No, no.  We had just a real quick conversation in the car.
 5   Q.  Other than that, do you have any other -- any other
 6   connection with Bill Yelton at all?
 7   A.  No.
 8           MR. ALLEN:  No other questions.
 9           THE COURT:  Redirect.
10           MR. HARRIS:  Yes, sir.
11                       REDIRECT EXAMINATION
12   BY MR. HARRIS:
13   Q.  That gentleman that just asked you some questions,
14   Mr. Allen, the guy in the yellow tie --
15   A.  Yes.
16   Q.  -- he represents Bill Yelton.
17   A.  Right.
18   Q.  You've met him before today, haven't you?
19   A.  Yes, I have.
20   Q.  In fact, he deposed you, didn't he?
21   A.  A deposition, yes, sir.
22   Q.  A civil lawsuit?
23   A.  Right.
24   Q.  Were you being sued?
25   A.  No, I'm not being sued.
```

```
 1   Q.  Were you suing somebody?

 2   A.  No.

 3   Q.  He just wanted to depose you?

 4   A.  Yeah.

 5   Q.  In fact, the first time he deposed you was June 28th, and

 6   the deposition was something in the neighborhood of 109 pages.

 7   Did you know that?

 8   A.  Yeah.

 9   Q.  Was that the only time he deposed you?

10   A.  He did a couple of more times after that.

11   Q.  In fact, that same lawyer, Mr. Allen --

12           MR. ALLEN:  Your Honor, may we approach?

13           THE COURT:  Yes, sir.

14       (The following proceedings were had at the bench out of the

15   hearing of the jury.)

16           MR. ALLEN:  Your Honor, I believe that this is a

17   purposeful mischaracterization of the deposition that was

18   intentionally continued by agreement with his lawyer.  It only

19   lasted for an hour or so, and then due to scheduling issues, it

20   went to another time.  It makes it sound as -- I think he's

21   intentionally driving it toward the idea that it was three

22   separate depositions.  And, in fact, it was continued by

23   agreement.

24           THE COURT:  Give him the total number of pages.

25           MR. HARRIS:  Okay.  I'll do it.
```

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1290

1     (The following proceedings were had within the presence and

2 hearing of the jury.)

3 Q.  (By Mr. Harris) This lawyer, Mr. Allen, deposed you three

4 separate times, but -- it was just one deposition, but there

5 were breaks because of people's schedule; is that fair?

6 A.  Right.  That's fair.

7 Q.  So the first time you all met, it was -- he deposed you to

8 the tune of 110 pages, I think?

9 A.  A lot of questions, yeah.

10 Q.  Second time, still -- part of the same deposition; right?

11 A.  Uh-huh.

12 Q.  He deposed you to the tune of looks like 57 pages.

13 A.  Right.

14 Q.  So 57 and 110.  And then the third time was just -- he

15 deposed you to the tune of 91 pages.

16 A.  Right.

17 Q.  So he was asking questions, and it's about almost 300

18 pages' worth of depositions?

19 A.  Right.

20 Q.  And only thing you know about Bill Yelton is what you just

21 told him that one time?

22 A.  Right.

23 Q.  Right.  And so he sat down and asked you -- all those

24 questions he asked you, did he ask you anything about Bill

25 Yelton when he deposed you?

```
 1   A.  I think he basically asked me the same thing he just asked

 2   me a while ago, if I ever had any contact with him.

 3   Q.  Who was he asking you questions about?

 4   A.  Bill Yelton.

 5   Q.  Anybody else?

 6   A.  Henderson.

 7   Q.  He was asking you questions about Jeff Henderson?

 8   A.  Yeah, I believe.

 9   Q.  Do you know why?

10   A.  I believe it might have been on that traffic stop.  Is that

11   what you're talking about?

12   Q.  I don't know.  I wasn't there.

13   A.  I can't really remember how many times he asked me about

14   Henderson, but several.

15   Q.  So this lawyer for Mr. Yelton deposed you to the tune of

16   almost 300 pages, and he's asking you questions about Jeff

17   Henderson; is that right?

18          MR. JONES:  Your Honor, may I approach the bench?

19          THE COURT:  Yes, sir.

20          (Whereupon the following proceedings were had in the

21   presence and hearing of the jury.)

22          MR. JONES:  A misleading impression has been created

23   here.  The deposition is in the civil case, and Mr. Allen

24   represents Mr. Henderson in a civil case.

25          THE COURT:  I think Mr. Harris said that.
```

 1          MR. JONES:  Well, but he's leaving the impression that

 2     all of these questions are being asked for the criminal case.

 3     Mr. Logsdon is a witness in the civil case.

 4          THE COURT:  I understand.  I'll let Mr. Wyatt cover it

 5     briefly.

 6          MR. JONES.  Thank you.

 7          MR. WYATT:  Your Honor, also with respect to that, I

 8     believe the government has opened up the door to the fact that

 9     with respect to one whole deposition and half of another one,

10     that they had to keep asking him questions because he entered

11     the Fifth Amendment and refused to testify.

12          THE COURT:  I don't think we're going to get into

13     that.

14          MR. WYATT:  Well, he's not the defendant.

15          THE COURT:  I understand.  What's that going to show?

16          MR. WYATT:  Well, it shows that we wouldn't have had

17     three depositions, it wouldn't have been 300 pages, it would

18     have been about a hundred pages had he simply asked (sic) the

19     questions, because he pled the Fifth to the first two days of

20     the testimony, same questions.  And then he was compelled to

21     answer those questions by the state court judge, and that's the

22     reason they came back.

23          THE COURT:  Mr. Harris.

24          MR. HARRIS:  I don't think he answered the questions.

25     I think he continued to take the Fifth.

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1293

1           MR. WYATT:  No, the entire last day, the deposition on

2    the third day, he answers the questions, Your Honor.

3           MR. ALLEN:  He takes the Fifth on occasion on the

4    third day, but on certain very specific things he said --

5           THE COURT:  When was the deposition taken?

6           MR. HARRIS:  June 28th.

7           THE COURT:  Last June, a couple of months ago?  I'll

8    permit you to cover that.

9       (The following proceedings were had within the presence and

10   hearing of the jury.)

11   Q.  (By Mr. Harris) You had an attorney at the deposition,

12   didn't you?

13   A.  Yes, Stan Monroe.

14   Q.  And they said you were a witness in that civil matter;

15   right?

16   A.  Right.

17   Q.  And do you know who Mr. Allen represented in that civil

18   matter?

19   A.  In the civil matter, he represented Jeff Henderson.

20   Q.  Okay.  Now, I heard some talk between Mr. Wyatt -- did you

21   know Mr. Wyatt, the gentleman that asked you the first

22   questions?

23   A.  It's the first time I met him today.

24   Q.  His name is Robert Wyatt, IV, I believe.

25   A.  Okay.

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1294

1   Q.  He asked you some questions, and then Mr. Allen did, too,

2   about Gary Knox.  Who is this Gary Knox guy?

3   A.  A childhood friend.

4   Q.  Did you know that Gary Knox was an investigator for them or

5   something?

6   A.  No, I didn't.  A real good childhood friend of mine.

7   Q.  Did he come to your house and bring you some beer and try

8   to tape record some stuff of you?

9   A.  He must have, yeah, from what I've been told.

10  Q.  Mr. Wyatt was asking you some questions -- you haven't been

11  charged with any of this stuff you've told about, have you?

12  A.  No.

13  Q.  You haven't been charged about all the dope dealing you've

14  done with Jeff Henderson?

15  A.  No.

16  Q.  Or Brandon McFadden?

17  A.  No.

18  Q.  Or all the drugs you bought from Adrian Torres?

19  A.  No, I haven't been charged at all, sir.

20  Q.  You haven't been charged with all the dope you sold, have

21  you?

22  A.  No.

23  Q.  Anybody tell you you're not going to get charged?

24  A.  No.

25  Q.  Anybody at this table say, you've got immunity, just tell

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1295

 1  us?

 2  A.  No.

 3  Q.  Do you realize that's what most witnesses do, they ask for

 4  immunity?

 5  A.  Yes.

 6  Q.  Why didn't you do that?

 7  A.  I wasn't worried about that.  I was worried about getting

 8  these officers, what they done to me when they threatened to

 9  take my child.  That's it.

10  Q.  I know when you testify, you seem to get the angriest when

11  you're talking about planting the marijuana.

12  A.  It happened, sir.

13  Q.  That seemed to have made you pretty mad?

14  A.  Damn right it did.

15  Q.  What about taking your kids?

16  A.  That topped it off right there.

17  Q.  Why in the world, if all they got is a little knick-knack

18  marijuana on January 23 --

19  A.  They was going to take my kid.

20  Q.  -- why in the world would you give them two pounds of meth

21  and a bunch of cash?

22  A.  To show them they was lying.

23  Q.  I guess you showed them, didn't you?

24  A.  I showed 'em.

25  Q.  Are you aware that -- I heard Mr. Wyatt ask you a lot of

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1296

1  questions about you've misstated things, you've said things

2  wrong.  You've just flat-out lied before, haven't you?

3  A.  Yes, sir.

4  Q.  In the Barnes trial, you lied?

5  A.  I lied.

6  Q.  Apparently in some state court trial you lied?

7  A.  Which one was that?

8  Q.  I don't know.  I'm trying to remember which -- you know, I

9  thought it was some state court --

10  A.  In state court?

11  Q.  Uh-huh.

12  A.  I testified against Luis, and I didn't lie on that.

13  Q.  Oh, you didn't tell everything, did you?

14  A.  No, didn't tell everything.

15  Q.  You didn't tell about you buying dope on the side and

16  selling it?

17  A.  Right, right, right.

18  Q.  I gotcha.  Okay.  And then you heard them talk to you about

19  all the little -- whether it was McFadden that planted the dope

20  or whether you told the OIG it was Henderson -- you heard all

21  those questions?

22  A.  Yeah.

23  Q.  Do you know what today is, what today's date is?

24  A.  8th.

25  Q.  Of what?

U.S. District Court
Northern District of Oklahoma

1   A.  August.

2   Q.  What year?

3   A.  2011.

4   Q.  When is everybody trying to ask you about stuff?  In what

5   year?

6   A.  Oh, they're trying to ask me things that happened to me

7   from '07 all the way up until now.  There's a lot of things

8   that's happened to me.  A lot.

9   Q.  Starting in actually late '06, I guess with Ms. Larita

10  Barnes.

11  A.  Late '06, true.

12  Q.  And where were you on June 1, 2008?

13  A.  June 1, 2008?

14  Q.  Uh-huh.

15  A.  I'd been at home.

16  Q.  How about June 1, 2011?

17  A.  I'd been at home with my kids.

18  Q.  It's kind of hard remembering everything, isn't it?

19  A.  Yeah.  Yeah, it is hard.

20  Q.  In fact, this OIG agent interviewed you on June 26, 2009.

21  A.  Okay.

22  Q.  Do you remember Mr. Wyatt talking to you about this?

23  A.  Are you talking about Ms. Hart?

24  Q.  Yeah, Ms. Hart --

25  A.  Uh-huh.

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1298

1   Q.  -- was the agent?

2   A.  Right, at the time.

3   Q.  This document, where they sat down and interviewed you, her

4   and Gary Graff of the FBI; right?

5   A.  Yes.

6   Q.  And how long did they interview you?

7   A.  What day was that again?

8   Q.  It was written on June 26.  Apparently June 22nd they

9   interviewed you, and maybe initial interview on June 10th,

10  2009.

11  A.  Yeah, they interviewed me twice, you know, about two or

12  three hours each time, I believe.

13  Q.  Have you seen this?  It is 21 pages.

14  A.  Yes.  I've got that at home.

15  Q.  Single space.

16  A.  Yes.

17  Q.  Is that you just sitting down and trying to remember

18  everything you've done?

19  A.  That's trying to sit down and remember everything I can the

20  best I can.

21  Q.  In '09, for the past two and a half years?

22  A.  Before that, yeah.

23  Q.  And at that time, had you thought about some of this stuff

24  in '08 and '07 and '06?

25  A.  Well, I -- all those things happened to me, so I remembered

U.S. District Court
Northern District of Oklahoma

```
 1   them the best I could.
 2   Q.  And the reason I asked this, it seems like there are some
 3   affidavits that you must have gotten search warrants where you
 4   really were the affiant for Jeff Henderson; am I right?
 5   A.  Right, I did do some.
 6   Q.  What did I hear, like 17 or 14 or something?
 7   A.  It was close to 20.
 8   Q.  I take it in those affidavits he probably put you were a
 9   reliable confidential informant, didn't he?
10   A.  A reliable confidential informant, that's what he put.
11   Q.  He said you talked the gospel, didn't he?
12   A.  That's right.
13   Q.  The Barnes trial.  The blank statement -- signing the blank
14   statement, were you asked about that in the Barnes trial?
15   A.  It seems like I was.
16   Q.  Mr. Wyatt asked you if you, at the Barnes trial, if you
17   lied voluntarily of your own free will.  Did you lie
18   voluntarily of your own free will?
19   A.  No, I did not.  Officer Henderson and McFadden had me lie.
20   Q.  But you didn't go, Oh, no, guys I'm not doing this, did
21   you?
22   A.  I tried, but it didn't work.
23   Q.  You didn't go to Rob Raley and go, Hey, Mr. Raley, let me
24   tell you, this is all a lie, did you?
25   A.  No, I did not.
```

1  Q.  You didn't go, Hey, Mr. Haley, McFadden and Henderson are

2  lying and I'm lying and we're just trying to put away some

3  people for a long time?

4          MR. WYATT:  I object.  This is leading.

5  Q.  (By Mr. Harris) Did you do that?

6          THE COURT:  Sustained.

7          THE WITNESS:  No.

8          MR. WYATT:  I objected.

9          THE COURT:  Sustained.

10          MR. HARRIS:  And I do know what sustained means,

11  Your Honor.

12          THE COURT:  I was afraid I was mumbling.

13          MR. HARRIS:  No, sir.  I'm ready to go to the bench at

14  any moment, Judge.

15  Q.  (By Mr. Harris) Mr. Logsdon, what in the world made you get

16  in federal court and lie about the Barneses?

17  A.  What made me get in there and lie?

18  Q.  Yeah.

19  A.  Officer Henderson did it -- made me lie.

20  Q.  Is that a pretty big deal?

21  A.  Yeah, it's a big deal.  He told me "You can think about

22  going -- you can lie in their trial or you can think about

23  going back to prison."  I lied in the trial.

24  Q.  What would have happened if you had said, "Guys, I'm going

25  to tell the truth, I'm not going to do it"?

RYAN LOGSDON - REDIRECT (By Mr. Harris)                              1301

1    A.  They would have stuck my ass in prison.

2    Q.  You realize you might go to prison anyway?

3    A.  Oh, yeah.

4    Q.  The chances are pretty good?

5    A.  Oh, I know.

6    Q.  The dope that was seized at your house on January 23rd?

7    A.  Yeah.

8    Q.  Do you know what -- the dope that was introduced into

9    evidence and put into the TPD evidence room -- do you know if

10   that had cut in it or do you know anything about it?

11          MR. WYATT:  I'm going to object unless he can lay a

12   foundation.

13          THE COURT:  That's what he's asking.

14          MR. WYATT:  I believe he previously testified there

15   was no cut.

16          THE COURT:  Overruled.  I'll permit it.

17   Q.  (By Mr. Harris)  Do you know whether there was cut?

18   A.  I knew when it left my house it wasn't cut.  It was pure

19   dope.

20   Q.  Did anyone ever tell you anything about it being cut?

21   A.  Yes, McFadden did.

22   Q.  What did McFadden tell you?

23          MR. WYATT:  I object to McFadden as hearsay.

24          MR. HARRIS:  It's coconspirator, Your Honor.

25          THE COURT:  It sounds like 801(d)(2) to me.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1302

1   Overruled.

2   Q.  (By Mr. Harris) What did McFadden say to you?

3   A.  McFadden said that he cut the dope before he turned it in.

4   Q.  Why would they do that?

5   A.  Well, what they did was, is McFadden said the two pounds of

6   dope that we got from your house, they took out a pound and a

7   half and put it to the side, and put in a pound and a half of

8   cut on top of the half a pound, which made it two pounds.  It

9   wasn't near as strong as it was when it left my house, but they

10  turned in two pounds, so therefore they turned in two pounds,

11  they had a pound and a half on the side.

12  Q.  And when did he tell you this?

13  A.  He told me that he'd done that on a few occasions.

14  Q.  No, when did he tell you --

15  A.  He told me, oh, around the summer of '08.  He didn't tell

16  me right off.  He didn't tell me right off.

17  Q.  What prompted him to tell you this?

18  A.  I don't know.  I don't know.  He just started telling me

19  things.

20  Q.  Did you think in your mind -- on January 23rd, 2007 they

21  catch you with two pounds and a bunch of cash?

22  A.  Uh-huh.

23  Q.  You're a pretty good arrest, ain't you?

24  A.  Yeah, if they would have found it, that would have been a

25  real good arrest, but they didn't find it.

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1303

1   Q.  But they got it though --

2   A.  You got it.

3   Q.  And you've got priors?

4   A.  Got priors.

5   Q.  And then you say I'll call up some Avery guy and he'll

6   bring over one pound --

7   A.  Right.

8   Q.  --  they bust him?

9   A.  Right.

10  Q.  Why do you think they didn't take you?  I mean, you had

11  more dope, more money and more priors.

12  A.  I knew that once I gave them him, they was going to let me

13  go like they said they would, and I knew I had to give them

14  some more people, so I didn't think they would just let me off

15  the hook with just that one guy.  I had a feeling they was

16  going to make me bring them some more.

17  Q.  You mentioned something about this 50 pounds of dope you

18  got from McFadden?

19  A.  Right.

20  Q.  You hid it in the woods and it got stolen?

21  A.  Yeah.

22  Q.  What did you tell McFadden?  Did you tell him that?

23  A.  No, I told him I fronted it to somebody.  I gave it to a

24  guy on credit and I told McFadden that guy burned me.  So I

25  just left that alone and just paid him what I owed him.

RYAN LOGSDON - REDIRECT (By Mr. Harris)                    1304

```
1   Q.  You paid who?

2   A.  McFadden.

3   Q.  The money for the 50 pounds?

4   A.  Yeah.

5   Q.  Why did you do that?

6   A.  Just keep things cool.  Wanted to keep in good with them.

7   Q.  Why didn't you tell them the truth, it got ripped off and I

8   got spooked?

9   A.  I don't know.  I just -- I paid him and left it alone.

10  Q.  You know, Mr. Wyatt was also asking you some questions,

11  another question he asked you, and he started off and he said,

12  "I'll just ask you, because I don't recall what you said on

13  direct."  He was asking you a question.

14  A.  Okay.

15  Q.  Okay.  And so now I'm asking you -- and the point is that

16  he -- do you realize he couldn't remember what you said on

17  direct?

18  A.  On some of the things.

19  Q.  Yeah.

20  A.  Yeah.  Pertaining to what?

21  Q.  Pertaining to all sorts of stuff.

22  A.  Oh, yeah.  There's a lot of stuff that happened.  I've got

23  some things mixed up, but I'm close, close as I can get.

24  Q.  How could -- did you know whether McFadden knew Rochelle

25  Martin before you met her at the TCC?
```

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - RECROSS (By Mr. Wyatt)                              1305

1              MR. WYATT:  I object unless he lays a foundation.

2              MR. HARRIS:  I'm asking if he knew.

3              THE COURT:  Overruled.

4    Q.  (By Mr. Harris) Do you know whether McFadden knew Rochelle

5    Martin when you entered the TCC?

6    A.  Never had no conversations about Rochelle Martin with

7    McFadden before then, no.

8    Q.  Okay.

9              MR. HARRIS:  That's all I have, Your Honor.

10             THE COURT:  Limited questions on the civil deposition

11   and Mr. Allen's participation.

12             MR. WYATT:  Yes, sir.  May it please the court.

13                       RECROSS EXAMINATION

14   BY MR. WYATT:

15   Q.  These three depositions taken on June 28, 2011, and then on

16   June 30, 2011, and then on July 22, 2011, those three

17   depositions were taken in a civil case filed by Larry Wayne

18   Barnes and Linda Sue Barnes against the City of Tulsa, Ronald

19   Palmer, Jeff Henderson and Brandon McFadden; is that correct?

20   A.  Yes.

21   Q.  And those were civil lawsuits; correct?

22   A.  Yes.

23   Q.  Okay.  And during the first two of those three depositions,

24   90 percent of your answers were "I plead the Fifth.  I decline

25   to answer;" isn't that correct?

U.S. District Court
Northern District of Oklahoma

RYAN LOGSDON - RECROSS (By Mr. Wyatt)                    1306

```
 1   A.  Yes, sir.

 2   Q.  And those hearings or those depositions were continued

 3   either at yours or your attorneys, or one of the other

 4   attorney's request, it wasn't something that was intentional;

 5   correct?

 6   A.  Right.

 7   Q.  You were asked specifically in that deposition about things

 8   that you've testified to today; correct?

 9   A.  Yes.

10   Q.  And your testimony was not always consistent in that sworn

11   testimony with what it was today, was it?

12           THE COURT:  Now you're overstepping the bounds,

13   Mr. Wyatt.

14           MR. WYATT:  Yes, Your Honor.  No further questions.

15           THE COURT:  You may step down.

16           MR. HARRIS:  May he be excused, Your Honor?

17           THE COURT:  Yes, sir.  Any reason this witness may not

18   be permanently excused?

19           MR. ALLEN:  Yes, Your Honor, we may call him in our

20   case in chief.

21           THE COURT:  All right.  You're still under subpoena.

22           Government may call their next witness.

23           MR. HARRIS:  Your Honor, at this time -- at this time,

24   Your Honor, we're going to read the testimony of Ryan Logsdon

25   at the Barnes trial into the record.
```

U.S. District Court
Northern District of Oklahoma

1307

1    THE COURT:  All right.

2    MR. HARRIS:  Ms. Duke is going to read part of it.

3    MR. WYATT:  Your Honor, may we approach?

4    THE COURT:  Yes, sir.

5    (The following proceedings were had at the bench out of the

6  hearing of the jury.)

7    MR. WYATT:  Your Honor, I object at this time to

8  reading in the transcript of the testimony of Ryan Logsdon at

9  the Larry Barnes trial.

10    I informed the court that I wanted to cross-examine

11  the witness regarding those things and now they're trying to

12  bring in the evidence after the witness has testified.  And I

13  think both sides had ample opportunity to examine that and

14  bring that in, and I object.

15    MR. HARRIS:  Judge, it's evidence in the record.  The

16  transcript has already been admitted.  We're just reading it

17  into the record like we've done with all the others.

18    THE COURT:  What's the point?

19    MR. HARRIS:  The point is for the jury to hear his

20  testimony.

21    THE COURT:  You did not excuse Mr. Barnes.  You have

22  the opportunity to recall him.

23    MR. WYATT:  Very well.  Thank you.

24    (The following proceedings were had within the presence and

25  hearing of the jury.)

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - DIRECT (By Ms. Harris)                    1308

1          MR. HARRIS:  Starting on 188, this is Exhibit 30, page

2    188, Your Honor.

3          MR. WYATT:  I'm sorry, did you say 188?

4          MR. HARRIS:  Page 188.  Turn to page 188, Ms. Duke.

5          (Whereupon the transcript was read to the jury and

6    both parties waived the reporting of such.)

7          MR. HARRIS:  That's all I have, Your Honor.

8          THE COURT:  You may call your next witness.

9          MS. HARRIS:  The United States calls Kelie Barnes.

10         THE COURT:  Please come forward and take the oath,

11   please.

12      (Witness sworn.)

13                      KELIE BARNES,

14   having been first duly sworn, was called as a witness and

15   testified as follows:

16                    DIRECT EXAMINATION

17   BY MS. HARRIS:

18   Q.  Please state your name.

19   A.  Kelie Barnes.

20   Q.  How do you spell your first name?

21   A.  K-E-L-I-E.

22   Q.  And how old are you, Kelie?

23   A.  32.

24   Q.  Do you work here in Tulsa?

25   A.  Yes, I do.

KELIE BARNES - DIRECT (By Ms. Harris)                    1309

1  Q.  What do you do for a living?

2  A.  I'm a manager at Sonic right now.

3  Q.  Be sure to speak well into the microphone so everybody can

4  hear you; you're soft spoken, okay?

5  A.  Okay.

6  Q.  How long have you been the manager at Sonic?

7  A.  I just started it about a month ago.

8  Q.  Okay.  And are you the daughter of Larry Barnes, Sr.?

9  A.  Yes.

10 Q.  Are you the sister of Larita Barnes?

11 A.  Yes.

12 Q.  All right.  Ms. Barnes, do you have a criminal history?

13 A.  Yes, I do.

14 Q.  If you would, just tell the jury what your prior charges

15 have been and how they were resolved.

16 A.  I was indicted in 1999 when I was 20 years old for a

17 conspiracy and manufacturing.

18 Q.  For what?

19 A.  Conspiracy to manufacturing.

20 Q.  And manufacture what?

21 A.  Methamphetamine.

22 Q.  Was that a federal indictment?

23 A.  Yes, it was.

24 Q.  Was your brother Larry Barnes, Jr. indicted as well?

25 A.  He was indicted but he wasn't on my case.

KELIE BARNES - DIRECT (By Ms. Harris)                           1310

1   Q.  It was a different indictment?

2   A.  Uh-huh.

3   Q.  Who were the other individuals that were indicted with you?

4   A.  Mark Barnes, my brother, and Hershal Clark was, and my

5   brother-in-law.  The other ones I don't know.  I can't

6   remember.

7   Q.  Were you involved in the sale of methamphetamine?

8   A.  No, I wasn't.

9   Q.  Were you a user?

10  A.  Not at that time.

11  Q.  Did you -- were you ever a user of methamphetamine?

12  A.  Yes, I was.

13  Q.  Were you ever addicted to methamphetamine?

14  A.  Yes, I was.

15  Q.  What happened to the charges against you in the indictment?

16  A.  I was -- I got three years probation and ten months on a

17  leg monitor.

18  Q.  Did you enter a guilty plea?

19  A.  Yes, I did.

20  Q.  What did you enter a guilty plea to?

21  A.  Misprison of a felony.

22  Q.  What is misprison of a felony?

23  A.  Knowing when a felony is being committed and not reporting

24  it.

25  Q.  What felony did you know was being committed that you

KELIE BARNES - DIRECT (By Ms. Harris)                              1311

```
 1   didn't report?
 2   A.  I presumed that my brother and my boyfriend -- or my kids'
 3   father at that time -- was making drugs.
 4   Q.  And you didn't report them to anybody, any law enforcement?
 5   A.  No, I didn't.
 6   Q.  Is that what you pled guilty to?
 7   A.  Yes.
 8   Q.  And what was your sentence?
 9   A.  Three years probation and ten months on leg monitor.
10   Q.  And what's a leg monitor?
11   A.  It was just a device I put on my leg, and they knew where I
12   was at all times.
13   Q.  When did you plead guilty?  Do you recall?
14   A.  I believe it was in 2000.
15   Q.  Did you complete your three years of probation?
16   A.  No, I was sent to prison.
17   Q.  You got revoked?
18   A.  Yes.
19   Q.  What does that mean?
20   A.  That I failed to complete the probation and they sent me to
21   prison.
22   Q.  How did you fail to complete the probation?
23   A.  I failed UAs.
24   Q.  What's a UA?
25   A.  Um --
```

KELIE BARNES - DIRECT (By Ms. Harris)                              1312

1   Q.  A urinalysis test?

2   A.  Yes.

3   Q.  So were you doing drugs while you were on probation?

4   A.  At that time, yes.

5   Q.  And what drugs were you doing while you were on probation?

6   A.  Just methamphetamine.

7   Q.  And so did you get sent to prison?

8   A.  Yes, I did.

9   Q.  How long did you get sent to prison for?

10  A.  I got revoked twice.

11  Q.  Okay.

12  A.  The first time was six months and then the second time I

13  was sent to a rehab.  And I wasn't on drugs, I had just gotten

14  a job and instead of taking the bus, I rode with my brother and

15  I told them that I took the bus because I didn't have enough

16  time to get on the bus.  That's why I was sent to prison.  The

17  second time I did a year.

18  Q.  You were sent to prison, was that because you lied to the

19  probation officer?  Is that what you're saying?

20  A.  No, I lied to the rehab.  It was a new rehab that just

21  opened at the old ADC.

22  Q.  And so the second time you went to prison was not for

23  drugs?

24  A.  No, I was sent to rehab for a dirty UA.

25  Q.  Okay.

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - DIRECT (By Ms. Harris)                          1313

1   A.  But I was not doing drugs in the rehab.

2   Q.  Okay.  And then you got sent to prison why?

3   A.  For lying to them about taking -- going with my brother.

4   Q.  You weren't supposed to be around anybody that was involved

5   in drugs?

6   A.  No, they had came to pick me up to take me to work, and

7   they didn't have verification with them, like the insurance,

8   because they had just bought the car, and I was supposed to

9   take the bus and I didn't have enough time so I just told them

10  I was going to take the bus, because it was my first day at the

11  job.

12  Q.  How much prison time did you end up serving related to all

13  of this?

14  A.  18 months.

15  Q.  How much?

16  A.  18 months.

17  Q.  And where did you serve that time?

18  A.  At Fort Worth, Texas.

19  Q.  When did you get out?

20  A.  2003 the second time.

21  Q.  What about the first time?

22  A.  2001, I believe.

23  Q.  Did you continue to have problems with drug use after you

24  got out of prison in Fort Worth?

25  A.  Yes, I did.

1   Q.  If you would, tell the jury about that.

2   A.  I used methamphetamine up until 20- -- to November of 2005

3   and I went to drug court.

4   Q.  What happened in November of 2005 that made you stop using

5   methamphetamine?

6   A.  I got into drug court and I went AWOL and they put me in

7   jail for 75 days, and then they sent me to a rehab in Norman

8   and I got clean off methamphetamine through drug court.

9   Q.  How long with were you in drug rehab in Norman?

10  A.  28 days, but I spent 75 days in jail.

11  Q.  Before that or after that?

12  A.  It was all in the same time.  I spent 75 days and I went

13  straight from there to Norman to a drug rehab.

14  Q.  And you completed that drug rehab?

15  A.  Yes, I did.

16  Q.  About when?  When did you complete that, do you remember?

17  A.  It was February of 2005.

18  Q.  Okay.  Since you completed rehab in Norman in '05, have you

19  used methamphetamine?

20  A.  No, I haven't.

21  Q.  Have you used any drugs?

22  A.  No.

23  Q.  Have you sought any sort of treatment for drug problems

24  since your release from rehab?

25  A.  No.  I was in drug court until July of 2007 when I

KELIE BARNES - DIRECT (By Ms. Harris)                                1315

1    graduated.

2    Q.  And from '05 to '07 were you monitored and supervised?

3    A.  I took random UAs all the time.

4    Q.  Did you ever fail any of those?

5    A.  No.

6    Q.  Are you clean as you sit up here today and talk to this

7    jury?

8    A.  Yes, yes, I am.

9    Q.  Any other convictions that you haven't told the jury about?

10   A.  No.  I just got in trouble with going to drug court in

11   2004, and that was possession of CDS, and that's when I got to

12   drug court.

13   Q.  And that's a controlled substance, and was that

14   methamphetamine?

15   A.  Yes.

16   Q.  That's how you ended up in drug court?

17   A.  Yes.

18   Q.  Was your sister Larita a drug user?

19   A.  Yes, she was.

20   Q.  Did she sell drugs?

21   A.  Not that I know of.

22   Q.  Did you ever see her sell drugs?

23   A.  No, I did not.

24   Q.  Let me ask you about May 8, 2007.  Do you remember May 8,

25   2007?

KELIE BARNES - DIRECT (By Ms. Harris)                                    1316

1   A.   Absolutely.

2   Q.   How do you remember May 8, 2007?

3   A.   The reason why I remember May 8 of 2007 is because I was at

4   work, and it just so happened that would be the day that we got

5   the new registers and I came in -- usually we get there at

6   nine, but we came that day one hour early, which would have

7   been eight o'clock.  I think I checked in at 8:15.

8   Q.   Where were you working in May of 2007?

9   A.   Charlie's Chicken.

10  Q.   Where is Charlie's Chicken?

11  A.   61st and Sheridan.

12  Q.   How long did you work at Charlie's Chicken?

13  A.   Almost four years.

14  Q.   Okay.  Who was your boss, your immediate boss at Charlie's

15  Chicken?

16  A.   Ashley Balocca.

17  Q.   Ashley Balocca?

18  A.   Uh-huh.

19  Q.   Was -- did you also associate the date May 8th with

20  anybody's birthday in your family?

21  A.   My sister's birthday was May 7th.

22  Q.   Your sister Larita?

23  A.   Yes.

24  Q.   Do you remember doing anything the day before for her

25  birthday?

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - DIRECT (By Ms. Harris)                    1317

1   A.   Yes.  We had a birthday party for her.

2   Q.   Who is "we"?

3   A.   Everybody.  The whole family.  I have a lot of family.

4   Q.   Where was that birthday party?

5   A.   At my sister's Tammy's house.

6   Q.   Now, you indicated that there was a change in the registers

7   on May 8th?

8   A.   Yeah.  We went from just having like just regular registers

9   to touch, like computers.

10  Q.   And why did that mean you had to go in early?

11  A.   Because we had to learn them.  We had to actually learn

12  them before the customers came in.

13  Q.   Now, are you aware that your father Larry Barnes, Sr., and

14  your sister Larita Barnes were indicted related to an alleged

15  drug buy that supposedly took place at their house on May 8,

16  2007?

17  A.   I am aware of that.

18  Q.   Are you aware that there was testimony in that trial from

19  Ryan Logsdon that when the drug buy took place you were at the

20  Barnes house?

21  A.   Yes.

22  Q.   And are you aware that Ryan Logsdon testified that you were

23  there at the time of the buy with your children?

24  A.   Yes.

25  Q.   Do you recall what day of the week May 8th was of 2007?

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - DIRECT (By Ms. Harris)                    1318

1   A.  I'm going to say it was on a Tuesday.  I don't recall the

2   day.

3   Q.  I think there has been -- actually been testimony about

4   that.

5   A.  Okay.

6   Q.  Did you have children at that time?

7   A.  Yes.

8   Q.  How many?

9   A.  Four.

10  Q.  In May of 2007, how old were your children?  I'm asking you

11  to do math and I apologize for that.

12          MR. WYATT:  Your Honor, I object to the relevance.

13          THE COURT:  Overruled.

14  Q.  (By Ms. Harris) Go ahead.

15  A.  In 2007, I have a -- my son would have been 11, I believe.

16  My daughter would have been eight.  This would have been four

17  years ago?

18  Q.  That's correct.

19  A.  Four years ago.  Okay.  My daughter would have been seven,

20  and my son would have been two.  I had two daughters and two

21  sons, so Katelyn would have been -- she just turned 12 -- she's

22  11 -- so she would have been seven.  Kirsten would have been --

23  she would have been five.  And Dallas would be two.

24  Q.  So 11, 7, 5 and 2 would have been their ages at that time?

25  A.  Yes.

KELIE BARNES - DIRECT (By Ms. Harris)                    1319

```
 1   Q.  Were any of your children at that time in school?

 2   A.  Yes.

 3   Q.  Where did they go to school?

 4   A.  McKinley elementary.

 5   Q.  And was May the 8th, 2007 a school day?

 6   A.  Yes, it was.

 7   Q.  And which of your children were at McKinley elementary that

 8   day?

 9   A.  Jeremiah, Katelyn and Kirsten.

10   Q.  What about your youngest child?

11   A.  I took him to daycare before I went to work.

12   Q.  What time did you arrive at work that day?

13   A.  I arrived at 8:15 because my son was crying because he

14   didn't want me to leave the daycare.  I was supposed to be

15   there at eight o'clock.

16   Q.  So you were a little bit late that day?

17   A.  I was about 15 minutes late, yeah.

18   Q.  What hours did you work that day?

19   A.  I was supposed to work until four.  I believe I worked

20   until five.

21   Q.  Did you leave Charlie's Chicken that day from the time you

22   arrived at 8:15 until the time you left?

23   A.  I didn't leave until -- yes, I never left.

24   Q.  You never left that day?

25   A.  No, huh-uh.
```

KELIE BARNES - DIRECT (By Ms. Harris)                    1320

1  Q.  Did you take a break at any time that day and leave the

2  building?

3  A.  We take a -- no.

4  Q.  What were you going to say about "we take a"?

5  A.  We take a 15-minute break.  It doesn't matter how many

6  hours we work, we just take a 15-minute break, we don't clock

7  out, and we just eat something off the -- we eat whatever is on

8  the line.  Whatever, you know -- and we sit in the lobby.

9  Q.  Did you actually have to physically clock in and clock out

10  that day?

11  A.  Yeah, we clock in with our fingerprints because we got new

12  registers.

13  Q.  So if you clocked in you had to -- tell the jury how you

14  did that.

15  A.  We just put our index finger and we clock in and it would

16  clock us in, and when we clock out, we have to use our

17  fingerprint to clock back out.

18  Q.  Could anybody else clock in or out for you?

19  A.  No, it's your fingerprint, so it would have to be you.

20  Q.  All right.  On any day that you worked, were you ever

21  authorized to leave during the lunch hour?

22  A.  No.

23  Q.  Why?

24  A.  We only took a 15-minute break and we just -- we never

25  left.

KELIE BARNES - DIRECT (By Ms. Harris)                    1321

1   Q.  Okay.

2   A.  If you wanted to take a 30-minute break, you could clock

3   out and leave, but nobody ever did it.  And we wasn't even

4   given that permission until like a couple -- like a year later?

5   Q.  Did you leave Charlie's Chicken that day, May 8, 2007, and

6   go to Larry Barnes' house during the noon hour?

7   A.  No.

8   Q.  Did you go to Larry Barnes's house, your father's house, on

9   May 8, 2007 at any time before you left work the day of May 8,

10  2007?

11  A.  Absolutely not, no.

12  Q.  Did you have your children at Larry Barnes' house on May 8,

13  2007 during the daytime hours?

14  A.  No.

15  Q.  Do you know Ryan Logsdon?

16  A.  I know of him.

17  Q.  Did you see him make a buy of methamphetamine at your

18  parents' house on May 8, 2007?

19  A.  No.

20  Q.  Did you ever -- have you ever seen him come to the Barneses

21  house?

22  A.  No.

23  Q.  Now your sister and father went to trial, did they not, on

24  their indictment?

25  A.  Yes.

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - CROSS (By Mr. Wyatt)                              1322

```
 1   Q.  Did you testify at that trial?

 2   A.  No, I didn't.

 3   Q.  Do you know why?

 4   A.  Probably because I was working.

 5   Q.  Were you --

 6   A.  I don't think they even had me to testify.  They never

 7   asked me to testify.

 8           MS. HARRIS:  May I have a moment, Your Honor?

 9           THE COURT:  You may.

10           MS. HARRIS:  Pass the witness.

11           THE COURT:  We'll take our afternoon recess.  We'll be

12   in recess until 3:15.

13       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS

14   WERE HAD IN OPEN COURT, WITHIN THE PRESENCE AND HEARING OF THE

15   JURY:)

16           THE COURT:  Court is back in session.

17       Cross-examination?

18                       CROSS-EXAMINATION

19   BY MR. WYATT:

20   Q.  Would it be a fair statement that you love your father?

21   A.  Yes.

22   Q.  Fair statement that you love your sister, Larita?

23   A.  Yes.

24   Q.  Now, you mentioned that you attended a birthday party on

25   May 7, 2007; is that correct?
```

U.S. District Court
Northern District of Oklahoma

KELIE BARNES - CROSS (By Mr. Wyatt)                1323

```
 1  A.  Yes.

 2  Q.  And that you specifically remember that and remember going

 3  to your sister's birthday party?

 4  A.  Yes.

 5  Q.  You didn't come into the court and testify about being at

 6  your sister's birthday party when your sister and father were

 7  on trial, did you?

 8  A.  No.

 9  Q.  In fact, nobody from the family came in and mentioned a

10  birthday party, did they?

11  A.  I wasn't at the trial.

12  Q.  Okay.  You have no knowledge of anyone doing that, do you?

13  A.  I do remember hearing them -- I remember the birthday

14  party.

15  Q.  Okay.  Fair enough.

16      Now, do you know what testimony, if any, that Jeff

17  Henderson gave at your sister's trial?

18  A.  I wasn't at the trial.

19  Q.  So you wouldn't have any dispute over whether he even

20  mentioned your name?

21  A.  I wouldn't know.

22  Q.  And --

23          MR. WYATT:  May I approach, Your Honor?

24          THE COURT:  You may.

25          MR. WYATT:  Exhibit 27-c, page 2.
```

KELIE BARNES - CROSS (By Mr. Wyatt)                    1324

1   Q.  (BY MR. WYATT)  Would you just scan through that --

2           MS. HARRIS:  Is that ours?

3           MR. WYATT:  Yes, government's exhibit 27-c, page 2.

4           MS. HARRIS:  Is that admitted?

5           MR. WYATT:  I believe it has been.

6           THE DEPUTY COURT CLERK:  Is it plaintiff's or

7   defendant's?

8           MR. WYATT:  Government's.

9           THE DEPUTY COURT CLERK:  Government's.  All right.

10          MS. HARRIS:  We don't have a 27-c is why I'm asking.

11          MR. WYATT:  A TRACIS report.

12          THE DEPUTY COURT CLERK:  It's not on the list.

13          THE COURT:  It's not been admitted by our records.

14          MR. WYATT:  Okay.

15  A.  Are you asking if my name is in here?

16  Q.  (BY MR. WYATT)  Yes, ma'am.

17  A.  Not that I'm aware of.  I may need to read the whole thing

18  but, scanning through it, no, I didn't see my name.

19  Q.  Okay.  Now, when you were arrested and convicted in federal

20  court, there was actually -- the investigation actually had its

21  own name, didn't it?  It was called the barnstormer case,

22  wasn't it?

23  A.  Not that I believe.

24  Q.  Do you know what a presentence investigation report is?

25  A.  Yes, I do.

KELIE BARNES - CROSS (By Mr. Wyatt)                          1325

1   Q.  And you had a presentence investigation report in your
2   case, didn't you?
3   A.  Yes.
4   Q.  And in the presentence investigation report, was it true
5   that it said, "Kelie served a federal sentence out of
6   barnstormer I and was released"?  Do you know anything about
7   that?
8   A.  No, I don't remember.
9   Q.  Okay.  Fair enough.
10      You said your sister doesn't sell drugs, Larita?
11          MS. HARRIS:  I don't think that's what she said, Your
12  Honor.  I object.
13  Q.  (BY MR. WYATT)  Does your sister, Larita, sell drugs?
14  A.  Not that I've seen, no.  I could say that I have never seen
15  her sell any kind of drugs.
16  Q.  Okay.  And are you aware of whether she obtains her income
17  from the sale of drugs?
18  A.  Not that I'm aware of.
19  Q.  Is your father a drug dealer?
20  A.  Absolutely not.
21  Q.  And are you aware of him receiving any income from the sale
22  of drugs?
23  A.  No.
24  Q.  Have you ever observed Ryan Logsdon in the house on Newton
25  Street, 7116, purchasing or selling drugs?

```
 1   A.   No.

 2   Q.   Do you know Ryan Logsdon?

 3   A.   I just know of him because my sister went to school with

 4   him.  I've seen him a few times, years and years ago.

 5   Q.   Now, your sister has been convicted of a number of drug

 6   crimes, hasn't she?

 7   A.   A few, yes.

 8   Q.   And when I say "your sister," I'm referring to Larita

 9   Barnes.

10   A.   I figured that.

11   Q.   Okay.  And does she go by another name?  Maybe Larita

12   Clark?

13   A.   Yeah, she is Larita Clark.

14   Q.   Does she go by any other names?

15   A.   Just Barnes.

16   Q.   Just Barnes or Clark?

17   A.   Uh-huh.

18   Q.   Okay.  And that's the sister that you know of who has

19   convictions for -- or drug convictions?

20   A.   Yes.

21   Q.   Okay.  Does your sister use drugs, Larita?

22   A.   Back several years ago, yes.

23   Q.   So she's clean today too?

24   A.   Yes.

25            MR. WYATT:  May I have a moment, Your Honor?
```

```
 1              THE COURT:  You may.

 2              MR. WYATT:  That's all I have, Your Honor.

 3              THE COURT:  Mr. Allen?

 4                     CROSS-EXAMINATION

 5  BY MR. ALLEN:

 6  Q.  Very quickly.  Do you know Bill Yelton?

 7  A.  No.

 8              MR. ALLEN:  No other questions.

 9              THE COURT:  Redirect?

10              MS. HARRIS:  No, Your Honor.  May this witness be

11  excused?

12              THE COURT:  You may step down, Ms. Barnes.  Any reason

13  that she may not be excused?

14              MR. WYATT:  No, Your Honor.

15              MR. ALLEN:  No, Your Honor.

16              THE COURT:  You are released from your subpoena.

17     Call your next witness.

18              MS. HARRIS:  Your Honor, the United States calls

19  Ashley Balocca.

20              MR. ALLEN:  May we approach?

21              THE COURT:  Yes, sir.

22     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH, OUT OF

23  THE HEARING OF THE JURY:)

24              MR. ALLEN:  Your Honor, I'm not sure of the relevance

25  of this witness.  The previous witness, we saw her testify that
```

1328

1  she didn't testify at the last trial but Jeff Henderson didn't

2  testify about her being there at the last trial.  I don't

3  really understand the relevance of this witness.

4          MS. HARRIS:  This witness was Kelie Barnes' manager at

5  Charlie's Chicken.  We'll show the documentation, we will offer

6  into evidence the documents verifying she was not at the

7  Barnes' residence on May 8th, 2007.  Ms. Barnes has testified

8  to that but this witness is simply to corroborate it with the

9  documentation, and that, of course, refutes what the testimony

10 was of Ryan Logsdon.

11         THE COURT:  You want to stipulate to that?

12         MR. ALLEN:   That --

13         THE COURT:  Kelie Barnes was not at the house.

14         MR. ALLEN:  I would stipulate that the record shows

15 that.  I mean, there's --

16         MS. HARRIS:  I would prefer to offer it through the

17 witness, Your Honor.

18         THE COURT:  Let's do it briefly.

19         MS. HARRIS:  It will be quick.

20    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

21 THE PRESENCE AND HEARING OF THE JURY:)

22         THE COURT:  Please come up and take the oath.

23    (WITNESS SWORN)

24

25

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                    1329

1                          ASHLEY BALOCCA,

2  being first duly sworn to testify the truth, the whole truth,

3  and nothing but the truth, testified as follows:

4                        DIRECT EXAMINATION

5  BY MS. HARRIS:

6  Q.  Good afternoon.

7  A.  Good afternoon.

8  Q.  Can you please state your name.

9  A.  Ashley Balocca.

10  Q.  And how do you spell your last name?

11  A.  B-A-L-O-C-C-A.

12  Q.  And in May of 2007, Ms. Balocca, did you work at Charlie's

13  Chicken?

14  A.  Yes, I did.

15  Q.  And what was your job there?

16  A.  I was the manager.

17  Q.  And did Kelie Barnes work for you at that time?

18  A.  Yes, she did.

19  Q.  And what was her job there?

20  A.  She was an assistant manager.

21  Q.  As part of your job as the manager, did you make

22  assignments of job duties for the employees?

23  A.  Yes, I did.

24  Q.  All right.  And at Charlie's Chicken, did you have a system

25  by which employees would clock in and clock out?

U.S. District Court
Northern District of Oklahoma

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                    1330

1   A.  Yes.

2   Q.  And was there something unique about May 8th, 2007, with

3   regard to your system?

4   A.  Yes.  We got new registers that day where you had to clock

5   in and out with a fingerprint.

6   Q.  Okay.  And can you describe just a little bit how that

7   worked?

8   A.  Okay.  Well, just whenever you first get there, of course,

9   you have to go up there and there's this little thing that

10  reads your fingerprint and you just put your finger on there.

11  No one else can clock in for you.  You have to do it yourself.

12  It clocks you in.  And then whenever you leave, you press it

13  and it clocks you out.

14  Q.  And you made shift assignments; is that right?

15  A.  Yes.

16  Q.  All right.  And are there payroll records that would

17  reflect when employees were working or how many hours an

18  employee would have worked on a specific date?

19  A.  Yes.  It kept track of all of that.

20  Q.  Okay.

21        MS. HARRIS:  Your Honor, I would like to offer into

22  evidence exhibit 29.  Is there any objection?

23        MR. WYATT:  Object as to relevance, Your Honor.

24        THE COURT:  Overruled.  It will be admitted.

25        MS. HARRIS:  We're going to put up on the screen in

U.S. District Court
Northern District of Oklahoma

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                    1331

1  front of you exhibit 29.

2      Have you reviewed, prior to your testimony today, the

3  records from Charlie's Chicken related to Tuesday, May 8th,

4  2007?

5  A.  Yes.

6  Q.  Okay.  And are you familiar with the record which is in

7  front of you on the screen right now, which is the first page

8  of government's exhibit 29?

9  A.  Yes.

10  Q.  Okay.  What is that?

11  A.  It's our shift assignment for May 8th.

12  Q.  2007?

13  A.  2007.

14  Q.  Is Kelie Barnes' name on that shift assignment?

15  A.  Yes, it is.

16  Q.  Okay.  Where is it on the left-hand side?

17  A.  It's at the bottom right underneath Dorothy.

18  Q.  Okay.  And what is her assignment on that date?

19  A.  She was cashier 2.

20  Q.  All right.  And then over on the right-hand side of that

21  page, is Kelie Barnes' name on there?

22  A.  Yes, it is.

23  Q.  Where is it?

24  A.  Under Dorothy again.

25  Q.  Okay.  And what were her assigned hours on May 8th, 2007?

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                    1332

1   A.  8 to 5:30.

2   Q.  Okay.

3         MS. HARRIS:  Can we go to the next page, please.  And

4   can you highlight just the few on the top?  And we'll go

5   across.

6   Q.  (BY MS. HARRIS)  Do you see on the top there, it says,

7   "Work week, 5-7-07 through 5-13-07"?

8   A.  Yes.

9   Q.  What is this document?

10  A.  It is just payroll, keeping track of our hours.

11  Q.  All right.  Does that payroll include the hours worked on

12  May 8th, Tuesday, May 8th, 2007?

13  A.  Yes.

14  Q.  And does that show the hours that Kelie Barnes worked on

15  that date?

16  A.  Yes.

17  Q.  What were the number of hours she worked on that date?

18  A.  8.75.

19        MS. HARRIS:  Can we go to the next page?  Can you

20  highlight the bottom block.

21  Q.  (BY MS. HARRIS)  Do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24  A.  That is -- it's just everything broke down, what day you

25  clocked in and out, what time, how many hours you worked.

U.S. District Court
Northern District of Oklahoma

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                1333

1   Q.  So would the third page of government 29 identify the

2   clock-in and clock-out times for Kelie Barnes for May 8th,

3   2007?

4   A.  Yes.

5   Q.  And is that shown on the screen there?

6   A.  Yes.

7   Q.  What time did Kelie Barnes clock in?

8   A.  At 8:15 a.m.

9   Q.  And was that using this fingerprint system?

10  A.  Yes.

11  Q.  What time did she clock out that day?

12  A.  5:15 p.m.

13  Q.  All right.  Now, let's go to the next page.  Okay.  What is

14  this?

15  A.  That is our work schedule.

16  Q.  All right.

17       MS. HARRIS:  And can you highlight the first part of

18  that?

19  Q.  (BY MS. HARRIS)  What week does that cover?

20  A.  The week of May 7th through May 13th.

21  Q.  Is Kelie Barnes on that?

22  A.  Yes.

23  Q.  What does it show that her scheduled work hours were for

24  May 8th?

25  A.  It was 8 to 4.

U.S. District Court
Northern District of Oklahoma

ASHLEY BALOCCA - DIRECT (By Ms. Harris)                    1334

1    Q.  But she worked longer hours than scheduled?

2    A.  Yes.  And everyone's hours are changed because we got our

3    new registers, so everyone had to come in an hour earlier.

4    Normally we don't get there until 9, so...

5    Q.  Was a change made on that 8?  Was it originally a 9?

6    A.  Yes, it was originally a 9.  And I had to keep her late

7    because I needed help showing everyone how to use the registers

8    that night.

9    Q.  All right.  Now, if Kelie Barnes -- well, first of all,

10   what breaks are given to employees during the routine work day?

11   A.  When are they given?

12   Q.  Yes, ma'am.

13   A.  From 1 to 2.

14   Q.  Okay.  Did Kelie Barnes leave work that day during the noon

15   hour?

16   A.  No.

17   Q.  How do you know that?

18   A.  Because you're not allowed to take breaks at noon.

19   Q.  Were you working at that time?

20   A.  Yes, I worked all day that day.

21   Q.  Would you have known if she had left?

22   A.  Oh, yes, definitely.

23   Q.  And why do you say, "Oh, yes"?

24   A.  Because we were very busy from that time, from about 11 to

25   2 we were really, really busy.

U.S. District Court
Northern District of Oklahoma

ASHLEY BALOCCA - CROSS (By Mr. Wyatt)                          1335

1         MS. HARRIS:  That's all I have.  Thank you.

2         THE COURT:  Any questions, Mr. Wyatt?

3         MR. WYATT:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5  BY MR. WYATT:

6  Q.  Did you testify in April, around April 21st, 22nd, 23rd of

7  2008, in a trial of United States of America vs. Larry Barnes

8  or Larita Barnes?

9  A.  Yes.

10 Q.  And do you know whether Officer Henderson ever mentioned

11 Kelie Barnes in his testimony?

12 A.  I'm not aware of anything to do with that, no.

13 Q.  Have you ever seen any police reports where Officer

14 Henderson said that he saw Kelie Barnes?

15 A.  No.

16 Q.  Do you know or have any knowledge, any personal knowledge,

17 of what Larita Barnes does while Kelie's at work?

18 A.  No.

19 Q.  Do you know what Larry Barnes does while Kelie's at work?

20 A.  No.

21 Q.  In fact, do you even know if Kelie lives with Larry and

22 Larita?

23 A.  Not 100 percent certain, no.

24 Q.  Okay.  So you have no knowledge what she does outside of

25 her work?

U.S. District Court
Northern District of Oklahoma

JAMES FUE - DIRECT (By Ms. Duke)                                    1336

```
 1   A.   No.

 2          MR. WYATT:  Nothing further, Your Honor.

 3          THE COURT:  Mr. Allen?

 4          MR. ALLEN:  No questions, Your Honor.

 5          THE COURT:  Redirect?

 6          MS. HARRIS:  No, Your Honor.  May this witness be

 7   excused?

 8          THE COURT:  Yes, ma'am, unless there's an objection.

 9          MR. WYATT:  No objection.

10          THE COURT:  You may step down, Ms. Balocca.

11      You may call your next witness.

12          MS. DUKE:  James Fue, Your Honor.

13          THE DEPUTY COURT CLERK:  Mr. Fue, I need you to stand

14   and raise your right hand as best you can.

15      (WITNESS SWORN)

16                          JAMES FUE,

17   being first duly sworn to testify the truth, the whole truth,

18   and nothing but the truth, testified as follows:

19                     DIRECT EXAMINATION

20   BY MS. DUKE:

21   Q.   Could you state your name, please.

22   A.   James Fue.

23   Q.   Okay.  Mr. Fue, I'm going to ask you to please scoot up

24   towards the microphone, if you could, sir, and speak loudly and

25   clearly into it.
```

JAMES FUE - DIRECT (By Ms. Duke)                                    1337

```
 1      How do you spell your last name?
 2  A.  F-U-E.
 3  Q.  And how old are you, sir?
 4  A.  32.
 5  Q.  Okay.  I'm still having a little bit of difficulty hearing
 6  you.  Could you speak up, please.
 7  A.  32.
 8  Q.  Okay.  And where are you from, Mr. Fue?
 9  A.  Tulsa.
10  Q.  Have you lived in Tulsa your entire life?
11  A.  Off and on, yes.
12  Q.  And you're obviously presently incarcerated; is that
13  correct?
14  A.  Yes.  This is not my everyday attire.
15  Q.  Okay.  Where are you incarcerated, sir?
16  A.  William S. Keys Correctional Center.
17  Q.  And where is William S. Keys Correctional Center?
18  A.  Ft. Supply, near the panhandle.
19  Q.  Okay.  And what are you serving a term of imprisonment for?
20  A.  Possession of marijuana with intent.  A four-year sentence.
21  Q.  Okay.  And was that a state or federal conviction?
22  A.  State.
23  Q.  Okay.  Other than your possession with intent to distribute
24  marijuana, do you have any other felony convictions?
25  A.  Yes, ma'am.  Possession and false impersonation.
```

U.S. District Court
Northern District of Oklahoma

1   Q.   Okay.   Possession of what?

2   A.   CDS.

3   Q.   What is CDS?

4   A.   Controlled dangerous substance.

5   Q.   Okay.   And then you said false impersonation?

6   A.   Yes, ma'am.

7   Q.   Okay.   Did the possession of CDS and the false

8   impersonation, was that a single case or separate cases?

9   A.   They're the same -- at the same time, yeah, same case.

10  Q.   When did you get those charges?

11  A.   2002.

12  Q.   Okay.   Mr. Fue, I want to take you back to early last year,

13  in 2010.

14  A.   Yes, ma'am.

15  Q.   In early 2010, did you come to be in some trouble with the

16  law?

17  A.   Yes, ma'am.

18  Q.   Okay.   What happened in early 2010?

19  A.   I was on probation for the charges that I'm serving a

20  prison term for now and some warrants were put out for my

21  arrest.   I was pulled over and I had some marijuana in the car

22  with me.

23  Q.   Okay.   Who were you pulled over by?

24  A.   Tulsa Police Department.

25  Q.   Okay.   As a result of that traffic stop, did you get any

JAMES FUE - DIRECT (By Ms. Duke)                                    1339

```
1   charges?
2   A.  Besides the marijuana?  No.
3   Q.  Did you get charges for the marijuana you had during that
4   traffic stop?
5   A.  Yes, ma'am.
6   Q.  Okay.  Were those state or federal charges?
7   A.  They was state.
8   Q.  Okay.
9   A.  But they then -- the result of an apartment that they said
10  I was leaving, they searched it and found a firearm, so like
11  two weeks after I bonded out it turned into a federal charge
12  and I was picked up by the U.S. federal marshals.
13  Q.  Okay.  And so this would have been, what, in January or
14  February of last year?
15  A.  No, that would have been like late February, yeah.
16  Q.  Okay.  And in February of 2010, did you get a lawyer on
17  those federal charges?
18  A.  Yes, ma'am.
19  Q.  Who's your lawyer?
20  A.  Stephen Greubel.
21  Q.  Did you say Greubel?
22  A.  Yes, ma'am.
23  Q.  Okay.  And while Mr. Greubel was representing you, did he
24  get the paperwork on your case?
25  A.  Yeah.  Yes, ma'am, he did.
```

U.S. District Court
Northern District of Oklahoma

JAMES FUE - DIRECT (By Ms. Duke)                                    1340

1   Q.  Did you have the opportunity to go over that paperwork with

2   Mr. Greubel?

3   A.  Yes, ma'am.

4   Q.  Did you notice anything odd about that paperwork?

5   A.  Yeah; one officer that was present at the time wasn't on

6   the paperwork anywhere.

7   Q.  Okay.  And who was that Officer Henderson?

8   A.  Jeff Henderson.

9   Q.  Okay.  Had you known Jeff Henderson prior to --

10  A.  Yes, ma'am.

11  Q.  Let me finish my question, okay?

12      Prior to early 2010, did you know Jeff Henderson?

13  A.  Yes, ma'am.

14  Q.  How did you know Jeff Henderson?

15  A.  He's the result -- him and Officer Sticks, as I thought his

16  name was, that was the result of my first felony conviction.

17  Q.  Okay.  You mentioned the name Sticks; is that right?

18  A.  Yes, ma'am.

19  Q.  Do you know a Tulsa Police officer that goes by the name

20  Sticks?

21  A.  Yes, ma'am.  I just found that out though.

22  Q.  I'm sorry.  You just found what out?

23  A.  That his name ain't really Sticks.  I was always under the

24  impression that his real name was Sticks, that was his real

25  last name.

JAMES FUE - DIRECT (By Ms. Duke)                    1341

1  Q.  And have you since found out what his true last name is?

2  A.  Yes.  Larkin.

3  Q.  Larkin?

4  A.  Yes, ma'am.

5  Q.  Okay.  So you knew Jeff Henderson and Officer Larkin prior

6  to January of 2010; correct?

7  A.  Yes, ma'am.

8  Q.  And I think you said they were maybe on your first charge?

9  A.  Yes, ma'am, they were.

10  Q.  Okay.  Now, in January of 2010, did you tell your attorney,

11  Mr. Greubel, something about your prior dealings with Officer

12  Henderson and Officer Larkin?

13  A.  Yes, ma'am.

14  Q.  What did you tell your attorney in January -- or in early

15  2010?

16  A.  That I know Mr. Henderson because he -- it's almost like he

17  didn't -- like when I told them, "Man I know he was there,"

18  like he almost didn't believe me like that I knew who he was.

19  I'm like, "Yeah, I know him.  I mean, I've been knowing him

20  since like 2002 when they came in my neighborhood in an

21  unmarked -- one was a green Aerostar van and a Grand Am and

22  ramshacked {sic} us in a neighbor's house, you know.  Sticks

23  put some crumbs off in my pocket and told me, "I've got you

24  now," you know what I'm saying?  I've been dealing with him

25  prior to that through the gang task force.

U.S. District Court
Northern District of Oklahoma

JAMES FUE - DIRECT (By Ms. Duke)                                    1342

```
 1  Q.  Okay.  So you had had dealings with them over the years;

 2  correct?

 3  A.  Yeah.

 4  Q.  Okay.  And so last year, when you got these charges, you

 5  noted, I think, that Mr. Henderson was not on your paperwork;

 6  correct?

 7  A.  Yeah, he wasn't nowhere on there.  None of the officers --

 8  I looked at every officer's name on there and his wasn't on

 9  there.

10  Q.  Okay.  And did you bring that to the attention of your

11  attorney?

12  A.  Yes, sir -- yes, ma'am.

13  Q.  Okay.

14  A.  I apologize.

15  Q.  And from your attorney, did you do anything further with

16  that information?

17  A.  Yeah, I told him because Henderson was the one who got me

18  to sign the consent form for them to search the apartment

19  because he explained to me, "Like you can't give consent to

20  search somebody else's apartment, so go on ahead and sign it if

21  you ain't really got nothing in there."  He said, "What you got

22  in there?"  That's how the conversation -- he was like, "What

23  you got in there?  Why you don't want them to search it?"  I

24  told them, I was like, "Man there's a gun in there, you know."

25  The gun was like special to me.  So he was like, "Well, go on
```

U.S. District Court
Northern District of Oklahoma

JAMES FUE - DIRECT (By Ms. Duke)                                    1343

1   and sign the consent form, you know, because you can't give

2   consent to search another person's house," so I went ahead and

3   signed it.

4   Q.  Did you also tell Mr. Greubel about an incident in fall of

5   2005 involving Officers Henderson and Larkin?

6   A.  Yes, ma'am, I did.

7   Q.  And what was that incident involving in fall of 2005?

8   A.  Officer Henderson and Sticks, they approached me at a

9   convenience store at 54th and North Peoria --

10  Q.  Okay.

11  A.  -- and told me to take a ride with them.  First, I'm like,

12  "No, I ain't riding with y'all, you know."  Henderson patted

13  his gun like, "Yeah, you're going to ride with us."  So I take

14  a ride with them.  They take us out --  They take me out to

15  56 -- all the the way out 56th Street.  I don't know the cross

16  street but it's by the old Tulsa army gun range.  That's the

17  legal part.  They got a -- there was a gun range right in that

18  curve.  They since then put white stone rocks there to make it

19  where it's closed off.  I mean, that's just to give a

20  description of it.  But he took me out there.  There's a left

21  you can make off of the 56th Street and go back around the back

22  side and they took me out there and --

23  Q.  Let me ask you this, Mr. Fue:  How do you know that this

24  took place in the fall of 2005?

25  A.  Because I had got out of jail and bought a vehicle, a

1   certain truck, and that's the truck that they picked me up in.

2   Q.  Okay.  And when Officers Henderson and Larkin picked you

3   up, were they together or in separate vehicles?

4   A.  No, they were together in an unmarked police car.

5   Q.  Okay.  And were you with anyone?

6   A.  No, ma'am.

7   Q.  And so they took you from this convenience store, I think

8   you said near 54th and North Peoria?

9   A.  Yes, ma'am.

10  Q.  Okay.  And where did you go?  You said something about a

11  gun range.

12  A.  Yeah, a gun range out on 56th Street North.

13  Q.  Okay.  Did you voluntarily go with the officers?

14  A.  No.

15  Q.  How did they get you into the vehicle?

16  A.  He patted his gun and let me know, that, "Yeah, you're

17  riding with us."  They the police; I mean, you've got to kind

18  of do what they say.

19  Q.  Okay.  You say "he patted his gun."  Who patted his gun?

20  A.  Jeff Henderson.

21  Q.  At that point in time had you done anything to get in

22  trouble with the authorities?

23  A.  I was on probation.  Other than that, no.  Like committed a

24  crime at that time?

25  Q.  Correct.

JAMES FUE - DIRECT (By Ms. Duke)                              1345

1   A.   No, ma'am.

2   Q.   Okay.  So you were just at this convenience store and they

3   pick you up and take you with them; correct?

4   A.   Yes, ma'am.

5   Q.   And what happens out at the gun range?

6   A.   They want some information.  They want me --  They want

7   information out of me about the inner workings of my

8   neighborhood.  A lot of us sell -- we partake in the sale of

9   narcotics, so they want information.

10  Q.   Okay.

11  A.   They want to know stuff about certain people.

12  Q.   Okay.  Did you give them information?

13  A.   I gave them some bogus stories, yeah.

14  Q.   Okay.

15  A.   Anything to get back to my truck and get out from out

16  there.

17  Q.   Okay.

18  A.   He put his gun to my head.  I mean, yeah, I told him -- I

19  told him, "Whatever you want to hear."

20  Q.   Who put his gun to your head?

21  A.   Mr. Henderson.

22  Q.   Okay.  What time of day was this?

23  A.   It was pitch black dark outside.  I know it was after 8.

24  Q.   Did anyone, to your knowledge, see you get in the vehicle

25  with Officers Henderson and Larkin?

U.S. District Court
Northern District of Oklahoma

JAMES FUE - DIRECT (By Ms. Duke)                                          1346

```
 1   A.  No, ma'am.
 2   Q.  Okay.  And when you were out at the gun range, did you see
 3   anyone else there besides Officers Henderson and Larkin?
 4   A.  No, ma'am.
 5   Q.  No one came by that you saw?
 6   A.  No.
 7   Q.  How long were you at the gun range?
 8   A.  About 30, 45 minutes or so.
 9   Q.  Okay.  Were you free to leave?
10   A.  No, ma'am.
11   Q.  How would you have left?
12   A.  That's why I kind of gave the smirk, the look.  I mean, how
13   was I going to leave?  We got two officers there, one of them
14   got his gun out held on me.
15   Q.  How long did Officer Henderson hold a gun on you?
16   A.  I mean, I wasn't watching the clock or nothing.
17   Q.  I mean, are we talking about an hour?
18   A.  No; we wasn't out there an hour.  We was out there about
19   30, 45 minutes.  The first part of it was him talking, and I
20   keep on telling him, you know, sideways stories.  He finally
21   get frustrated, you know, and said, "No, you're going to tell
22   us something today, and we want something real, not no
23   games.  I'm tired of playing games with you."
24   Q.  Were you playing games with them at that point?
25   A.  I mean, of course.  I'm not ever going to be a informant or
```

JAMES FUE - DIRECT (By Ms. Duke)                                    1347

1   a snitch.  I mean, just like me sitting here now, I don't want

2   to be here; I don't want to talk; I don't want to testify.  I

3   didn't want to be here.

4   Q.  So why are you here, Mr. Fue?

5   A.  Because by the good graces of an attorney, she sat and

6   talked to me for about an hour and convinced me to come -- to

7   go ahead and talk to the FBI.  When the FBI set up their

8   meeting, I thought I was done for a day or two.  I didn't go

9   see them.

10  Q.  So let's go back to last spring when you tell Mr. Greubel

11  this information.

12  A.  Uh-huh.

13  Q.  Does somebody suggest to you to tell the FBI about it?

14  A.  Yes, ma'am.

15  Q.  And what did you say in response?

16  A.  No.

17  Q.  Why?

18  A.  Because I mean I don't -- I don't want to be here because I

19  know the aftermath of this.  The aftermath, after all this is

20  said and done and y'all get y'all convictions or whatever, or

21  not convicted or whatever, to be living in north Tulsa after

22  this is over is going to be, pardon my French, as hell as y'all

23  called it in the newspaper, the hell in north Tulsa, that's

24  what it's going to result to, because the Tulsa Police

25  Department are going to take retaliation.  Of course, they is.

JAMES FUE - DIRECT (By Ms. Duke)                              1348

```
 1   I mean, --
 2   Q.  Is it your preference not to be here today, Mr. Fue?
 3   A.  Yes, ma'am.  And that's what I discussed with my attorney.
 4   I asked them, "Well, what if I choose not to testify?"
 5   Q.  And?
 6   A.  And she gave me the ins and outs if I chose not to.
 7   Q.  Okay.
 8   A.  But I went ahead.  I mean, I started this so I might as
 9   well finish it.  But, no, I really don't want to be here at
10   all.
11   Q.  Okay.  Do you stand to gain any benefit as a result of your
12   testimony today?
13   A.  Yeah, I get to gain benefits.  I get to get harassed in
14   prison, like I have been since my day at the grand jury.
15   That's the benefit I receive.  I get to get harassed in
16   prison.  My peers all think I'm -- they think that I didn't
17   tell on enough people and that's why I'm in prison.  I get to
18   think --  My son's mother, she thinks I'm telling on somebody.
19   She don't know whether to stay with me or not be with me
20   because she's scared.  So that's the benefits I gain.  I mean,
21   if y'all call them benefits.
22   Q.  Anybody promised you anything that might happen on your
23   state sentence?
24   A.  No, ma'am.
25          MS. DUKE:  I have nothing further, Your Honor.
```

U.S. District Court
Northern District of Oklahoma

JAMES FUE - CROSS (By Mr. Wyatt)                          1349

```
 1              THE COURT:  Cross-examination?
 2              MR. WYATT:  Yes, Your Honor.  Thank you.
 3                       CROSS-EXAMINATION
 4   BY MR. WYATT:
 5   Q.  Mr. Fue, you testified a moment ago that this event out at
 6   the old armory or gun club, whatever it is, that that occurred
 7   in 2005; that's correct?
 8   A.  Yes, sir.
 9   Q.  And that was your independent memory of that; is that
10   correct?
11   A.  Yes, sir.
12   Q.  Now, at the grand jury, you actually testified that it was
13   the early part of 2004 before you got out of prison; isn't that
14   what you said?
15   A.  Yeah, but I changed it later on.
16   Q.  Well, you changed it later on when Ms. Duke corrected you;
17   correct?
18   A.  Yes.
19   Q.  So Ms. Duke had to prompt you to give you the right date
20   and time?
21   A.  Yes -- no.  No, sir, she didn't.
22   Q.  Well, let me read just this to you.
23   A.  I reread it too already.  That's why I knew they later on I
24   changed it.
25   Q.  Well, let me read it to you.
```

U.S. District Court
Northern District of Oklahoma

1        "Q.  Was there an occasion where you saw Sticks and

2   Henderson that they took you somewhere?

3        "A."  --

4        MS. DUKE:  Your Honor, could I get a page reference,

5   please?

6        MR. WYATT:  Certainly.  Page 16.  The grand jury

7   testimony, July 19, 2010.

8   Q.  (BY MR. WYATT)  Line 14:

9        "Q.  Was there an occasion where you saw Sticks and

10  Henderson that they took you somewhere?

11       "A.  Yes, ma'am.

12       "Q.  Tell us about that.  When was this?

13       "A.  The early part of 2004.  The reason I know about

14  it, because I just recently, I can put a -- pinpoint a date

15  with that because I went to prison not too far afterwards.

16  Anyway, I was at the same store, I had just -- it was later at

17  night, later part of the night, probably like 9:30, 10, after

18  dark.

19       "Q.  Now, are you sure it wasn't later than 2004?  Was

20  it not after you were in prison?  Got out about '05, '06?

21       "A.  Okay, that's when my truck -- yes, ma'am, I

22  got -- I bought -- got out, bought a truck with some drugs.

23       "Q.  So you got out of prison when?

24       "A.  Say, oh, not real, them dates because I don't

25  keep up with it but I just in prison, so probably '05."

JAMES FUE - CROSS (By Mr. Wyatt)                           1351

1      Is that your testimony?

2  A.  Yes, sir.

3  Q.  Is that what you read?

4  A.  Yes, sir.

5  Q.  So you would agree with me that you initially said to the

6  grand jury that this happened in 2004 before you went to

7  prison; correct?

8  A.  Yes, sir.

9  Q.  Then, upon the prompting from the prosecutor, you changed

10 that to 2005; is that correct?

11 A.  Yes, sir.

12 Q.  And after you got out of prison; correct?

13 A.  Yes, sir.

14 Q.  And that is because, before the FBI when you were

15 interviewed with them, you told the FBI agent it happened

16 afterwards when you traded drugs for a pickup truck; correct?

17 A.  Yes, sir.

18 Q.  Now, you're a gang member?

19 A.  Yes, sir.

20 Q.  What gang?

21 A.  Five-seven.

22 Q.  Okay.  And drug dealer?

23 A.  Yeah.

24 Q.  What do you deal?

25 A.  Nothing at the moment.

JAMES FUE - CROSS (By Mr. Wyatt)                                    1352

```
 1   Q.  Understood.  Fair enough.
 2       What did you deal before you were arrested?
 3   A.  Drugs.
 4   Q.  What kind of drugs?
 5   A.  Various kinds.
 6   Q.  Could you identify what those are, please, sir?
 7   A.  Drugs.
 8   Q.  Cocaine?
 9   A.  Narcotics.
10   Q.  Cocaine?
11   A.  Illegal narcotics.
12   Q.  Did you deal cocaine, sir?
13   A.  I have.
14   Q.  Methamphetamine?
15   A.  I have.
16   Q.  Crack?
17   A.  Yeah.
18   Q.  Both powder and crack?
19   A.  Who?
20   Q.  Powder?
21   A.  Yeah.
22   Q.  Marijuana?
23   A.  Yes.
24   Q.  Heroin?
25   A.  No.
```

JAMES FUE - CROSS (By Mr. Wyatt)                                1353

```
1    Q.  Pills?

2    A.  Yes.

3    Q.  What kind of pills?  Ecstacy, Xanax, prescription pills?

4    A.  Pills.

5    Q.  Amphetamines?

6    A.  Pills.

7    Q.  Barbiturates?

8    A.  Pills.

9    Q.  Okay.  So you basically have dealt all kinds of drugs?

10   A.  That's what I said.

11   Q.  Okay.  And how long have you been doing that?

12   A.  Quite some time.

13   Q.  Okay.  Now, at the time that you claim you came into

14   contact with Officer Henderson and Officer Larkin, in fact, you

15   were in a park among a number of other gang members; correct?

16   A.  No, sir.

17   Q.  No?

18   A.  No.

19   Q.  And you deny having told the FBI that?

20   A.  Yes.  I was at a house.

21   Q.  Okay.  And you had gone out to the truck to move it to the

22   other side of the street; is that right?

23   A.  Yes, sir.

24   Q.  And there were a number of other people out there just

25   assembling; correct?
```

U.S. District Court
Northern District of Oklahoma

JAMES FUE - CROSS (By Mr. Wyatt)                                    1354

1   A.  Yes, sir.

2   Q.  And officers came up to you and they were questioning

3   everybody; is that right?

4   A.  No, they weren't questioning.  They was drawing guns

5   telling people to freeze and get on the ground.

6   Q.  Okay.  So when they came up there, they told you to freeze

7   and get on the ground?

8   A.  Yes, sir.

9   Q.  And they drew their weapons?

10  A.  Yes, sir.

11  Q.  Now, are you telling -- let me ask you this:  Did you tell

12  the FBI agent that?

13  A.  Yes, sir.

14  Q.  And if I tell you there's nothing in the FBI report about

15  the police officers drawing their weapons and putting you on

16  the ground, would you dispute that?

17  A.  No, because that doesn't mean -- I'm pretty sure I did

18  though.

19  Q.  Okay.  I'm just asking:  Would you dispute that, sir?

20  A.  I'm pretty sure I did tell them that.

21  Q.  Okay.  And, in fact, you told the FBI that that night you

22  were dealing marijuana; correct?

23  A.  No, sir.

24  Q.  But you deny having told Agents Kilpack and Agent Gary

25  Graff, FBI agents, that on that night you were selling

JAMES FUE - CROSS (By Mr. Wyatt)                                          1355

1   marijuana but you were not in possession of cocaine?

2   A.  Yes, sir.

3   Q.  Okay.  Now, tell the jury step by step -- well, let me ask

4   you this:  Did you say it was a marked car they took you out to

5   this location in?

6   A.  Unmarked.  Unmarked.

7   Q.  And have you previously said that it had "TPD" down the

8   side of the car?

9   A.  No, I said it didn't have "TPD" down the side of the car.

10  Q.  Did not?

11  A.  Yes, sir.

12  Q.  It was a slick-top car?  Didn't have lights or bars or

13  anything like that?

14  A.  No, sir.

15  Q.  Okay.  So this attorney, this female attorney that you said

16  you talked to, that's Julie O'Connell, isn't it?

17  A.  Yes, sir.

18  Q.  That's the same attorney for Larry Barnes and Rochelle

19  Martin?

20  A.  I'm not aware of that, if she is or not.

21  Q.  Okay.  Now, tell the jury exactly what happened from the

22  time you arrive at this location off of 56th Street out by the

23  gun armory.  Walk through every step of what happened at that

24  point.

25  A.  They got me out; start asking me a bunch of questions; I

1  kept feeding them different stories; Henderson got frustrated,

2  pulled his gun and told me, "No, you're going to tell us

3  something real today."

4  Q.  He cocked his gun, didn't he?

5  A.  Yes, sir.

6  Q.  Put it up to your head and cocked it?

7  A.  Yes, sir.

8     Anything else happen while you were out there?

9  A.  No.

10 Q.  Okay.  Now, on that night that you were first arrested by

11 Sticks and Henderson, you actually gave them a false name,

12 didn't you?

13 A.  No, sir, I didn't.

14 Q.  You did not?  You didn't give them your name backwards?

15 A.  Yes, sir.

16 Q.  Okay.

17 A.  That's not a false name.

18 Q.  Okay.  And you were charged with false impersonation for

19 that; correct?

20 A.  Yes, sir.

21 Q.  And you pled to that charge, didn't you?

22 A.  Yes, sir.

23 Q.  And in the charge it actually doesn't say "Fue, James."  It

24 says "Fred Jones," doesn't it?

25 A.  Yes, sir.

JAMES FUE - CROSS (By Mr. Wyatt)                                    1357

1  Q.  Okay.  And that's what you pled guilty to?

2  A.  Yes, sir.

3  Q.  And in the Oklahoma forms, when you plead guilty, it

4  actually says on the form that, "I'm pleading guilty because I

5  did the crime."  Isn't that what it says?

6  A.  Yes, sir.

7  Q.  And it says, "I'm not pleading guilty because I've been

8  coerced or put under duress or anybody made me do this."  Isn't

9  that right?

10  A.  Yes, sir.

11  Q.  And that's on the standard form and you've seen it before;

12  right?

13  A.  Yes, sir.

14  Q.  And it says you've gone over that form with your lawyer?

15  A.  Uh-huh.

16  Q.  And that you've had an opportunity to have advice, and that

17  you're happy with your lawyer?

18  A.  Yes, sir.

19  Q.  And that you've told your lawyer everything that you know

20  about the case, and that you are satisfied with his or her

21  advice?

22  A.  Correct.

23  Q.  And you have an opportunity to talk to the judge about that

24  form before you enter the plea; correct?

25  A.  Yes.

1   Q.  In fact, the judge calls you up and asks you, "Is this your

2   signature on the form?"

3   A.  Yes, sir.

4   Q.  And asks you, "Do you realize" -- as it says right here --

5   "having been sworn before this court"?

6   A.  Yes, sir.

7   Q.  So the statement that you made to the court with respect to

8   that false impersonation in saying that you were pleading to

9   the name Fred Jones, that you were swearing to the judge that

10  was a true and correct statement?

11  A.  Correct.

12  Q.  Okay.  What you're telling us now is that was false?

13  A.  I also filed the appeal part too where you -- where you

14  only accept the plea.

15  Q.  Yes, sir.

16  A.  I also filed that too.

17  Q.  So you filed notice of intent to appeal?

18  A.  Yes, sir.

19  Q.  Okay.  But you actually have a conviction for that because

20  you violated your sentence; correct?

21  A.  No, because --

22  Q.  Violated your probation?

23  A.  -- they gave me a different lawyer and I was not contacted

24  by the lawyer to make it to the court for the appeal part.

25  Q.  So it didn't make it on time?

```
 1   A.  No, it did not.

 2   Q.  Okay.  So you still have a conviction --

 3   A.  Yes, sir.

 4   Q.  -- For false impersonation?

 5   A.  Yes, sir.

 6   Q.  It was not reversed on appeal?

 7   A.  Yes, sir.

 8   Q.  Okay.  And you understand that under Oklahoma's legal

 9   process, that when you miss that deadline, that you concede

10   post-conviction relief; isn't that correct?

11   A.  No, I did not know that.

12   Q.  Okay.  But you had a lawyer; correct?

13   A.  Yes, sir.

14   Q.  And that lawyer could have pursued whatever options were

15   available, even though you don't know what they were?

16   A.  He told me that there was nothing else that he could do.

17   Q.  Okay.  Now, this event that you've described was, if it's

18   in 2004, was reported what year?  2010?

19          MS. DUKE:  Objection, Your Honor.  He said it was

20   2005.

21          MR. WYATT:  Well, I'm asking both ways, Your Honor.

22          THE COURT:  All right.  Why don't you just ask him --

23   Q.  (BY MR. WYATT)  Was it 2004 or 2005?  What year did you --

24   A.  I didn't report to it anyone.

25   Q.  To 2010?
```

```
 1   A.  I didn't report it.

 2   Q.  Okay.  Well, you reported it to Stephen Greubel, your

 3   lawyer?

 4   A.  He asked me some questions and I answered them.

 5   Q.  Okay.  And that was in 2010?

 6   A.  Yes, sir.

 7   Q.  That's five or five-and-a-half or six years, depending on

 8   what year we're dealing with?

 9   A.  Yes, sir.

10   Q.  Okay.

11          MR. WYATT:  May I have just a moment, Your Honor?

12          THE COURT:  Yes, sir.

13   Q.  (BY MR. WYATT)  What time of year were you out at the

14   armory?

15   A.  I don't recall.

16   Q.  Winter, summer?  Was it cold, not cold?

17   A.  It wasn't cold.

18   Q.  And you testified today, I believe, that that was around

19   8:30?

20   A.  No, I said it was after 8:30.  It was after 8 o'clock

21   because it was pitch black dark outside.

22   Q.  Okay.

23   A.  That's what I testified.

24   Q.  All right.  Just one moment, please, sir.

25       You described the car -- or actually I don't know that you
```

```
 1  did.  What did the car look like that the officers were
 2  driving?
 3  A.  Unmarked police car.
 4  Q.  What color?
 5  A.  Like a beige-ish gray.
 6  Q.  I'm sorry?
 7  A.  Like a beige-ish gray.  A dark colored car.
 8  Q.  Okay.  Beige or gray but it was dark colored?
 9  A.  Yeah, dark colored car.
10  Q.  Do you have any idea about the make and model?
11  A.  No, sir.
12  Q.  Okay.  What were the officers wearing?
13  A.  I don't --
14  Q.  A police uniform?
15  A.  No; I ain't never seen Officer Henderson or Sticks in a
16  police uniform ever.
17  Q.  What were they wearing?
18  A.  I know it wasn't no police uniform.  I'm sure it was their
19  gang insignia task force thing, the football jersey with "gang
20  task force" on it.
21  Q.  What color was it?
22  A.  It was blue with yellow writing.
23  Q.  All right.  What color pants?
24  A.  Who?
25  Q.  What color pants?
```

1   A.  I wasn't looking.  I don't know.

2   Q.  Okay.

3           MR. WYATT:  Nothing further, Your Honor.

4           THE COURT:  Mr. Graham, Mr. Allen?

5           MR. GRAHAM:  No questions, Your Honor.

6           THE COURT:  Redirect?

7                       REDIRECT EXAMINATION

8   BY MS. DUKE:

9   Q.  Mr. Fue, why did you wait five-and-a-half years to report

10  this incident?

11  A.  Because that's why I'm really -- I was going to just ask

12  the judge before I get out of here and they made me leave, can

13  I explain something to the jury, to your lawyer, to Ms. Duke?

14  I didn't want to tell them then.

15          MR. WYATT:  I object to the narrative.

16          THE WITNESS:  Huh?

17          THE COURT:  Pardon me?

18          MR. WYATT:  I object to the narrative.  It's not

19  responsive to the question.

20          THE WITNESS:  I mean I didn't --

21          THE COURT:  Sustained.  Ask a question that he may

22  answer.

23          THE WITNESS:  So I can answer it now?

24          THE COURT:  Wait until she asks it.

25  Q.  (BY MS. DUKE)  I've learned this lesson.

U.S. District Court
Northern District of Oklahoma

JAMES FUE - REDIRECT (By Ms. Duke)                              1363

1    Why did you wait five-and-a-half years to report this?

2 A.  I wouldn't have reported it in 10 years, five years, a

3 year.  They the police.  It's something you got to deal with

4 and live with in our neighborhood, and that's just it.  I don't

5 want to be sitting here talking to y'all about it.  I didn't

6 want to talk to my lawyer about it.  The only reason I even

7 mentioned it to her is just he would know that, yeah, I know

8 Jeff Henderson.  I mean, I know he was there at the scene.  I

9 know him.  I'm not getting nothing out of this.  There ain't no

10 reason for me to be here.  I don't want to be here.  I don't

11 want to be talking to y'all.  I don't want to be a part of

12 this.  Like I say, I asked before I even came in here, "Could I

13 not testify?  What if I came in and I refused to just not" -- I

14 don't want to do this.  I didn't want to do it at the grand

15 jury.  I thought it was over.  When I missed the first subpoena

16 date, I thought I was done, and then I get a federal writ while

17 I'm in prison, and then I get another one a year later.  I

18 don't want to be here.  I'm not --  There's nothing for me to

19 gain here.  There's no reason why I'm here.  If they go to

20 jail, if they don't go to jail, it's no big deal to me.

21        MS. DUKE:  No further questions, Your Honor.

22        THE COURT:  Any reason this witness may not be

23 permanently excused?

24        MR. WYATT:  No, Your Honor.

25        MS. DUKE:  No, Your Honor.

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                    1364

```
 1              THE COURT:  Thank you, Mr. Fue.
 2      You may call your next witness.
 3              MS. HARRIS:  Jan Reincke.
 4              THE COURT:  Please come forward and take the oath.
 5              THE DEPUTY COURT CLERK:  Raise your right hand,
 6   please.
 7      (WITNESS SWORN)
 8                           JAN REINCKE,
 9   being first duly sworn to testify the truth, the whole truth,
10   and nothing but the truth, testified as follows:
11                       DIRECT EXAMINATION
12   BY MS. HARRIS:
13   Q.  Good afternoon.
14   A.  Good afternoon.
15   Q.  Can you introduce yourself to the jury, please.
16   A.  Yes.  My name is Jan Reincke.  I'm an Assistant United
17   States Attorney in the U.S. Attorney's Office here in Tulsa.
18   Q.  And how do you spell your last name?
19   A.  R-E-I-N-C-K-E.
20   Q.  How old have you been an AUSA here in Tulsa?
21   A.  Seven years today.
22   Q.  How long have you worked for the Department of Just- --
23   Today is your anniversary?
24   A.  Today is my anniversary.
25   Q.  Well, happy anniversary.
```

JAN REINCKE - DIRECT (By Ms. Harris)                                1365

```
 1   A.  Thank you.

 2   Q.  I'm sure you wanted to spend it here in court.

 3   A.  I didn't realize it until I was on my way over here,

 4   actually.

 5   Q.  Okay.  How long have you worked for the Department of

 6   Justice?

 7   A.  25 years.

 8   Q.  If you would, just give the grand jury -- not the grand

 9   jury -- the jury a little bit of backgrounds about your work

10   history for the department, please.

11   A.  In 1986 I went to Washington, D.C. with Frank Keating and

12   he and I worked at the Department of the Treasury.  In 1988

13   President Reagan ordered Mr. Keating over to the Department of

14   Justice and I went with him.  And in August of 1988 I went to

15   the U.S. Attorney's Office in Alexandria.  I was there from

16   August of 1988 until 1994 when I transferred to the Norfolk

17   division.

18   Q.  Is that Alexandria, Virginia?

19   A.  Yes, it is.

20   Q.  Okay.

21   A.  In the same district.  And then in 2002 I moved to the

22   Newport News division in the same district.  And in 2004 I

23   returned -- or I came to Tulsa to work in the U.S. Attorney's

24   Office here.

25   Q.  What brought you to Tulsa?
```

JAN REINCKE - DIRECT (By Ms. Harris)                                    1366

1    A.   My mom was ill and the U.S. Attorney's Office in Virginia

2    detailed me here so that I could be closer to her.  She passed

3    away, and while I was here one of the assistants asked if I

4    would like to trade jobs, and I wanted to get closer to home

5    because I born and raised in southeast Kansas, so I agreed,

6    and the two U.S. Attorneys worked it out, and about a year

7    later, August 8th, 2004, I became permanent here at the office.

8    Q.   Okay.  Now, since you've been here in Tulsa, are there any

9    specific kinds of cases that you've specialized in working?

10   A.   Guns and drugs.

11   Q.   Guns and drugs?

12   A.   Uh-huh.

13   Q.   What agencies do you generally work for?

14   A.   Usually it's ATF, and I do a lot of work with TPD officers

15   from the Special Investigations Division drug unit.

16   Q.   Okay.  Did you work with Brandon McFadden?

17   A.   Yes, I did.

18   Q.   Did you work with Jeff Henderson?

19   A.   I worked cases that he worked, and I worked with him a

20   couple of times on cases, but I worked with Brandon more than

21   anybody.

22   Q.   Okay.  Did you know an individual named Jose Angel

23   Gonzalez?

24   A.   Yes.

25   Q.   How do you know Jose Angel Gonzalez?

JAN REINCKE - DIRECT (By Ms. Harris)                          1367

1  A.  I prosecuted Mr. Gonzalez for possession of a sawed-off

2  shotgun and for distribution of methamphetamine and possession

3  with intent to distribute methamphetamine.

4  Q.  Okay.  Let's talk about how the charges initially were

5  brought.

6      Who brought you the case on Mr. Gonzalez?

7  A.  The gun case was brought to me by Brandon McFadden.

8  Q.  And did you receive the gun case before or after the drug

9  case?

10  A.  Before.

11  Q.  Was it a separate charge in terms of -- was it related to

12  the drug case date wise or was it a completely separate

13  isolated incident?

14  A.  Completely separate.

15  Q.  Okay.  All right.  So the case was brought to you, the gun

16  case was brought to you by Mr. McFadden?

17  A.  Yes.

18  Q.  All right.  And what information did he provide you about

19  the gun case?

20  A.  He brought me the case file -- or the case report and told

21  me that he thought I would be interested in it because it was a

22  gun case.  I believe I read the report and he had -- if I'm not

23  mistaken, I think he told me that Mr. Gonzalez was going to be

24  an informant but chose not to return any phone calls and was

25  not living up to his end of the bargain, so they were bringing

JAN REINCKE - DIRECT (By Ms. Harris)                                    1368

 1   the case for prosecution.

 2   Q.  When you say that Mr. McFadden brought you the report, what

 3   kind of report are you referring to?

 4   A.  It's the Tulsa Police Department TRACIS report.

 5   Q.  Okay.  And was it a report prepared by Officer -- I mean

 6   Mr. McFadden or was it prepared by a Tulsa Police Department

 7   officer?

 8   A.  I believe it was prepared by Officer Henderson.

 9   Q.  Okay.  I'm showing you what has been admitted into evidence

10   as 33-c-2, which is a Tulsa TRACIS report on Jose Angel

11   Gonzalez.  Do you recognize that document?

12   A.  It looks like the report that I got from Mr. McFadden.

13   Q.  Okay.  And what is the date on that document in terms of

14   when the incident occurred where a sawed-off shotgun was

15   located at Mr. Gonzalez's house?

16   A.  September 26th of 2007.

17   Q.  Is that consistent with your recollection about the date

18   charged in the indictment?

19   A.  Yes.

20   Q.  Okay.

21        MS. HARRIS:  Could you go down to the bottom of the

22   page?

23   Q.  (BY MS. HARRIS)  Okay.  Can you identify who prepared the

24   report?

25   A.  It says Officer Henderson.

JAN REINCKE - DIRECT (By Ms. Harris)                                    1369

1   Q.  And what other officers are identified as having been

2   involved in this report and in this incident?

3   A.  Steve Castleberry, Sean Hickey, Bill Yelton, Frank Khalil

4   and Sergeant Van Ellis and Corporal Nelson signed as the

5   supervisor.

6   Q.  Did you understand, based on your discussion with Officer

7   Henderson -- or Mr. Henderson, that this report was prepared

8   related to the execution of a search warrant on Mr. Gonzalez's

9   house?

10  A.  Based on the report, and I believe that the search warrant

11  was attached to that, I do not recall whether I ever talked

12  with Mr. Henderson about this or not.

13  Q.  Okay.  Do you recall though having an understanding that a

14  search warrant was, in fact, executed at Mr. Gonzalez's house

15  and that resulted in the preparation of this police report?

16  A.  Yes.

17  Q.  Okay.  Were you involved with the preparation of the

18  affidavit in support of that search warrant?

19  A.  No.

20  Q.  Was that a federal or state search warrant?

21  A.  State.

22  Q.  And were you consulted with regard to what information to

23  put in the affidavit?

24  A.  No.

25  Q.  Were you given any information about who the reliable

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                              1370

```
 1   confidential informant was on that search warrant?
 2   A.  No.
 3   Q.  To this day, do you know?
 4   A.  Not for sure.
 5   Q.  Okay.  All right.
 6       Now, so is it fair to say that you didn't get involved in
 7   this case until after all that had transpired?
 8   A.  That's correct.
 9   Q.  Okay.  Were you aware that approximately a week before this
10   search warrant was executed, I believe on September 17th, that
11   Mr. Gonzalez had been stopped in a traffic stop by the Tulsa
12   Police?
13   A.  Not at the time.
14   Q.  Okay.  Was that part of the packet that you received from
15   Mr. McFadden?
16   A.  I don't recall that it was.
17   Q.  Okay.  All right.  Now, you indicted Mr. Gonzalez for
18   possession of the sawed-off shotgun?
19   A.  Yes.
20   Q.  All right.  Did Mr. Gonzalez have any prior felony
21   convictions?
22   A.  No.
23   Q.  So you couldn't charge him with being a felon in
24   possession?
25   A.  That's correct.
```

JAN REINCKE - DIRECT (By Ms. Harris)                    1371

1  Q.  Okay.  What is illegal about the possession of this
2  shotgun?
3  A.  It needs to be registered in the National Firearms
4  Register.  It's illegal to possess a firearm of certain
5  dimensions.  We refer to them as sawed-off shotguns.  I believe
6  now the charge that we use is possession of unregistered
7  firearm because they have to be a certain barrel length in
8  order to be legally owned or legally possessed, and this
9  firearm was not.  So there is a registry with the Bureau of
10 Alcohol, Tobacco, Firearms & Explosives in Washington that
11 lists the names of all individuals who have legally obtained
12 permission to own sawed-off shotguns or rifles or guns of this
13 sort.
14 Q.  If Mr. Gonzalez had registered this gun, would it have been
15 illegal for him to have possession of it?
16 A.  No.  Not unless he was otherwise prohibited.
17 Q.  Okay.  And at the time that you indicted him, he was not
18 otherwise prohibited?
19 A.  That's correct.
20 Q.  Okay.  What do you have to do to register a gun like this?
21 A.  I have absolutely no idea.  I'm assuming you can call your
22 local ATF office or go to a federal firearms licensee.  But
23 other than that...
24 Q.  All right.  Now, you indicated that after the search
25 warrant was executed, but before the case was brought to you,

JAN REINCKE - DIRECT (By Ms. Harris)                           1372

1   was there some understanding that Mr. McFadden told you about

2   with regard to Mr. Gonzalez cooperating?

3   A.   I believe there was.  I know on occasion cases have been

4   brought to me that are a little older or that might not be as

5   up to date or as current, and the first question I ask is:  Why

6   has it been so long?  And it's usually because the individual

7   was required to or agreed to cooperate with the local police

8   department and, for whatever reason, hadn't done so, and I

9   believe that was the situation in this case.

10  Q.   Okay.  Now, were you provided information by Mr. McFadden

11  about whether Mr. Gonzalez had, in fact, cooperated before he

12  presented the case to you?

13  A.   No.

14  Q.   Is it your understanding that he presented the case to you

15  because there had not been cooperation?

16  A.   Yes.

17  Q.   Okay.  And when was the indictment?  Do you remember the

18  date?

19  A.   I want to say it was early -- maybe February of 2008.

20  Q.   You've got a great memory.

21  A.   I do remember that it's 08-CR -- I believe 25 is the

22  shotgun and 98 is the drug case.

23  Q.   Those are the case numbers that you're referring to?

24  A.   Yes.

25  Q.   Okay.  So assuming you indicted him in February of '08, was

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                                1373

```
 1   that a one-charge indictment?
 2   A.  Yes.
 3   Q.  Or a one-count indictment?
 4   A.  One count.
 5   Q.  And that was the gun charge?
 6   A.  Yes.
 7   Q.  Now, after that gun charge, did Mr. Gonzalez indicate that
 8   he would be interested in cooperating?
 9   A.  Yes, I believe so.  I believe that at the time he was
10   released on bond so that he could do that, if I've got my time
11   line correct.
12   Q.  And he picked up another charge, didn't he, after --
13   A.  Yes.
14   Q.  -- after you indicted him?
15   A.  Yes.
16   Q.  What did he pick up a charge on?
17   A.  He sold methamphetamine to an undercover police officer.
18   Q.  And was that a Tulsa Police officer?
19   A.  Yes; it was officer Randy Mackenzie.
20   Q.  Okay.  Do you recall when that took place?
21   A.  As I recall, that was in March or April.
22   Q.  Same year, '08?
23   A.  Yes.
24   Q.  Okay.
25   A.  And then a subsequent possession with intent at the time
```

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                              1374

1   that officers executed the arrest warrant, a federal arrest

2   warrant, at Mr. Gonzalez's house.

3   Q.  Okay.  So did you indict him or did you do a superseding

4   indictment?

5   A.  No, I indicted --

6   Q.  Or did you do a separate indictment?

7   A.  A separate indictment.

8   Q.  Okay.  And that had a separate case number altogether?

9   A.  Yes.

10  Q.  And what were the charges in the second indictment?

11  A.  The second indictment was distribution of methamphetamine,

12  Count 1; and possession with intent to distribute

13  methamphetamine, Count 2.

14  Q.  Okay.  Do you recall when that indictment was issued by the

15  grand jury?

16  A.  I believe that was in April or May.

17  Q.  Okay.  You indicated a few minutes ago that a federal

18  arrest warrant was executed on Mr. McFadden.  And there was

19  some marijuana found on him; is that correct?  Or there was

20  some drugs found on him?

21          THE COURT:  Mr. McFadden?

22          MS. HARRIS:  I'm sorry.

23  A.  Mr. Gonzalez?

24  Q.  (BY MS. HARRIS)  Yes, Mr. Gonzalez.

25  A.  When the -- and I don't recall if -- I'm not real sure

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                           1375

1   about the sequence of events but the officers went to

2   Mr. Gonzalez's residence, which was different, as I recall,

3   from the residence where the sawed-off shotgun had been

4   found, --

5   Q.  Okay.

6   A.  -- to arrest him on the charges for the shotgun.  And when

7   they did, they received, according to the TRACIS report,

8   consent to search the house, and found an additional seven or

9   14 grams of methamphetamine in his house.

10  Q.  I would like to pull up exhibit 48, which I believe is the

11  TRACIS report related to the execution of the arrest warrant.

12          MR. WYATT:  What was that number?

13          MS. HARRIS:  48.

14          MR. WYATT:  Thank you.

15  Q.  (BY MS. HARRIS)  Do you see that there in front of you?

16  A.  Yes.

17  Q.  And what's the date on that?

18  A.  April 18th, 2008.

19  Q.  And is that consistent with your memory approximately when

20  Mr. Gonzalez was arrested?

21  A.  Yes.

22  Q.  Okay.

23          MS. HARRIS:  And can we go down to the bottom of the

24  page?

25  Q.  (BY MS. HARRIS)  Can you identify for the jury who the

JAN REINCKE - DIRECT (By Ms. Harris)                                    1376

```
1   officers were involved in that.
2   A.   Frank Khalil signed the report, which indicated to me that
3   he had prepared the report; Steve Castleberry and Agent Brandon
4   McFadden were involved in the arrest; and it was signed by A
5   supervisor, Sergeant Van Ellis.
6            MS. HARRIS:  Can we go to the next page of that
7   report?
8   Q.   (BY MS. HARRIS)  Do you recall whether you received this
9   report and had an opportunity to review it after the arrest
10  took place?
11  A.   Yes.
12  Q.   Okay.  It states, "Mr. Gonzalez began to tell officers that
13  we set him up, he stated that officers planted the sawed-off
14  shotgun that he had in his how the first time, he stated that
15  he did have the shotgun but after he left the car stop he had
16  gone straight home to remove the gun and he could not find it.
17  He further stated that we had sent an informant to his house
18  while he was on the car stop to find his shotgun and hide it in
19  the vent."
20       Did you remember reading that?
21  A.   Yes.
22  Q.   What did you think when you read that?
23  A.   I believe I asked Agent McFadden about that and he told me
24  that Mr. Gonzalez had said that but later recanted.
25  Q.   Okay.  So did you place any real importance on that
```

JAN REINCKE - DIRECT (By Ms. Harris)                          1377

1   paragraph after speaking with Agent McFadden about it?

2   A.   No.

3   Q.   Okay.   After Mr. Gonzalez was arrested on the federal

4   warrant, was he placed in jail?

5   A.   He was momentarily, but then I think he was released on

6   bond because he indicated THAT he did want to cooperate.

7   Q.   Okay.   Now, could you give the jury an understanding of --

8   is this a common occurrence or is this something that happens

9   in the course of your work as a prosecutor that someone you

10  indict wants to cooperate and proactively do some work?

11  A.   Yes.   On occasion, there are individuals who, after

12  conducting what we call a Rule 11, which is a debrief of

13  defendants concerning information they might have about the

14  crime they have been accused of, or crimes that they may know

15  about or have been involved once in a while others, and if we

16  believe that they can cooperate and perhaps make controlled

17  buys or make phone calls, introduce undercover officers to

18  individuals who are committing crimes, we will agree to release

19  them on bond and they will work with the agent who is

20  responsible for the case that resulted in their charges.

21  Q.   And do you rely on the agent to supervise the activities of

22  that defendant?

23  A.   Yes, I do.

24  Q.   Okay.   And what do you expect them to do to supervise those

25  activities?

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                    1378

1   A.   Well, I expect them -- they have rules and regulations of

2   their own agency that they have to follow when they're working

3   with individuals who are cooperating, and I don't get involved

4   in that because that's something that's set up internally with

5   their agency.  So as long as they have dotted the i's and

6   crossed the t's there, then that's not something that I would

7   routinely get involved with.

8        I expect them to keep me posted about what is happening and

9   what the individuals are cooperating about.  And if they need

10  any federal papers, such as a search warrant or toll records or

11  any kind of documentation to support what the individual may be

12  doing, then that's something that I would take care of.  But

13  other than that, I usually let them go their merry way because

14  I believe that they're supposed to know what they're doing and

15  I don't supervise their investigations.

16  Q.   What was your understanding with regard to why Mr. Gonzalez

17  wanted to cooperate and work?

18  A.   It was my understanding that he knew some individuals who

19  were moving some pretty large quantities of methamphetamine,

20  and that he could set up another an undercover officer with an

21  introduction to these individuals or could provide information

22  that would allow search warrants to be executed and/or

23  shipments of methamphetamine coming in from other areas to be

24  stopped, cars searched, and drugs and/or large amounts of money

25  seized.

1  Q.  And what would Mr. Gonzalez hope to get in return for the

2  cooperation that he was to provide?

3  A.  He would hope to get a reduction on his sentence, but

4  that's not prom- -- I don't promise that.

5  Q.  Is there any guarantee that he would get a reduction?

6  A.  No.

7  Q.  There's hope?

8  A.  There's always hope.  And I tell defendants, and I've been

9  telling defendants the same thing for 25 years, "I cannot and

10  will not promise that you're going to get a reduction.  You're

11  the only person who can help yourself."

12  Q.  Do you recall meeting with Mr. Gonzalez?  Do you remember

13  whether you did or not?

14  A.  No, I don't.  I know I saw him in court.  I may have met

15  him with with his attorney, if we did a Rule 11.  I try not to

16  stay around when the agents are doing Rule 11s because I have a

17  tendency to interrupt their flow.  They have a way of

18  interviewing and I sometimes can interfere with that, so I try

19  to stay for the first part and then I usually leave after that.

20  Q.  Okay.  Where did you get information from about what work

21  Mr. Gonzalez was doing?

22  A.  Brandon McFadden.

23  Q.  Okay.  Did you ever talk to Jeff Henderson about what work

24  Mr. Gonzalez was doing?

25  A.  I don't believe I did.

JAN REINCKE - DIRECT (By Ms. Harris)                          1380

```
 1   Q.  Okay.
 2   A.  I didn't talk to Mr. Henderson very much about -- unless we
 3   were getting ready for trial.
 4   Q.  Now, do you recall what information Brandon McFadden told
 5   you with regard to what Mr. Gonzalez did?
 6   A.  He was --  I would talk to him periodically because we had
 7   a couple of defendants who were doing the same thing, but I
 8   would talk to Mr. McFadden occasionally and say, "What is he
 9   doing?  What kind of information has he provided?  Do you need
10   me to do anything?  Is there enough for a federal search
11   warrant?  Do you want toll records?"  And --
12   Q.  What are toll records?
13   A.  Phone records, or pin registers, which are also like toll
14   records; they provide telephone numbers, calls out and calls
15   coming in.
16   Q.  All of these tools, I guess, are at the disposal of an AUSA
17   to help an agent with an investigation?
18   A.  Yes.
19   Q.  Did Officer McFadden ever ask you for help in obtaining a
20   search warrant?
21   A.  No.
22   Q.  What about a pin register?
23   A.  No.
24   Q.  What about toll records?
25   A.  No.
```

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                    1381

1   Q.  Anything else?

2   A.  No.

3   Q.  Okay.  What did he tell you that Mr. Gonzalez did?

4   A.  He told me that Mr. Gonzalez had provided him, on occasion,

5   had provided him information about individuals who were dealing

6   methamphetamine in the Northern District of Oklahoma, around

7   Tulsa and north Tulsa, and that there were shipments that were

8   due in.  That Mr. Gonzalez could pinpoint or let law

9   enforcement know, let Mr. McFadden know, when the shipments

10  were on their way or had arrived, that then they would be able

11  to attempt to either stop before they got to where they were

12  going or be the subject of a possible search warrant once they

13  had arrived.

14  Q.  Now, did Mr. McFadden ever tell you that they were able to

15  pinpoint any shipments of methamphetamine or other drugs based

16  on information provided by Mr. Gonzalez?

17  A.  No.

18  Q.  Okay.  Did you keep some handwritten notes in your file

19  concerning the cooperation information you understood

20  Mr. Gonzalez provided?

21  A.  I made notes of a conversation that Mr. McFadden and I had

22  about one particular incident that revolved around the search

23  warrant that was executed by another Tulsa Police officer and a

24  case that was subsequently prosecuted by one of my colleagues.

25  Q.  Can you explain to the jury what information you discussed

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - DIRECT (By Ms. Harris)                          1382

```
 1   with Mr. McFadden.
 2   A.  We discussed, as I recall, we talked about Mr. Gonzalez had
 3   pointed out a house off of, I believe it was off north Utica,
 4   around Oklahoma or Newton or Latimar or one of those side
 5   streets where he knew that a large quantity of methamphetamine
 6   was either being stored or was being -- was going to be there
 7   at a certain period of time, and he gave the name of the
 8   individual who either lived at the house or who was bringing
 9   the methamphetamine to the house.  And I had talked to
10   Mr. McFadden about when it was supposed to happen, staying on
11   top of it, and, again, "If you need a search warrant or you
12   need something from me, let me know."
13   Q.  And what happened with regard to the information
14   Mr. Gonzalez provided?
15   A.  It was my understanding from Mr. McFadden that he was going
16   to attempt to get a state search warrant, but before he could
17   do that another police officer with Special Investigations
18   Division drug unit executed a search warrant, found the
19   methamphetamine, and the individual was then referred to one of
20   my colleagues for prosecution.
21   Q.  So the information --  Did the information Mr. Gonzalez
22   provided result in any prosecution of that target?
23   A.  No.
24   Q.  Okay.  You said that it was your understanding that
25   Mr. McFadden was going to get a state search warrant?
```

JAN REINCKE - DIRECT (By Ms. Harris)                    1383

 1  A.  Yes.

 2  Q.  Why would he get a state search warrant instead of come to

 3  you for a federal search warrant?  Did he explain to you why?

 4  A.  A state search warrant is done before a judge of record and

 5  that's what we require in the federal system, that it be

 6  obtained by a judge of record.  And oftentimes, cases, they

 7  will get state search warrants until they determine that, in

 8  fact, it is going to be a federal case.

 9  Q.  You started out by saying the state search warrant is

10  before a judge of record?

11  A.  Yes.

12  Q.  Okay.  Is a federal search warrant the same?

13  A.  Yes.

14  Q.  Okay.  So is there any reason why you would go for a state

15  search warrant versus a federal search warrant?

16  A.  It might be more advantageous, it might be easier because

17  they have easier access to the judges in state court.

18  Q.  Now, so the search warrant didn't work out for the

19  information provided by Mr. Gonzalez?

20  A.  No.

21  Q.  Okay.  Now, at some point during this time frame, did

22  Mr. McFadden move?

23  A.  I believe he went back to Texas in August --

24  Q.  Okay.

25  A.  -- or September of '08.

JAN REINCKE - DIRECT (By Ms. Harris)                           1384

1   Q.  Okay.  And did at some point Mr. Gonzalez enter guilty

2   pleas in his cases?

3   A.  Yes.

4   Q.  Okay.  Do you recall about when that was?

5   A.  Maybe around the same time that Mr. McFadden left, because

6   I believe, if I'm not mistaken, the first sentencing hearing

7   was in November of '08.

8   Q.  Okay.

9   A.  So it would have been three months before.

10  Q.  Usually takes a few months for a presentence report?

11  A.  Yes.

12  Q.  Okay.  What did Mr. Gonzalez plead guilty to?

13  A.  He pleaded guilty to possession of the sawed-off shotgun,

14  and he pleaded guilty to distribution of methamphetamine in the

15  second indictment.

16  Q.  Okay.  And were any counts dismissed as to him?

17  A.  Not yet.

18  Q.  Okay.  After he pled guilty to those two charges, did you

19  have conversations with Mr. McFadden about Mr. Gonzalez being

20  sentenced?

21  A.  Yes.

22  Q.  Did you have discussions with Mr. McFadden about whether

23  Mr. Gonzalez should get some sort of reduction in his sentence

24  for his cooperation?

25  A.  Yes.

JAN REINCKE - DIRECT (By Ms. Harris)                              1385

1   Q.  Okay.  Did Mr. McFadden give you information that kind of

2   summarized what cooperation Mr. Gonzalez had provided?

3   A.  The only cooperation that Mr. McFadden gave me was the

4   information about the search warrant on the house that was

5   conducted by another police officer, and said that that was --

6   that search warrant was executed on the same house that

7   Mr. Gonzalez had provided information about.

8   Q.  Okay.  And was that information provided by Mr. McFadden in

9   an e-mail that he sent to you?

10  A.  Yes.

11         MS. HARRIS:  May I approach, Your Honor?

12         THE COURT:  You may.

13  Q.  (BY MS. HARRIS)  I'm going to show you what is an e-mail

14  from Brandon McFadden to Jan Reincke on October 27, 2008.  Can

15  you identify that, please?

16  A.  Yes.  I believe I had e-mailed Brandon and said I need to

17  know what cooperation Mr. Gonzalez has provided because his

18  attorney was calling me telling me that he had done a number of

19  things but I didn't have any information about what he was

20  doing, and the only thing that I knew about that even came

21  close to being cooperation was the execution of the search

22  warrant at the house where another officer seized three pounds

23  or so of methamphetamine.

24  Q.  What information did Mr. Gonzalez's attorney provide you

25  about what Mr. Gonzalez had done for McFadden?

1   A.   She told me -- I believe she sent me an e-mail that said

2   that he had provided information on two or three cases and it

3   resulted in arrests of other individuals, but I didn't have any

4   specifics from her.  I told her that I have spoken with

5   Mr. McFadden and he hadn't provided me any of that.

6   Q.   Did Mr. Gonzalez's attorney -- and who is that, by the way?

7   A.   Julie O'Connell.

8   Q.   Did she tell you that Mr. Gonzalez had made some controlled

9   drug buys from Mr. McFadden -- for Mr. McFadden?

10  A.   I don't recall if she put them in that wording but she said

11  that -- she may have said he made some purchases or he set up

12  some purchases, I don't recall what the conversation was or the

13  specifics, but it wasn't enough, in and of itself, for me to

14  know what it was about.  That's why I contacted Mr. McFadden.

15  Q.   Did Mr. McFadden -- and you've got your e-mail there that

16  he sent you about what cooperation was provided.  What did he

17  tell you?

18  A.   "Angel Gonzalez provided police with information in regards

19  to a Jose Rivas and a Yohn -- Y-O-H-N -- Gomez.  Gonzalez

20  provided the location of two residences in Tulsa where he had

21  seen large amounts of methamphetamine distributed.  Gonzalez

22  knew the two individuals were receiving their methamphetamine

23  from an unknown source in Arizona.  A Tulsa County search

24  warrant was executed at the residence of Rivas where three

25  pounds of methamphetamine were recovered.  Rivas confessed to

JAN REINCKE - DIRECT (By Ms. Harris)                    1387

1  selling narcotics and that he had sold over 15 pounds for the

2  organization from Arizona in the last two months.  All of the

3  information provided by Gonzalez was found to be true and

4  correct by Rivas's own statement."

5  Q.  Is that the sum total of the information that Mr. McFadden

6  told you about the cooperation Mr. Gonzalez provided?

7  A.  Yes.

8  Q.  Did he ever tell you that Mr. Gonzalez made controlled drug

9  buys for him?

10  A.  No.

11  Q.  If he was, or if he did, would that have been important for

12  you to know in determining whether -- or what percent of

13  reduction he was entitled to in his sentence?

14  A.  Yes.

15  Q.  Okay.  Now, you indicated that Mr. Gonzalez pled guilty to

16  a drug count and to the gun count?

17  A.  Yes.

18  Q.  And can you tell the jury what is the current status of

19  both of those cases, please?

20  A.  The gun count has been dismissed.

21  Q.  And why is that, if you know?

22  A.  Well, it's a legal reason.  It was because of Giglio

23  material that wasn't provided at the time.

24  Q.  Okay.  What is -- this jury never has heard that word, I

25  can promise you.  What is Giglio material?

U.S. District Court
Northern District of Oklahoma

1  A.  Giglio is a case that was decided by the Supreme Court that

2  required prosecutors to turn over evidence concerning a

3  witness's credibility.  Any evidence that could impeach a

4  witness is required to be turned over prior to the trial of the

5  case.  At this particular point, although Mr. Gonzalez was not

6  going to trial, we believed that the impeachment evidence was

7  of such a nature that we should have provided it, and because

8  we did not, we moved to vacate the gun charge.

9  Q.  Impeachment evidence of whom?

10 A.  The officers who would have testified at any trial.

11 Q.  And who were those officers?

12 A.  It would have been Agent McFadden -- or Mr. McFadden,

13 Mr. Henderson, Mr. Yelton, and at the time I think just those

14 three.

15 Q.  Okay.  Did my office in Arkansas tell your office in

16 Oklahoma what you should do about that case?

17 A.  You know, I don't know that.  I think you did but I'm

18 not -- I'm not sure.  I know I got the information to file the

19 motion to vacate through my people at my office.

20 Q.  Did you and I or you and any of the AUSAs here ever talk

21 about it?

22 A.  No.

23 Q.  Okay.  The word came from whom?

24 A.  I believe it came from my U.S. Attorney, if I'm not

25 mistaken, Scott Woodward.

1   Q.   Did you trust Agent McFadden when he told you that Gonzalez

2   had not made any controlled buys?

3   A.   Yes.

4   Q.   And you had had a working relationship with him?

5   A.   Yes.

6   Q.   Okay.  Obviously, if you had thought that there was a

7   problem with the case, would you have pursued it?

8   A.   No.

9   Q.   Now, what's the status of Mr. Gonzalez's cases right now?

10  The gun charge is dismissed.  What about the drugs?

11  A.   He's waiting on sentencing on the drug count.

12  Q.   Has that been scheduled yet; do you know?

13  A.   I believe it's been scheduled for -- I want to say

14  September.

15  Q.   Have you made any determination about what level of

16  cooperation Mr. Gonzalez has provided?

17  A.   No.

18  Q.   So you do not --  Do you know at this time what

19  recommendation you intend to make --

20  A.   No.

21  Q.   -- to the judge with regard to a reduction?

22  A.   Well, there's a process that we go through.  I prepare a

23  memo to my criminal chief who --

24  Q.   Who is that?

25  A.   Joe Wilson.

JAN REINCKE - DIRECT (By Ms. Harris)                          1390

```
 1   Q.  All right.
 2   A.  And I have certain things that I have to tell him and
 3   certain information that I have to provide, including the
 4   information that I believe supports the granting of the motion
 5   to file a motion to reduce someone's sentence.  He goes through
 6   and reads the memo, and if he agrees he signs off on it and
 7   then sends it to the U.S. Attorney.  The U.S. Attorney then
 8   reviews the memo, and if neither of them have any questions,
 9   then the U.S. Attorney will make a decision.  If the U.S.
10   Attorney says, "Yes, you can file the motion," then they send
11   it back to me and I prepare a motion that is filed normally
12   under seal with the court two weeks before the sentencing
13   hearing in which I lay out what the cooperation has been and a
14   recommendation of what I believe a reduced sentence should be.
15   Q.  Have you prepared that memo to your criminal chief at this
16   point?
17   A.  No.
18   Q.  When do you anticipate that you'll be doing that?
19   A.  It will be after I receive whatever information there is
20   about any of his cooperation --
21   Q.  Okay.
22   A.  -- once it's completed.
23   Q.  Okay.  And do you know what sentencing guideline range
24   Mr. Gonzalez is currently facing related to his guilty plea on
25   the drug charge?
```

JAN REINCKE - DIRECT (By Ms. Harris)                                  1391

 1   A.  No, I really don't.

 2   Q.  Okay.

 3   A.  I haven't looked at that presentence report in a long time.

 4   Q.  Fair enough.

 5       Now, do you know Ryan Logsdon?

 6   A.  Know of him.  I've never met him.

 7   Q.  Never met him?  How do you know Ryan Logsdon?

 8   A.  Ryan Logsdon was a potential defendant in early '07.  There

 9   was a large amount of methamphetamine that was seized from him,

10   and after the seizure he cooperated, called an individual by

11   the name of Avery Brewer to bring him more methamphetamine, and

12   when Mr. Brewer arrived he was arrested, a large quantity of

13   methamphetamine was seized from his person, and he was

14   prosecuted.

15   Q.  Did you prosecute Avery Brewer?

16   A.  Yes.

17   Q.  Do you remember what the result of that prosecution was?

18   A.  He pleaded guilty and is currently serving time.

19   Q.  All right.  And do you recall that Mr. Logsdon's

20   cooperation stemmed from the search warrant that was executed

21   in January of '07?

22   A.  Yes.

23   Q.  Okay.  Who reported to you about Mr. Logsdon's involvement

24   and cooperation?

25   A.  Mr. McFadden.

JAN REINCKE - DIRECT (By Ms. Harris)                              1392

1   Q.  Okay.  Did you ever talk to Mr. Henderson about

2   Mr. Logsdon?

3   A.  I don't recall.

4   Q.  Okay.

5   A.  I didn't get involved in the confidential informants unless

6   there was some question that I had to answer in regard to the

7   prosecution of cases.

8   Q.  Okay.  So do you have any knowledge about what level of

9   involvement Mr. Henderson had with Mr. Logsdon after the search

10  warrant was executed?

11  A.  I know that after the investigation was started, I was

12  asked how many cases Mr. Logsdon had been involved in of the

13  cases I had prosecuted, and I could not answer that question.

14  I knew of a couple when his name had been mentioned but I

15  didn't know the extent of the other cases he might have been

16  involved in.  So I contacted Mr. McFadden and said, at the

17  request of an FBI agent, "Can you tell me how many of the cases

18  Ryan Logsdon was involved in?"

19  Q.  Did that request include both state and federal cases?

20  A.  Well, I don't know that -- I didn't mean to say state

21  cases, but I was sent an e-mail back from Mr. McFadden that

22  included state cases.

23  Q.  Okay.  Now, did you intend to indict Mr. Logsdon?

24  A.  Yes, I did.

25  Q.  And why is that?

JAN REINCKE - DIRECT (By Ms. Harris)                    1393

1   A.  Because he was a major methamphetamine dealer, and at some

2   point he knew that -- or I had told Mr. McFadden he's not going

3   to walk away scot-free, he's going to have to take a plea.  And

4   Mr. McFadden said, "But he's doing such a good job making

5   cases, and if he gets indicted or if he has to go to jail or if

6   he's out on bond, that might be a problem because he knows a

7   lot of major meth dealers."  So I said, "Okay, I'll wait and

8   we'll see what happens, but you need to let him know that this

9   is not a free ride."

10  Q.  And did you have any other discussions with Mr. McFadden

11  down the road about, "Hey, where are we on Mr. Logsdon"?

12  A.  I did just prior to him leaving and he said that he was

13  about to finish up all of his discussion -- or all of his

14  cooperation and at that point he may have had a couple of other

15  state cases that he was working on.

16  Q.  Okay.  And did you indicate to him that you still intended

17  or desired to indict Mr. Logsdon?

18  A.  Yes.

19  Q.  Okay.  And you indicated I think that Mr. McFadden sent you

20  a list of cases that Mr. Logsdon had assisted on?

21  A.  Yes.

22  Q.  Okay.

23          MS. HARRIS:  May I approach?

24          THE COURT:  You may.

25  Q.  (BY MS. HARRIS)  I'm going to hand you an e-mail from

1  Brandon McFadden to Jan Reincke, April 1, 2009, and ask you if

2  you can identify it.

3  A.   This was in response to my e-mail after having spoken with

4  an FBI agent who was investigating Mr. McFadden, I was asked

5  how many cases Ryan Logsdon was invo- -- my cases that I had

6  done with Mr. McFadden Mr. Logsdon was involved in.  I told him

7  I did not know, I only knew of a couple.

8  Q.   Okay.

9  A.   And he asked if I could find out.  So I suggested sending

10 Mr. McFadden an e-mail, which I did, and this is the result of

11 that e-mail.

12 Q.   Okay.  And what cases did he identify that Ryan Logsdon

13 worked in?

14 A.   Do you want just my cases or all of them?

15 Q.   All of them, please.

16 A.   Avery Brewer, Dustin Eastom, Jerry Hill and Stephanie

17 Crawford, Larry Barnes, Sr. and Larita Barnes, Brian Cole

18 Williams, Thomas Neal, Isias Gonzalez, Juan Mata, Arias Nelson,

19 Kyle Isaacs, Rodolfo Amador, Alphie McKinney and Jeremy Battle.

20 Q.   Did Mr. McFadden identify Ryan Logsdon as someone who

21 assisted on a case involving Elton Shaw?

22 A.   That's not on my list.

23 Q.   What about Dustin Shelley?

24 A.   That's not on my list either.  These are all federal cases.

25 Q.   Okay.  Did he ever identify any state cases to you that

 1  Mr. Logsdon had worked on?

 2  A.  I thought that he had but I may have looked at the cases

 3  that other of my colleagues did and realized those weren't my

 4  cases so...

 5  Q.  Do you recall whether Mr. McFadden ever told you about a

 6  case involving Dustin Shelley that Ryan Logsdon assisted on?

 7  A.  No.

 8  Q.  Do you recall whether Mr. -- did Mr. McFadden tell you

 9  about a case, Corey Wayne Smith, that he claimed Ryan Logsdon

10  worked on?

11  A.  No.

12  Q.  Did Mr. McFadden ever indicate to you that Ryan Logsdon was

13  involved as the RCI on the Jose Angel Gonzalez case?

14  A.  No.

15  Q.  Would that have been something that you would have liked to

16  know?  That was a federal case, wasn't it?

17  A.  Yes.

18  Q.  Tell me, if you would, what -- tell the jury:  What's

19  immunity?  What is court-ordered immunity?

20  A.  When an individual is not going to be prosecuted for crimes

21  that he or she has provided information about.

22  Q.  Is there a difference between getting a court to order

23  immunity and the prosecutor giving a letter of immunity?

24  A.  Are you talking about a Rule 11?

25  Q.  No, ma'am.  I'm talking about -- are you familiar with the

1  procedure where an Assistant U.S. Attorney has to go to the

2  Department of Justice to obtain an authorization to request

3  court-ordered immunity?

4  A.  I've only done that once in my 25 years and it was when I

5  was in the Eastern District of Virginia, so...

6  Q.  Is that an unusual step to take?

7  A.  It was for me, and as far as I recall then, it was in that

8  office, and I don't know that it's been done since I've been

9  here, but then I'm not privy to what my colleagues do --

10 everything my colleagues do.

11 Q.  You've done it just once in your career?

12 A.  Yes, that I can recall.

13        MS. HARRIS:  I don't have anything else at this time.

14 Thank you, ma'am.

15        THE COURT:  Cross-examination?

16        MR. WYATT:  Yes, Your Honor.  Thank you.

17    May it please the court.

18        THE COURT:  Counsel.

19                    CROSS-EXAMINATION

20 BY MR. WYATT:

21 Q.  As I understand it, you were the prosecutor for Jose Angel

22 Gonzalez; is that correct?

23 A.  Yes, sir.

24 Q.  So you're familiar with the traffic ticket that was given

25 to him at the traffic stop; would that be a fair statement?

JAN REINCKE - CROSS (By Mr. Wyatt)                                    1397

```
 1   A.  I don't recall.
 2   Q.  Well, let me show you defendants' exhibit 159.
 3         MR. WYATT:  May I ask if it has been admitted?  It
 4   has?
 5   Q.  (BY MR. WYATT)  We'll show it to you on the monitor.
 6         MR. WYATT:  May I approach, Your Honor?
 7         THE COURT:  You may.
 8   A.  If that was part of the TRACIS report that I received, but
 9   I don't recall --
10         MR. ALLEN:  Cindy, could you --
11   A.  -- if it was or not.
12         MS. HARRIS:  Just so the record is clear, I believe
13   this is part of government's exhibit 33-c-1.  It's apparently
14   been introduced twice.
15         THE COURT:  Okay.  In any event, it's admitted.  So we
16   need to get the monitors up.
17   Q.  (BY MR. WYATT)  Ma'am, does it appear to you that these are
18   two tickets issued to Jose Angel Gonzalez?
19   A.  That's what it looks like.
20   Q.  And would you read the names of the officers who appear at
21   the bottom of each ticket.
22   A.  The ticket on the left is Nelson and Hickey.  And the
23   ticket on the right is Nelson and Hickey.
24   Q.  And I believe also Sergeant Steve Castleberry?
25   A.  Yes, Steve Castleberry's name appears in the -- two-thirds
```

U.S. District Court
Northern District of Oklahoma

1  of the way down on the ticket on the right and -- I don't have

2  my glasses.  Is that --

3  Q.  I believe it's the same.

4  A.  Is that Castleberry?

5  Q.  Yes, ma'am.

6  A.  Okay.  It looks like some of it has been cut off.

7  Q.  And it appears that these are consecutively numbered

8  tickets?

9  A.  Yes, sir.

10 Q.  And the date of the ticket appears to be -- September 17,

11 2007; does that look to be right?

12 A.  9-17-07?  Yes, sir.

13         MR. WYATT:  Could I have just a moment, Your Honor?

14         THE COURT:  Yes, sir.

15 Q.  (BY MR. WYATT)  It's a fair statement to say that from your

16 independent recollection you do not know whether these tickets

17 issued by Mr. Castleberry have anything to do with the

18 investigation of Jose Angel Gonzalez; would that be fair?

19 A.  That's correct.

20 Q.  And would it be fair to state that the TRACIS report for

21 the investigation serving the warrant at his house was nine

22 days after the traffic ticket?

23 A.  If it was dated September 26th and that's the 17th, that

24 would be correct.

25 Q.  Okay.  And you indicated that Brandon McFadden sent you the

JAN REINCKE - CROSS (By Mr. Wyatt)                          1399

1   document that was marked as defendants' exhibit 185, I believe

2   it was admitted under that number, the April 1, 2009, e-mail?

3   A.  Is that the one I have in front of me?

4   Q.  Yes, ma'am, I believe it is.

5   A.  Yes.

6   Q.  And it had all of those names attached, and you said all of

7   those were federal cases; is that correct?

8   A.  That's correct, yes.

9   Q.  And you may or may not have talked with him about state

10  cases?

11  A.  The only thing I -- I don't recall talking with him about

12  specific state cases but I remember him telling that

13  Mr. Logsdon -- telling me that Mr. Logsdon had cooperated in a

14  number of state cases as well as federal cases.

15  Q.  And if we go down toward the bottom of that, I've blown it

16  up on the screen so the jury can see it, he says that, "There

17  were so many and lots of them were Mexicans"; is that correct?

18  About half way down, ma'am.

19  A.  Half way down on the e-mail?

20  Q.  On the e-mail, yes, ma'am.

21       THE COURT:  I have an extra pair of cheaters if you

22  need them.

23  Q.  (BY MR. WYATT)  It begins with the sentence, "It is hard to

24  remember how many cases.  There were so many and lots of them

25  were Mexicans."

JAN REINCKE - CROSS (By Mr. Wyatt)                                    1400

```
 1              MR. WYATT:  May I approach, Your Honor?

 2              THE COURT:  Yes, sir.

 3              THE WITNESS:  Cheaters?  Ah-ha.

 4    Q.  (BY MR. WYATT)  We're looking at different e-mails.

 5    A.  Oh, no wonder.

 6              MR. WYATT:  I believe defendants' exhibit 185 has been

 7    previously admitted; is that correct?

 8    A.  I see what you're saying.  Yes, that's correct.  "It is

 9    hard to remember" --

10              THE DEPUTY COURT CLERK:  Yes, it's admitted.

11              MR. WYATT:  185 is admitted?

12              THE DEPUTY COURT CLERK:  Isn't that the one we just

13    talked about?  Admitted.  Stipulated.

14    A.  I see where you are.  Yes, that's correct.

15    Q.  (BY MR. WYATT)  Okay.  Now we're on the same document?

16    A.  Right.

17    Q.  I'm sorry.

18    A.  That's quite all right.

19    Q.  And then just below that, it says, "I would say there were

20    25 to 35 federal cases."

21    A.  That's correct.

22    Q.  And then he says, "Maybe 50 cases in state court"?

23    A.  That's correct.

24    Q.  "And to my knowledge he's still working on these cases"?

25    A.  "To my knowledge he's still working with those guys."
```

JAN REINCKE - CROSS (By Mr. Wyatt)                                1401

```
 1   Q.  And what's the second-to-last sentence read?

 2   A.  "I know he put himself out there for us and produced like

 3   no other."

 4   Q.  And that's referring to Ryan Logsdon?

 5   A.  Yes.

 6   Q.  He produced like no other?

 7   A.  That's what he's saying.

 8   Q.  Were you familiar with a case involving Corey Fields?

 9   A.  No.  I know the name.

10   Q.  How do you know that name, ma'am?

11   A.  Mr. McFadden told me that Corey Fields was on their radar

12   for purposes of possible federal charges because he was dealing

13   large quantities of methamphetamine.

14   Q.  And, in fact, you talked with the Office of Inspector

15   General about Corey Fields, didn't you?

16   A.  I don't recall.

17   Q.  I apologize.  How about Shane Fields?

18   A.  Yes.

19   Q.  You're familiar with Shane Fields?

20   A.  I prosecuted Shane Fields.

21   Q.  Do you know his brother to be Corey?

22   A.  No, I don't think they're related.

23   Q.  Okay.  Fair enough.  Then I'll move on then.  I apologize.

24       Now, you talked about the PSR for Jose Angel Gonzalez.

25   It's already come back; correct?
```

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - CROSS (By Mr. Wyatt)                          1402

1   A.  Yes.

2   Q.  And do you know what the sentencing guideline range was?

3   A.  I don't recall.  I haven't reviewed it in a long time.

4   Q.  Generally speaking, sentences in this district are meted

5   out approximately 30 days after the final presentence

6   investigation report; is that correct?

7   A.  No; actually the judges -- after a plea or finding of

8   guilty, judges continue cases normally for 90 days.

9   Q.  Correct.  That's in order to get the PSR?

10  A.  Yes.

11  Q.  And then once the presentence investigation report is

12  completed, the parties have 14 days to respond?

13  A.  Yes.

14  Q.  And then a final PSR comes out within another two or three

15  weeks?

16  A.  I believe it's the week before the sentencing date.

17  Q.  Okay.  Have you received a final presentence investigation

18  report or just the first draft?

19  A.  I don't recall.  I don't know that answer either.

20  Q.  Okay.  Fair enough.

21     My next question would be then is:  When did you receive

22  the PSR?  How many weeks or months or days ago?

23  A.  Well, the first one would have been within 35 to 40 days

24  probably after the pleas.  And if there has been a revised

25  report, it would have been within the same time frame before

1  the scheduled sentencing.

2  Q.  Okay.  Let me ask you this:  Has the sentencing been put

3  off in any way to allow Jose Angel Gonzalez to cooperate in

4  this case?

5  A.  It has been continued a number of times, yes.

6  Q.  Okay.  So the government is continuing -- the government,

7  meaning your office, is continuing that so that he can testify

8  in this case?

9  A.  I believe the motions have been filed by his attorney and

10 we have not objected.

11 Q.  Okay.  But the purpose is to allow him to testify in this

12 case; correct?

13 A.  That's my understanding, yes.

14 Q.  And that is so he will have an opportunity to benefit from

15 his cooperation in this case?

16 A.  Yes.

17 Q.  Okay.  And that is something and one of the factors that

18 you will consider in determining whether to recommend a motion

19 under 5K -- what is it -- 1.1?

20 A.  Yes.

21 Q.  And that's called a motion for downward departure or

22 variance?

23 A.  Based on substantial assistance, correct.

24 Q.  And based on that substantial assistance in an ongoing

25 investigation, the U.S. Attorney's Office has the opportunity

1  to recommend a reduced sentence?

2  A.  Yes.

3  Q.  And once you have filed that recommendation with the court,

4  whoever the sentencing judge is in that given case, and I don't

5  know who it is, but whoever that judge is, they may go all the

6  way down to probation; correct?

7  A.  Unless there is a minimum mandatory and the government

8  doesn't recommend that there is -- doesn't recommend a sentence

9  below a minimum mandatory.

10  Q.  And in this given case, there's not a minimum mandatory, is

11  there?

12  A.  No.

13  Q.  Okay.  Now, you indicated a few moments ago that in 2007

14  you really wanted to prosecute Ryan Logsdon?

15  A.  Yes.

16  Q.  And are you familiar with all of his drug activity?

17  A.  I wasn't then.  I don't know that I am now but I know that

18  Mr. McFadden told me that he was cooperating, and doing a very

19  good job at it, and wanted to let him do as much as he could

20  before he was required to come in and plead.

21  Q.  Okay.  And if he is --  Has there been any effort by the

22  United States Attorney for the Northern District of Oklahoma

23  here in Tulsa to prosecute Ryan Logsdon?

24  A.  No.

25  Q.  Is there any agreement not to do that?

JAN REINCKE - CROSS (By Mr. Wyatt)                    1405

1    A.   No.

2    Q.   Okay.  Do you intend to prosecute him?

3    A.   No.

4    Q.   Why is that?

5    A.   That's been turned over to the special prosecutor.

6    Q.   Meaning the people at this table?

7    A.   Well, I'm not involved with Ryan Logsdon, and I don't know

8    that I could prosecute him because of Giglio-impaired

9    witnesses.

10   Q.   Okay.  But my question is:  You said that was turned over

11   to the special prosecutor?

12   A.   Well, not turn- -- we provided information to the special

13   prosecutor, and as the Gonzalez case was -- the gun case was

14   dismissed, we're recused from all those cases.  So I've not

15   prosecuted him and at this point don't know that I can.

16   Q.   So your office has withdrawn voluntarily is what you mean

17   by recused?

18   A.   Yes.

19   Q.   And, as a result of that, they don't have any influence or

20   aren't participating in any decisions with respect to Ryan

21   Logsdon?

22   A.   Who's "they"?

23   Q.   Your office.

24   A.   Not at this point, no.

25   Q.   Okay.  Is there a point where that can become an issue

JAN REINCKE - CROSS (By Mr. Wyatt)                                    1406

```
 1   again?

 2   A.  That, I don't know.

 3   Q.  Okay.

 4   A.  That's not a decision that I can independently make.

 5   Q.  Okay.  Let me ask you, ma'am, in a drug case that has 20 or

 6   25 pounds of methamphetamine, a person would be looking at

 7   something like a level 38 in their guidelines, wouldn't they?

 8   A.  I don't -- no, I don't think so.  15 kilograms, I believe,

 9   is the top, and 25 pounds would be a little under 11 kilos.  So

10   I believe 15 kilos and more is a level 38; five to 15 would be

11   a level 36.  So it would be a level 36.

12   Q.  Okay.  And if a person has distributed in excess of 25

13   pounds, 10 kilos, 11 kilos, so to speak, and their plea

14   agreement limits their punishment to a maximum of 500 grams,

15   there would be a substantial reduction as a result of that

16   limitation, wouldn't there?

17   A.  It's not that simple.

18   Q.  The difference between the 15 -- or the 11 kilos and a

19   maximum of 500 grams would be at least six levels on the

20   sentencing guidelines; correct?

21   A.  Perhaps.  But it all depends on a lot of things.

22   Q.  Sure.  There are additions, subtractions, enhancements --

23   A.  Right.

24   Q.  -- and reductions?

25   A.  And relevant conduct.
```

U.S. District Court
Northern District of Oklahoma

1  Q.  Starting on the base level alone, that would be a big

2  difference; correct?

3  A.  Yes.

4  Q.  Okay.  And you don't dispute there would be a six-level

5  difference on the base?

6  A.  If you say so, but without looking at the guidelines I

7  wouldn't say for sure.

8  Q.  Fair enough.  I understand that.  They're complicated,

9  aren't they?

10  A.  Well, they're not something I've committed to memory.

11  Q.  Okay.  Fair enough, ma'am.

12     To your knowledge, have you seen all of the police reports

13  for the Jose Angel Gonzalez case?

14  A.  Which one?

15  Q.  For the gun case.

16  A.  To the best of my knowledge, I have, yes.

17  Q.  Okay.  And can you tell me, was Jose Angel Gonzalez present

18  when the officers served the search warrant and found the gun?

19  A.  No, I don't believe so.

20  Q.  So if Brandon McFadden took the witness stand and said,

21  "You should have seen Jose Angel Gonzalez's face when they

22  found that shotgun," that couldn't have happened, could it?

23  A.  I don't know.  I haven't read the report in quite some

24  time.  If it was in the report that he was there, then -- but

25  that's not something that I would have --

JAN REINCKE - CROSS (By Mr. Wyatt)                                1408

1   Q.   I don't believe it's in the report.

2   A.   I would not have committed that to memory.

3   Q.   Okay.

4        MR. WYATT:  Your Honor, may I have just a moment,

5   please, sir?

6        THE COURT:  Yes.

7   Q.   (BY MR. WYATT)  I'm going to refer you back to defendants'

8   exhibit 185, the e-mail, and the attachment.

9   A.   Now, the attachment, is that the list of cases?

10  Q.   Yes, ma'am.

11  A.   Okay.

12  Q.   Do you know whether Ryan Logsdon participated in any of

13  those things?

14  A.   I know that he participated in Avery Brewer.  I did not

15  know that he provided information in Dustin Eastom until I got

16  this list because it was -- the case was Leland Ashley's cases

17  and Officers Henderson, McFadden and Khalil, I believe, was

18  there as backup to Officer Ashley, and I can't recall who was

19  with him at the time.

20      I did not know about Barnes or Williams, obviously.

21      And there may have been one other one, but I don't recall,

22  knowing that Ryan Logsdon was involved in all of these cases.

23  Q.   Okay.  Did you ever get an e-mail from Kevin Adams

24  regarding the Barnes case and Ryan Logsdon's participation in

25  that?

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - CROSS (By Mr. Wyatt)                                1409

1   A.   I may have.   I don't remember.

2         MR. WYATT:   May I approach one more time, Your Honor?

3         THE COURT:   You may.

4   Q.   (BY MR. WYATT)   May I see the other e-mail that you

5   received?   I don't believe I have a copy of it.

6        And I'll ask you while I'm here:   Are these two separate

7   e-mails?

8   A.   Yes.   This one is dated October 27th, 2008, and that was in

9   reference to an e-mail I sent to Mr. McFadden about

10  Mr. Gonzalez's cooperation based on a conversation with

11  Gonzalez's attorney.

12       And this is Mr. McFadden's -- or this is my e-mail to

13  Mr. McFadden about getting a list of the names of all the cases

14  in which Ryan Logsdon was involved, as I recall.

15  Q.   Okay.   So, just so I understand it, the April 1 e-mail that

16  you sent to Ryan Logsdon at noon --

17  A.   To Brandon McFadden.

18  Q.   Excuse me.   -- to Brandon McFadden, there was a response to

19  that which is my defendants' exhibit 185 about 8 p.m. that

20  night?

21  A.   Yes.

22  Q.   Okay.   Thank you.   Just one moment, please.

23       This e-mail with respect to Angel Gonzalez with respect to

24  his cooperation in Jose Rivas and Yohn Gomez, do you have any

25  indication as to whether that information is true and accurate?

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - CROSS (By Mr. Allen)                            1410

1   A.  He provided information but the information was not used in

2   connection with a search warrant that resulted in the seizure

3   of methamphetamine.

4   Q.  Okay.  And with respect to the list of cases that Brandon

5   McFadden sent to you, if Ryan Logsdon told this jury that he

6   did not give some of those names that McFadden e-mailed to you,

7   who would you believe, Ryan or Brandon?

8            MS. HARRIS:  Object to the question.

9            THE COURT:  Sustained.

10           MR. WYATT:  Nothing further, Your Honor.

11      I will return these two documents.

12           THE COURT:  Mr. Allen?

13                       CROSS-EXAMINATION

14   BY MR. ALLEN:

15   Q.  Hello, Ms. Reincke.

16   A.  Hi.

17   Q.  You mentioned that Bill Yelton would have been Giglio

18   material on Jose Angel Gonzalez.  He wasn't on the tickets that

19   you saw; right?

20   A.  Right.

21   Q.  He wasn't on the warrant; right?

22   A.  Right.

23   Q.  Just because he was present during the execution of the

24   search warrant, is that why?

25   A.  Yes.

JAN REINCKE - CROSS (By Mr. Allen)                              1411

1    Q.  Would you have had to submit Giglio material on Frank

2    Khalil?

3    A.  If I was going to call him as a witness, yes.

4    Q.  What about Sean Hickey?

5    A.  If I was going to call him as a witness, yes.

6    Q.  Neither of whom are indicted?

7    A.  Neither of whom are indicted.

8    Q.  Do you ever get information from the AllStar system?

9    A.  Not personally.  I believe I've received a couple of

10   reports since it was installed and utilized two years ago, but

11   it's usually the same information that I've already received in

12   police reports.

13   Q.  And so does the person who is named as one of the sources

14   of information in AllStar go into your decision about whether

15   or not to charge someone?

16   A.  I don't understand your question.

17   Q.  So at some point, as the Assistant United States Attorney,

18   you make decisions about whether to proceed toward an

19   indictment; right?

20   A.  Right.

21   Q.  Do you ever request to know who is listed as a source in

22   AllStar before you determine whether somebody should be

23   indicted?

24   A.  You mean the source of information?

25   Q.  Yes.

JAN REINCKE - CROSS (By Mr. Allen)                              1412

1   A.   Confidential informant?

2   Q.   Right.

3   A.   No.

4   Q.   You've never asked?

5   A.   No.

6   Q.   Has anybody ever told you in advance to help you make that

7   decision?

8   A.   No.

9   Q.   Okay.  Is AllStar information information that you provide

10  to the defendant in cases when you've charged -- whenever

11  someone has been indicted?

12       MS. HARRIS:  Your Honor, I don't think there's been a

13  foundation that she ever received it to provide it.  I would

14  request that a foundation --

15       THE COURT:  You said you've seen it once.  All right.

16  Overruled.

17  A.   Not that I recall, no.

18  Q.   (BY MR. ALLEN)  You said that you wouldn't be able to

19  indict or you may not be able to prosecute Ryan Logsdon due to

20  the Giglio-impaired witnesses.  Now, is that only regarding the

21  charges that you knew of or the potential charges that you knew

22  of when you were in charge of his case, I should say?

23  A.   Well, at the time that his case -- that he was involved in

24  the Avery Brewer case, which was a result of the search warrant

25  at his house, I wasn't aware of any charges.  But to prosecute

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - CROSS (By Mr. Allen)                                    1413

1   him today, Giglio material would be required to be given to the

2   defense attorneys based upon the witnesses that I would need to

3   testify in any prosecution of what happened in 2007.

4   Q.  So that would only apply to those things that happened in

5   2007, is what you're saying?

6   A.  For the case that I would prosecute, yes.

7   Q.  Okay.  So if he had done -- if the FBI had done controlled

8   buys on him that didn't involve Jeff Henderson or Bill Yelton

9   or Brandon McFadden, then you could indict on those things;

10  right?

11          MS. HARRIS:  I'd object; I think she stated that they

12  don't have the case any more and she doesn't intend to indict

13  him.

14          THE COURT:  Overruled.

15  A.  I can't give a specific answer to that because I haven't

16  seen a case and I haven't seen the facts and I haven't seen who

17  all is involved.  It's a little more complicated than that.

18  Q.  Did I hear you testify earlier that you can recommend a

19  sentence lower than the statutory mandatory minimum?

20  A.  If we file under 3582(c).

21  Q.  And so if somebody has a charge that has a five year

22  mandatory statutory minimum, you may be able to actually get

23  them a lower sentence?

24  A.  Yes; 18 United States Code Section 3582(c) provides that if

25  the government asks the court to go below the minimum

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - CROSS (By Mr. Allen)                              1414

1   mandatory, that a court can do so in such a case.

2   Q.  What would influence you to file such a motion?

3   A.  It would depend on a defendant's criminal history; it would

4   depend on the charges for which he or she was indicted and/or

5   pleaded guilty; it would depend on the circumstances

6   surrounding those charges, whether or not there were any

7   victims, whether it was a large amount of controlled substances

8   if, in fact, it was; whether there was a large amount of guns

9   involved; the type of cooperation that had been provided.

10  There's just a whole lot of factors that go into a

11  recommendation.  It's not the same for everybody.  It depends.

12  Q.  Does the level of cooperation have a high priority on those

13  factors?

14  A.  Yes.

15  Q.  So the more a person helps to prosecute a defendant, the

16  more likely they are to get one of those motions?

17  A.  It depends on the cooperation, and it depends on the type

18  of cooperation.  Somebody who puts themselves in a position and

19  goes out and makes controlled buys, somebody who makes phone

20  calls, somebody who introduces an undercover officer to a drug

21  supplier versus giving information that leads to the execution

22  of a search warrant, or makes a phone call without putting

23  themselves in harm's way perhaps, or making a face-to-face, all

24  of those things go into it.  It's just not something you can

25  quantify by saying, yeah, this person is going to get more

JAN REINCKE - CROSS (By Mr. Allen)                              1415

1   because, or this person will let less because.  We do it on a

2   case-by-case basis.

3   Q.  Would testifying at trial be on the more put-yourself-out-

4   there side of things?

5   A.  Yes; testifying at trial, testifying in grand jury.

6   Q.  Would it be true that one person who may not even be

7   indicted can help out a person who is indicted or who has been

8   sentenced?

9   A.  That's possible.  For me, it has to be the individual who

10  is not indicted.  The person who is indicted has to be able to

11  do the same thing the person not indicted is doing but for the

12  fact the indicted person is incarcerated or indicted.  It's

13  not -- you can't -- a defendant can't call somebody up and say,

14  "Hey, can you get some good points on my sheet and go help the

15  police?"  It's got to be more than that.

16  Q.  Like testifying at trial?

17  A.  Well, yeah, but it has to be doing what the defendant who's

18  looking for the cooperation could do but for the fact he's a

19  defendant and perhaps incarcerated or not allowed to do

20  whatever it is the cooperation is.

21  Q.  Now, isn't it true that before the OIG or FBI or anyone

22  came to talk to you about Jose Angel Gonzalez, that Julie

23  O'Connell had actually approached you about his same

24  allegations?

25  A.  What allegations?

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - REDIRECT (By Ms. Harris)                    1416

1   Q.  About Jose Angel Gonzalez's allegations that Brandon

2   McFadden was not on the up and up when it came to drug deals?

3   A.  No; the first time I heard about any allegation that

4   Mr. McFadden was not an honest cop was from my U.S. attorney

5   and from my first assistant.

6   Q.  Had you not heard about it from Julie O'Connell?

7   A.  No.

8   Q.  Never mind.  I was mistaken.

9           MR. ALLEN:  I have no other questions.

10          THE COURT:  Redirect?

11          MS. HARRIS:  Thank you, Your Honor.

12      May I approach?

13          THE COURT:  You may.

14                      REDIRECT EXAMINATION

15  BY MS. HARRIS:

16  Q.  I just have a few questions about these e-mails.

17  A.  Uh-huh.

18  Q.  Specifically, --

19  A.  He kept the list.

20          MS. HARRIS:  Mr. Wyatt, you took the e-mail and the

21  list.

22          MR. WYATT:  Kept my copy.  Defendant's 185.

23          MS. HARRIS:  185.

24  Q.  (BY MS. HARRIS)  This is the e-mail from Brandon McFadden

25  to you on April 1, '09?

U.S. District Court
Northern District of Oklahoma

JAN REINCKE - REDIRECT (By Ms. Harris)                    1417

1   A.  Right.

2   Q.  And that was the one in response to your request for

3   information about Ryan Logsdon's cooperation?

4   A.  That's correct.

5   Q.  Okay.  And I think you were asked about some of the

6   information.  Okay.  Can you just read the whole document,

7   because I don't think all of it has actually been read into the

8   report.

9   A.  Sure.

10     "Hey there.  Yes, we all think Ryan has worked off his

11  charges and the case needs to be closed."

12  Q.  What did you understand that to mean?

13  A.  That there shouldn't be a prosecution of Mr. Logsdon.

14  Q.  And when he says, "Yes, we all think Ryan has worked off

15  his charges," who is "we"?  Who are "we"?

16          MR. WYATT:  I would object unless she can lay a

17  foundation.

18  Q.  (BY MS. HARRIS)  Do you know who that is referring to?

19          THE COURT:  Lay the foundation.

20          MS. HARRIS:  I'm sorry, Judge.

21          THE COURT:  That's all right.  Go ahead.

22  A.  Yes; I believed he was talking about Jeff Henderson and --

23  well, Jeff Henderson.

24  Q.  Okay.

25          MR. WYATT:  Your Honor, I again object.  That calls

U.S. District Court
Northern District of Oklahoma

1   for speculation.  There's been no foundation laid as to why she

2   believes that.

3   Q.  (BY MS. HARRIS)  Why did you think he was referring to

4   himself and Jeff Henderson?

5   A.  Because he worked the majority of his cases with Jeff

6   Henderson and brought them, at least the cases that I

7   prosecuted.  The majority of the cases that he worked with Jeff

8   Henderson, he brought to me.

9   Q.  Okay.  And then what's the next line?

10  A.  "Avery Brewer and the Barnes clan are the cases where he

11  was the most involved in.  I think he testified at Brewer's

12  sentencing and I know he testified and was the government's

13  star witness at the Barnes trial.  It is hard to remember how

14  many cases.  There were so many and lots of them were

15  Mexicans.  I would say that there were over 25 to 35 federal

16  cases that was the RCI.  I would say approximately 50 cases in

17  state court."

18  Q.  And the list that he gave you, were those just the federal

19  cases?

20  A.  Yes.

21  Q.  Okay.  It didn't include the 50 cases in state court?

22  A.  No.

23  Q.  And after the sentence he says, "I would say approximately

24  50 cases in state court," what does he say?

25  A.  "To my knowledge he is still working with those guys."

JAN REINCKE - REDIRECT (By Ms. Harris)                1419

```
 1   Q.  Who are "those guys"?
 2   A.  I assumed he meant --
 3           MR. WYATT:  I object to her assumption.
 4           THE COURT:  Sustained.
 5   Q.  (BY MS. HARRIS)  What did you understand "those guys" to
 6   mean when he referred to "those guys"?
 7   A.  Jeff Henderson --
 8           MR. WYATT:  Your Honor, I would object to her
 9   understanding without a foundation.  It's speculation.
10           THE COURT:  As to her, I'll overrule it.
11   A.  Jeff Henderson and J.J. Gray.
12      "I know he put himself out there for us and produced like
13   no other.  Have a great evening."
14   Q.  (BY MS. HARRIS)  And on the list of cases that he provided
15   to you that you reviewed earlier, --
16   A.  Uh-huh.
17   Q.  -- is the name Juan Mata on that list?
18   A.  Yes.
19   Q.  Nelson Arias?
20   A.  It's Arias, Nelson, but yes, it's transposed.
21   Q.  Alphie McKinney?
22   A.  Yes.
23   Q.  Were you aware that Mr. Henderson documented Rochelle
24   Martin as the RCI on those cases?
25   A.  No.
```

JAN REINCKE - REDIRECT (By Ms. Harris)                          1420

1           MR. WYATT:  Your Honor, I object to that.  She's

2    testifying.

3           THE COURT:  Overruled.

4    Q.  (BY MS. HARRIS)  Ms. Reincke, you were asked some questions

5    about cooperation and the number of factors you had to

6    consider.  Who makes --  If you decide you're going to ask for

7    a reduction in somebody's sentence, and you file a motion

8    asking for that, who makes the decision whether the defendant

9    gets a reduction?

10   A.  The sentencing judge.

11   Q.  Okay.  Can the sentencing judge ignore your memo?

12   A.  Yes.

13   Q.  Can the sentencing judge give more of a reduction than you

14   request?

15   A.  Yes, unless I've not requested that he go below the minimum

16   mandatory.

17   Q.  Can the sentencing judge give a higher sentence than you

18   request?

19   A.  Yes.

20   Q.  Can the sentencing judge give a sentence all the way up to

21   the maximum statutory imprisonment time?

22   A.  Yes.

23   Q.  Regardless of whether you file a motion to reduce the

24   sentence?

25   A.  That's correct.

1    Q.   Okay.  Now, in your experience and practice, if you find

2    that a defendant who cooperates is not truthful, do you request

3    that the court give them a reduction in their sentence?

4    A.   No.

5             MS. HARRIS:   Thank you.

6             THE COURT:   Thank you.  Any reason this witness may

7    not be excused?

8             MR. ALLEN:   No, Your Honor.

9             THE COURT:   You may step down, Ms. Reincke.

10       Ladies and gentlemen, we'll take our evening recess at this

11   point.  I'll again remind you not to discuss the case with

12   anyone, don't do any research, don't listen to or read any

13   media coverage, and don't reach any conclusions until you've

14   heard all the evidence.

15       Court will be in recess.

16       (THE EVENING RECESS WAS TAKEN)

17       (PLEASE REFER TO VOLUME VII)

18

19

20

21

22

23

24

25

1422

1     **REPORTERS' CERTIFICATION**

2        WE CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4
                          CERTIFIED:    *s/Greg Bloxom*_____
5                                       Greg Bloxom, RMR, CRR
                                        United States Court Reporter
6                                       333 W. 4th Street, RM 4-548
                                        Tulsa, OK 74103
7                                       (918)699-4878
                                        greg_bloxom@oknd.uscourts.gov
8
                          CERTIFIED:    *S/Terri Beeler*_____
9                                       Terri Beeler, RMR, FCRR
                                        United States Court Reporter
10                                      333 W. 4th Street
                                        Tulsa, OK 74103
11                                      (918)699-4877
                                        terri_beeler@oknd.uscourts.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. District Court
Northern District of Oklahoma